1   <u>**PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**</u>

*FILED*

*JUL 2 8 2008*

2   Name  BROWN, Charles Lloyd

*RICHARD W. WIEKING*
*CLERK, U.S. DISTRICT COURT*

3   ‾‾‾‾‾‾(Last)‾‾‾‾‾‾‾‾‾‾‾(First)‾‾‾‾‾‾‾‾(Initial)   *NORTHERN DISTRICT OF CALIFORNIA*

Prisoner Number  E-25371

4   Institutional Address  Correctional Training Facility, P.O. Box 689,

5   East Dorm 153-Low, Soledad, CA. 93960-0689   **(PR)**

6   ======================================================

7   **UNITED STATES DISTRICT COURT**
    **NORTHERN DISTRICT OF CALIFORNIA**

8   CHARLES BROWN

    (Enter the full name of plaintiff in this action.)   CV } 08       3596

9

10                      vs.                     Case No. _____

                                                (To be provided by the clerk of court)

11  Ben Curry, Warden
                                                **PETITION FOR A WRIT**
12  _____           **OF HABEAS CORPUS**

13  _____

    _____
14  (Enter the full name of respondent(s) or jailor in this action.)

15  _____

16  ======================================================

    <u>**Read Comments Carefully Before Filling In**</u>

17  <u>**When and Where to File**</u>

18      You should file in the Northern District if you were convicted and sentenced in one of these

19  counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20  San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21  this district if you are challenging the manner in which your sentence is being executed, such as loss of

22  good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23      If you are challenging your conviction or sentence and you were <u>not</u> convicted and sentenced in

24  one of the above-named fifteen counties, your petition will likely be transferred to the United States

25  District Court for the district in which the state court that convicted and sentenced you is located. If

26  you are challenging the execution of your sentence and you are not in prison in one of these counties,

27  your petition will likely be transferred to the district court for the district that includes the institution

28  where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS        - 1 -

<u>Who to Name as Respondent</u>

You must name the person in whose actual custody you are. This usually means the Warden or jailor. Do not name the State of California, a city, a county or the superior court of the county in which you are imprisoned or by whom you were convicted and sentenced. These are not proper respondents.

If you are not presently in custody pursuant to the state judgment against which you seek relief but may be subject to such custody in the future (e.g., detainers), you must name the person in whose custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack was entered.

## A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

1. What sentence are you challenging in this petition?

    (a)  Name and location of court that imposed sentence (for example; Alameda County Superior Court, Oakland):

    Superior Court of CA.          Placer County

    Court                          Location

    (b)  Case number, if known ___1259___

    (c)  Date and terms of sentence ___July 17, 1989, 17 yrs. to life___

    (d)  Are you now in custody serving this term? (Custody means being in jail, on parole or probation, etc.)    Yes _xxx_    No _____

    Where?

    Name of Institution: CORRECTIONAL TRAINING FACILITY

    Address: P.O. Box 689, Soledad, CA. 39960-0689

2. For what crime were you given this sentence? (If your petition challenges a sentence for more than one crime, list each crime separately using Penal Code numbers if known. If you are challenging more than one sentence, you should file a different petition for each sentence.)

Penal Code §§187,1203.69(a)(1), 12022(a)(b)

_____

_____

PET. FOR WRIT OF HAB. CORPUS        - 2 -

3.  Did you have any of the following?

    Arraignment:                         Yes _xxx_     No _____

    Preliminary Hearing:             Yes _xxx_     No _____

    Motion to Suppress:             Yes _xxx_     No _____

4.  How did you plead?

    Guilty _____    Not Guilty _xxx_    Nolo Contendere _____

    Any other plea (specify) _____

5.  If you went to trial, what kind of trial did you have?

    Jury _xxx_    Judge alone _____    Judge alone on a transcript _____

6.  Did you testify at your trial?         Yes _xxx_     No _____

7.  Did you have an attorney at the following proceedings:

    (a)    Arraignment            Yes _xxx_     No _____

    (b)    Preliminary hearing     Yes _xxx_     No _____

    (c)    Time of plea           Yes _xxx_     No _____

    (d)    Trial                 Yes _xxx_     No _____

    (e)    Sentencing            Yes _xxx_     No _____

    (f)    Appeal               Yes _xxx_     No _____

    (g)    Other post-conviction proceeding    Yes _xxx_     No _____

8.  Did you appeal your conviction?      Yes _xxx_     No _____

    (a)    If you did, to what court(s) did you appeal?

        Court of Appeal         Yes _xxx_     No _____

        Year: _1989_    Result: _Denied_____

        Supreme Court of California    Yes _xxx_     No _____

        Year: _N/A_    Result: _Denied_____

        Any other court         Yes _xxx_     No _____

        Year: _N/A_    Result: _Denied_____

    (b)    If you appealed, were the grounds the same as those that you are raising in this

PET. FOR WRIT OF HAB. CORPUS      - 3 -

petition?                                              Yes _____    No x x x

(c)   Was there an opinion?                            Yes _____    No_____

(d)   Did you seek permission to file a late appeal under Rule 31(a)?

                                                       Yes _____    No x x x

If you did, give the name of the court and the result:

_____

_____

9. Other than appeals, have you previously filed any petitions, applications or motions with respect to this conviction in any court, state or federal?    Yes _____    No x x x

        [Note:  If you previously filed a petition for a writ of habeas corpus in federal court that challenged the same conviction you are challenging now and if that petition was denied or dismissed with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit for an order authorizing the district court to consider this petition.  You may not file a second or subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit.  28 U.S.C. §§ 2244(b).]

        (a)   If you sought relief in any proceeding other than an appeal, answer the following

              questions for each proceeding.  Attach extra paper if you need more space.

              I.    Name of Court: _____

                    Type of Proceeding: _____

                    Grounds raised (Be brief but specific):

                          a._____

                          b._____

                          c._____

                          d._____

                    Result: _____Date of Result:_____

              II.   Name of Court: _____

                    Type of Proceeding: _____

                    Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS              - 4 -

a._____

b._____

c._____

d._____

Result: _____ _____Date of Result:_____

III.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

IV.    Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a._____

b._____

c._____

d._____

Result: _____Date of Result:_____

(b)    Is any petition, appeal or other post-conviction proceeding now pending in any court?

Yes _____    No_____

Name and location of court: _____

B. GROUNDS FOR RELIEF

State briefly every reason that you believe you are being confined unlawfully.  Give facts to

support each claim.  For example, what legal right or privilege were you denied?  What happened?

Who made the error?  Avoid legal arguments with numerous case citations.  Attach extra paper if you

PET. FOR WRIT OF HAB. CORPUS            - 5 -

1  need more space. Answer the same questions for each claim.

2      [Note: You must present ALL your claims in your first federal habeas petition. Subsequent

3  petitions may be dismissed without review on the merits. 28 U.S.C. §§ 2244(b); McCleskey v. Zant,

4  499 U.S. 467, 111 S. Ct. 1454, 113 L. Ed. 2d 517 (1991).]

5      Claim One:__ SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS

6  _____

7  Supporting Facts:SEE ATTACHED PETITION

8  _____

9  _____

10 _____

11     Claim Two:__ SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS

12 _____

13 Supporting Facts:__ SEE ATTACHED PETITION

14 _____

15 _____

16 _____

17     Claim Three:_SEE ATTACHED PETITION FOR WRIT OF HABEAS CORPUS

18 _____

19 Supporting Facts:_SEE ATTACHED PETITION

20 _____

21 _____

22 _____

23     If any of these grounds was not previously presented to any other court, state briefly which

24 grounds were not presented and why:

25 _____

26 _____

27 _____

28 _____

PET. FOR WRIT OF HAB. CORPUS        - 6 -

1        List, by name and citation only, any cases that you think are close factually to yours so that they

2    are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3    of these cases:

4    SEE ATTACHED MEMORANDUM OF POINTS AND AUTHORITIES

5    _____

6    _____

7    Do you have an attorney for this petition?                    Yes_____    No<u>x x x</u>

8    If you do, give the name and address of your attorney:

9    _____

10       WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11   this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13   Executed on _July 17, 2008_                    _Charles Brown_

14               Date                                        Signature of Petitioner

15

16

17

18

19

20   (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS          - 7 -

# EXHIBIT 1

FILED
SUPERIOR COURT OF CALIFORNIA
COUNTY OF PLACER

JAN 08 2008

JOHN ___
EXECUTIVE OFFICER & CLERK
By _____
Deputy

SUPERIOR COURT OF CALIFORNIA

COUNTY OF PLACER

In the Matter of the Petition of      ) Case No. 737
                                      )
                                      )
                                      ) RULING ON MOTION TO RECONSIDER DENIAL
CHARLES BROWN                         ) OF PETITION FOR WRIT OF HABEAS CORPUS
                                      )
                                      )
                                      )
For Writ of Habeas Corpus            )
                                      )

     Defendant's Petition for Writ of Habeas Corpus was denied by a ruling

filed on June 26, 2007.  Petitioner subsequently filed a Motion for

Reconsideration of the order denying his petition.

     The Motion for Reconsideration is hereby denied.

                              Dated this 7th day of January, 2008

                              _____
                              Robert P. McElhany,
                              Judge of the Superior
                              Court

- 1

**EXHIBIT 2**

IN THE

# Court of Appeal of the State of California

IN AND FOR THE

## THIRD APPELLATE DISTRICT

# F I L E D

MAR 1 3 2008

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

BY_____ Deputy

In re CHARLES BROWN on Habeas Corpus.

C058284
County
No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated:  March 13, 2008

SCOTLAND, P.J.

---------------------------------

cc: See Mailing List

**IN THE**

# Court of Appeal of the State of California
**IN AND FOR THE**
## THIRD APPELLATE DISTRICT

MAILING LIST

Re:    In re CHARLES BROWN on Habeas Corpus.
       C058284

Copies of the attached document have been sent to the individuals checked below:

Charles Brown
CDC:E-25371
Correctional Training Facility
P.O. Box 686
Soledad, CA 93960

Office of the State Attorney General
P.O. Box 944255
Sacramento, CA 94244-2550

## COURT OF APPEAL, THIRD APPELLATE DISTRICT

Criminal   C058284

In re CHARLES BROWN on Habeas Corpus.


Judge:
Nature of Action:  hc        Habeas corpus

### ATTORNEY - LITIGANTS


In propria persona

      Petitioner
      Charles Brown
      E-25371
      Correctional Training Facility
      P.O. Box 686
      Soledad, CA  93960

Office of the State Attorney General (Bar No. SAGSAC-01)
P.O. Box 944255
Sacramento, CA  94244

      Respondent
      The People


### DOCKET EVENTS


03/05/2008
Petition for a writ of habeas corpus filed.
(ms)

**EXHIBIT 3**

Court of Appeal, Third Appellate District - No. C058284
**S162122**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re CHARLES BROWN on Habeas Corpus

The petition for review is denied.

SUPREME COURT
**FILED**

MAY **2 1** 2008

Frederick K. Ohlrich Clerk

_____
Deputy

_____
**GEORGE**
Chief Justice

1

**TABLE OF CONTENTS**

2

Topic                                                                    Pages

3

Index .............................i,ii

4

Points and Authorities .....................iii,iv,v,vi

5

MEMORANDUM OF POINTS AND AUTHORITIES

6
7
8

PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY
AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY
INTEREST IN THE EXPECTATION OF PAROLE UNDER
PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME
OF INCARCERATION.
.............................1

9

A. EXISTENCE OF A LIBERTY INTEREST
.............................1

10

B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY
.............................4

11

GROUND ONE:

12
13

THE BOARD'S DECISION TO DENY PAROLE IS OTHERWISE
ARBITRARY AND IS NOT SUPPORTED BY "SOME
EVIDENCE" CONTAINING AN INDICIA OF RELIABILITY.
.............................5

14

GROUND TWO:

15
16
17
18
19

THE BOARD'S FINDING OF UNSUITABILITY AND REFUSAL
OF THE GRANTING OF PAROLE VIOLATED THE
PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED
HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST
WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT
WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE"
IN VIOLATION OF THE 5TH AND 14TH AMENDMENTS OF
THE UNITED STATES CONSTITUTION.
.............................8

20
21
22
23

A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
PETITIONER POSES AN "UNREASONABLE RISK" OF
THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
THE DECISION WAS WITHOUT EVIDENCE AND WAS ARBI-
TRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
DUE PROCESS.
.............................11

24
25
26

B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
OF LIFE, LIBERTY OR PROPERTY WITHOUT DUE PROCESS
OF LAW.
.............................15

GROUND THREE:

27
28

THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
THE FACE OF CLEAR EVIDENCE OF REHABILITATION,

1
## TABLE OF CONTENTS (continued)

2
Topic                                                                          Pages

3
(GROUND THREE cont.)

4
          AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
          BE FOUND SUITABLE AT EACH HEARING. A FINDING OF

5
          EGREGIOUSNESS    IS    BARRED    BY    THE    INMATES
          COMPLIANCE WITH THOSE AGREED TERMS.

6
                               ...............................16

      A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF
7
         THE CRIME VIOLATES DUE PROCESS.
                               ...............................18
8
      B. CONTINUED RELIANCE UPON FACTS OF THE CRIME
         VIOLATES DUE PROCESS.
9
                               ...............................22

10
      C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
         UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
11
         AND THE LIBERTY INTERESTS OF INMATES. THE ESSENCE
         OF THE PAROLE SYSTEM IS THE RE-ENTRY OF PRISONERS
12
         WHO NO LONGER POSE A PUBLIC DANGER.
                               ...............................25
13
      D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
14
         N PAROLE DECISIONS.
                               ...............................27
15
      E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY
         HEARING.
16
                               ...............................28

17
CONCLUSION                     ...............................30

18
PRAYER FOR RELIEF              ...............................31

19

20

21

22

23

24

25

26

27

28

<u>POINTS AND AUTHORITIES</u>

<u>Name/Title</u>

In re Bramble
(1947) 31 Cal.2d 43, 51 [6] P.2d 411

People v. Stuart
(1956) 47 Cal.2d 167, 175 [7] 302 P.2d 5, 55 A.L.R.2d 705

People v. Smith
(1955) 44 Cal.2d 77, 79 [2] 279 P.2d 33

In re McVickers
(1946) 29 Cal.2d 264, 278, 176 P.2d 40

People v. Valentine
(1946) 28 Cal.2d 121, 143 [20] 159 P.2d 1

People v. Ralph
(1944) Cal.2d 575, 581 [2] 150 P.2d 401

Biggs v. Terhune
(9th Cir. 2003) 334 F.3d 910, 914, 915,916

In re Ramirez
(2001) 94 Cal.App.4th 549, 564-565, 571

Edward v. Balisok
(1997) 520 U.S 541, 648

In re Caswell
92 Cal.App.4th 1017, 1029

People v. Dubon
90 Cal.App.4th 949, 952, (2001)

Charlton v. Federal Trade Comm.
543 F.2d 903-907, 908 (D.C. Cir. 1976)

McQuillion v. Duncan
306 F.3d 901-910, (9th Cir. 2002)

In re Smith
109 Cal.App.4th 489 (2003)

Kentucky Dept of Corrections v. Thompson
490 U.S. 454, 459-460 (1989)

Board of Pardons v. Allen
(1987) 482 U.S. 369, 376-78

Greenholtz v. Inmates of Neb. Penal & Corr. Complex
(1979) 442 U.S. 1, 11-12

-iii-

1    <u>POINTS AND AUTHORITIES</u> (continued)

2    <u>Name/Title</u>

3    U.S. v. Guagliardo
     275 F.3d 868-872, (9th Cir. 2002)
4
     Graynet v. City of Rockford
5    408 U.S. 104, 108-109 (1972)

6    Irons v. Warden
     358 F.Supp.2d 936 (E.D. Cal. 2005)
7
     In re Scott
8    34 Cal.Rptr.3d at 919-920, 133 Cal.App.4th at 594-595

9    Shaputis
     37 Cal.Rptr.3d at 335
10
     In re Rosenkrantz
11   29 Cal.4th at 654-661

12   In re Smith
     114 Cal.App.4th 343, 370,372
13
     Caswell v. Calderon
14   363 F.3d 832, 389 (9th Cir. 2004)

15   Scott
     119 Cal.4th at 899
16
     Scott
17   133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920

18   Superintendent v. Hill
     472 U.S 445, 455-457 (1985)
19
     In re Minnis
20   (1972) 7 Cal.3d 639, 643, n.2

21   People v. Morse
     (1964) 60 Cal.2d 631, 643, n.8
22
     Masoner
23   2004 WL1090177 *1-2

24   Bair
     2005 WL2219220 *12 n.3
25
     Williams v. State of New York
26   (1949) 337 U.S. 241, 247

27   Sass v. Calif. Board of Prison Terms
     376 F.Supp.2d (E.D. Cal. 2005)
28

                         -iv-

POINTS AND AUTHORITIES (continued)

Title/Name

In re Lee
49 Cal.Rptr.3d 931

In re Elkins
50 Cal.Rptr.3d 503

Rosenkrantz v. Marshall
774 F.Supp.2d, 1063 (C.D. Cal. 2006)

Blankenship v. Kane,
2006 WL5215627 *3 (N.D. Cal. 2006)

Murille v. Perez
2005 L2592420 *3n.1. (C.D. Cal. 2005)

Siafullah v. Carey
2005 WL1555389 *8 (E.D. Cal. 2005)

Superintendent Steve Lomas Hill
472 U.S. at 455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356 (1985)

Rojas v. Neilson
428 F.3d 1229, 1232, (9th Cir. 2005)

Sanchez v. Kane,
444 F.Supp.2d 1049 (C.D.Cal. 2006)

Delgado v. Lewis
233 F.3d 976, 982 (9th Cir. 2000)

Pham v. Terhune
400 F.3d 740, 742 (9th Cir. 2005)

Hines v. Thompson
336 F.3d 848, 853 (9th Cir. 2003)

Pirtle v. Morgan
313 F.3d 1160 , 1167 (9th Cir. 2002)

Powell v. Gomez
33 F.3d 39, 40

Earp v. Oronski
(9th Cir. 2003) 372 U.S. 293 (1963)

Keeney v. Tamaya-Reyes
504 U.S. 1, 5 1992

Taylor v. Maddox
(9th Cir. 2004) 336 F.3d 992, 1001.

POINTS AND AUTHORITIES (continued)

Title/Name

In re Lawrence
(May 22, 2007) Cal.Rptr.3d WL1475283

In re Elkins
(2006) 144 Cal.App.4th 475, 487

In re Lee
(2006) 143 Cal.App.4th 1400, 1408

In re Barker
May 29, 2007, DJDAR 7548

Martin v. Marshall
431 F.Supp.2d at p.1047

CCR, Title 15, Division 2
    §2000(b)(49)
    §2000(b)(62)(90)
    §2402
    §2402(a)(b)

Penal Codes
    §3041
    §3041(a)
    §3041(b)

Evidence Code
    §115

California Constitution, Article V
    §8(b)

## MEMORANDUM OF POINTS AND AUTHORITIES

**PETITIONER WAS DEPRIVED OF HIS CONSTITUTIONALLY
AND STATUTORILY PROTECTED RIGHT TO THE LIBERTY
INTEREST IN THE EXPECTATION OF PAROLE UNDER
PENAL CODE §3041(b) WHICH ATTACHED AT THE TIME
OF INCARCERATION.**

The due process clause of the 5th and 14th Amendment prohibits a state action that deprives a person of life, liberty or property without due process.

However, a person alleging such a violation must establish that (a), he had protection; (b) that he was deprived of such a protection; and, (c) that the procedure which led to the deprivation was constitutionally deficient. Kentucky Dept. of Corrections v. Thomas, 490 U.S 459-460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989); McQuillion v. Duncan, 306 F.3d 895, 900 (9th Cir. 2002).

### A. EXISTENCE OF A LIBERTY INTEREST.

The Supreme Court held in 1979, and reiterated in 1987 that, "a state's statutory scheme, if it uses mandatory language, creates a presumption that parole release will be granted when or unless certain designated findings are made, and then, thereby, gives rise to a constitutionally protected 'Liberty Interest'". McQuillion v. Duncan, supra, 306 F.3d at 901, (citing Greenholtz v. Nebraska Penal Institute, 442 U.S. I, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) and Board of Pardons v. Allen, 482 U.S. 369, 373, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987).

Recently, our Ninth Circuit has "held" that California's parole scheme created such a liberty interest because Penal Code §3041 uses mandatory language and is similar to the Nebraska and Montana statues addressed in Greenholtz, supra, and

-1-

1   Allen, supra. (See McQuillion, supra, 306 F.3d at 901-901).

2     Not only did the Ninth Circuit hold that "Section 3041 of

3 the Penal Code creates in every inmate a cognizable liberty

4 interest in parole which is protected by the procedural

5 safeguards of the due process clause," but further held that

6 "the interest arises upon the incarceration of the inmate."

7 Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir. 2003).

8     Two United States Supreme Court decisions, Greenholtz v.

9 Inmates of Nebraska Penal and Correctional Complex, (1979) 442

10 U.S. 1, 12, decided in 1979 and Board of Pardons v. Allen,

11 (1987) 482 U.S. 369, 381, decided in 1987, held the Federal Due

12 Process Clause creates a constitutional liberty interest for

13 convicted persons in certain jurisdictions. The existence of

14 this right depends on whether the state employs "mandatory

15 language" indicating parole will be granted if certain findings

16 are made, Board of Pardons v. Allen, supra, 482 U.S. at pages

17 377-381. In 2002 the Ninth Circuit examined the California

18 parole scheme in MQuillion v. Duncan, (9th Cir. 2002) 306 F.3d

19 895 and found it "uses mandatory language and is largely

20 parallel to the schemes found in Greenholtz and Allen,"

21 McQuillion v. Duncan, supra, 306 F.3d at page 901. Accordingly,

22 the McQullion court found a "liberty interest" was created under

23 the federal constitution for state prisoners in California,

24 McQullion v. Duncan, supra, 306 F.3d at page 901.

25     While it is true post McQuillion, the California Supreme

26 Court had occasion to visit and decide in In re Dannenberg that

27 "life" prisoners did not have a liberty interest in the

28 expectation that the Board of Parole Hearings would engage in

-2-

1  "uniform term" analysis under Penal Code §3041(a) <u>if</u> it

2  demonstrated that public safety warranted denial of parole under

3  §3041(b). That court <u>did not</u> hold, however, that there is <u>no</u>

4  protected liberty interest in parole whatsoever. Indeed,

5  California courts have continued to analyze such claims. See <u>In</u>

6  <u>re Shaputis</u>, 135 Cal. App. 4th, 217, 224, 231-232, Cal.Rptr.3d

7  324 (citing <u>Dannenberg</u>); <u>In re Scott</u>, 133 Cal.App.4th 573, 34

8  Cal.Rptr.3d 905 (2005); <u>In re Lee</u>, 49 Cal.Rptr.3d 931; <u>In re</u>

9  <u>Elkins</u>, 50 Cal.Rptr.3d 503; <u>In re Lawrence</u>, (May 22, 2007),

10 Cal.Rptr.3d WL1475283. Post <u>Dannenberg</u>, even federal courts have

11 uniformly, save one District court decision (Eastern District of

12 California), which seemingly reversed itself in its very next

13 case, [see <u>Sass v. California Board of Prison Terms</u>, 376

14 F.Supp.2d, 975, 982 (E.D. Cal. 2005), which was recently

15 overrulled by the Ninth Circuit in <u>Sass v. Board of Prison Terms</u>

16 376 F.Supp.2d, 975, 982, (9th Cir. 2006), and is currently under

17 appeal. (See and compare <u>Sass</u>, <u>supra</u>, to <u>Bair v. Folsom State</u>

18 <u>Prison</u>, 2005 WL2219110 fn.3 (E.D. Cal. 2005), Report and

19 Recommendations adopted by 2005 WL3081634 fn.1 (E.D. Cal.

20 2005).], have followed the reasoning in <u>McQuillion</u>, <u>supra</u>,

21 establishing a liberty interest. Because the Ninth Circuit

22 analyzed the liberty interest which arose from California's

23 Penal Code §3041(a), <u>Dannenberg</u> does not undermine the Ninth

24 Circuit decision in <u>McQuillion</u>. Therefore, <u>McQuillion v. Duncan</u>

25 holds that the mandatory language of Penal Code §3041(b)

26 creating a liberty interest in parole remains controlling

27 precedent. [See <u>Rosenkrantz v. Marshall</u>, 774 F.Supp.2d 1063

28 (C.D. Cal. 2006); <u>Blankenship v. Kane</u>, 2006 WL5215627 *3 (N.D.

1 | Cal. 2006); <u>Murille v. Perez</u>, 2005 W.2592420 *3 N.1 (C.D. Cal.

2 | 2005); <u>Saifullah v. Carey</u>, 2005 WL1555389 *8 (E.D. Cal. 2005)].

3 |      Thus, petitioner has clearly established not only that he

4 | has a constitutionally protected liberty interest but that he

5 | was denied this liberty by the denial of parole by the Board of

6 | Parole Hearings on July 24, , 2006.

7 |     **B. PROCEDURES WHICH LED TO DEPRIVATION OF LIBERTY.**

8 |     It is established principles of due process that a prisoner

9 | must provided <u>notice</u> of the hearings; and <u>opportunity</u> to be

10 | heard; and, <u>statement of reasons</u>, for denial of parole.

11 |     Petitioner agrees that he was provided each of these

12 | protections. However, the United States Supreme Court has

13 | expanded these protections to include:

14 |        "In a variety of contexts, the court has

15 |        recognized decisions resulting in a loss of an
important liberty interest violates due process

16 |        if the decision is not supported by some
evidence." <u>Superintendent v. Hill</u>, 472 U.S. at

17 |        455, 105 S.Ct. 2768, 2774, 86 L.Ed.2d 356
(1985): <u>Rosenkrantz v. Marshall</u>, 444 F.Supp.2d

18 |        1063 (C.D. Cal. 2006) fn. 13; <u>Rojas v. Neilson</u>,
428 F.3d 1229, 1232 (9th Cir. 2005)[Per curiam]

19 | The court further held:

20 |        "Although '[T]he some evidence standard is
minimally stringent', <u>Powell v. Gomez</u>, 33 F.3d

21 |        39, 40, the evidence underlying the
[Governor's] decision must have some indicia of

22 |        reliability." <u>Hill</u>, <u>supra</u>, 472 U.S. at 455-56,
105 S.Ct. at 2774; See also <u>Sanchez v. Kane</u>,

23 |        444 F.Supp.2d 1049 (C.D. Cal. 2006).

24 |     As an additional matter the <u>Hill</u> court concluded that the

25 | decision to deny parole must not be "otherwise arbitrary." <u>Hill</u>,

26 | <u>supra</u>, at 547.

27 |     Clearly then, the <u>Hill</u> analysis determined that due process

28 | requires much more than notice, opportunity to be heard and

1   statement of reason. It also requires (A). evidence which

2   supports the conclusion; (B). the evidence to be reliably

3   related to the issue of present dangerousness (CCR Title 15,

4   §2402(a)); In re Scott, supra, 1373 Cal.App.4th 593, 34

5   Cal.Rptr.3d 905; In re Elkins, 50 Cal.Rptr.3d 503; In re Lee, 49

6   Cal.Rptr.3d 931; (C). the evidence must be truthful and (D). the

7   decision must not be arbitrary or capricious. Sanchez v. Kane,

8   444 F.Supp.2d 1049 (C.D. Cal. 2006).

9   GROUND ONE:

10           THE BOARD'S DECISION TO DENY PAROLE IS
             OTHERWISE ARBITRARY AND IS NOT SUPPORTED BY
11           "SOME EVIDENCE" CONTAINING AN INDICIA OF
             RELIABILITY.
12

13      In combining the California and federal standards of

14   review, as they have been articulated thus far by the California

15   Supreme Court and the Ninth Circuit, respectively, the

16   commitment crime can lack the power to supply "some evidence"

17   supporting a denial of parole because of the interplay between

18   two factors - the nature of that crime and the passage of time

19   since its commission. That is, the fact there is "some evidence"

20   the crime was committed and committed a certain way at a certain

21   time does not mean that crime necessarily represents "some

22   evidence", that petitioner's release on parole will pose an

23   unreasonable risk of danger to the public safety at the present

24   time. Whether it possesses the necessary predictive value

25   depends both on the nature of the crime  and how long ago it

26   happened. Petitioner's commitment offense, now over 17 years in

27   the past does not provide "some evidence" his present release

28   would represent an "unreasonable risk" of danger to the

1 community.

2     It is worth noting that the issue before this court is
3 whether petitioner is suitable for parole, not when he should be
4 released under the California parole system. The Board's initial
5 task with respect to any inmate serving an indeterminate
6 sentence is to determine whether the prisoner is suitable for
7 parole. That is whether the prisoner "pose[s] an unreasonable
8 risk of danger to society if released from prison. CCR, Title 15
9 §2402." Only after the Board deems an inmate suitable is a
10 release date set. CCR, Title 15, §2282; See also Dannenberg, 34
11 Cal.4th 1061, 1071 (2005). ("[A] determination of individual
12 suitability must proceed the setting of a ... parole release
13 date.") The actual parole release date may well be (in some
14 cases) a number of years into the future, under the Board
15 regulations, the release date is established using a matrix that
16 takes into account the inmate's offense of imprisonment and the
17 circumstances in which it was committed. CCR, Title 15, §2282.

18     Supreme Court law clearly established a parole decision,
19 like a prison disciplinary decision, deprives a prisoner of due
20 process if it is not uspported by "some evidence" or is
21 "otherwise arbitrary." Hill, supra, at 457; McQuillion v. Duncan
22 306 F.3d 895, 904 (9th Cir. 2002).

23     However, that evidence "must have some indicia of
24 reliability," Scott I, supra, 119 Cal.App.4th at p.899) and
25 "suitability determinations must have some rational basis in
26 fact. (In re Elkins, 144 Cal.App.4th at p.489).

27     As our Supreme Court has summarized it, "the judicial
28 branch is authorized to review the factual basis of a decision

-6-

1   of the board denying parole in order to ensure that the decision

2   comports with the requirements of due process of law, but ... in

3   conducting such review, the court may inquire only whether "some

4   evidence" in the record before the board supports the decision

5   to deny parole, based upon factors specified by statute and

6   regulation. If the decision's consideration of the specified

7   factors is not supported by "some evidence" in the record and

8   thus is devoid of a factual basis, the court should grant the

9   prisoner's petition for writ of habeas corpus and should order

10  the board to vacate its decision denying parole and thereafter

11  to proceed in accordance with due process of law. (Rosenkrantz,

12  supra, 29 Cal.4th at p.658, underline added). Finally, as has

13  been recently stated, because the overarching consideration is

14  public safety, the test in reviewing the board's decision

15  denying parole "is not whether some evidence supports the

16  reasons [the board] cites for denying parole, but whether some

17  evidence indicates a parolee's release unreasonably endangers

18  public safety.[Citations]. Some evidence of the existence of a

19  particular factor does not necessarily equate to some evidence

20  the parolee's release unreasonably endangers public safety." (In

21  re Lee, 143 Cal.App.4th at p.1408)(In re Barker, May 29, 2007),

22  DJDAR   7548)(In   re  Lawrence, (May  22,  2007)  Cal.Rptr.3d

23  WL1475283)(In re Rosenkrantz, (2002) 29 Cal.4th 616, 665)(In re

24  Dannenberg, (2005) 34 Cal.4th 1061, 1100).

25      Merely to pick pieces from evidence to create one's version

26  sufficient   to   justify   an   action   is   not   "some   evidence"

27  reasonably  related  to  the  circumstances  sufficient  to  deny

28  parole. Superintendent v. Hill, requires  more.  The  Hill

-7-

1  requirement mandates that the evidence relied upon possess not

2  only an "indicia of reliability" but that is is "reasonably

3  related to the circumstances so as to constitute some evidence

4  that the crime was 'particularly egregious'". (i.e. "reasonably"

5  sufficient to support the decision made). See Hill, 472 U.S.

6  445, 455-56, (1985). Accordingly, to recite in rote,

7  circumstances of the crime sufficient under different

8  circumstances (for instance as one would apply to first degree

9  murder) and proclaim that sufficient under these circumstances,

10  does not constitute "some evidence" justifying denial of parole

11  or establish a current danger to the public. The decision of the

12  board is unreasonable in light of the volumes of evidence

13  showing suitability. Furthermore, since the evidence clearly

14  does not support the board's conclusion, the"conclusion" does

15  not possess any "indicia of reliability" and is patently

16  arbitrary and capricious, denying petitioner his liberty

17  interest in parole. It is clear that the board's finding amounts

18  to an "unreasonable" determination of the facts in light of the

19  evidence available to the board at the hearing. Only by

20  examination may the court determine whether the board's decision

21  was in fact "unreasonable" or "objectively unreasonable."

22  Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000); Pham v.

23  Terhune 400 F.3d 740, 742 (9th Cir. 2005); Hines v. Thompson,

24  336 F.3d 848, 853 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d

25  1160, 1167 (9th Cir. 2002).

26  GROUND TWO:

27          THE BOARD FINDING OF UNSUITABILITY AND REFUSAL
         OF THE GRANTING OF PAROLE VIOLATED THE
28        PETITIONER'S RIGHT TO DUE PROCESS AND DEPRIVED

HIM OF HIS FEDERALLY PROTECTED LIBERTY INTEREST WHEN THE BOARD DENIED PETITIONER A PAROLE GRANT WITHOUT ANY RELIABLE EVIDENCE OR "SOME EVIDENCE," IN VIOLATION OF THE 5TH AND 14TH AMENDMENT OF THE UNITED STATES CONSTITUTION.

Section 3041 of the California Penal Code creates substantial presumption that a parole release date shall be set at the initial parole hearing, and in a manner that is uniform to other similar offenses. Subdivision (a) and (b), of §3041 mandates that a parole release date "shall" be set "unless" the board finds that the gravity of the commitment offense or offenses, or the timing and gravity of past convicted offenses are such that a consideration of the public safety warrant not setting a release date at that hearing. "Furthermore, if there be any reasonable doubt as to identity of offense we are bound to resolve that doubt in favor of petitioner." (In re Bramble, 1947, 31 Cal.2d 43, 51, [6], 187 P.2d 411). Moreover, the rule is established that when language which is reasonably susceptible of two constructions is used in a penal law, ordinarily that construction which is more favorable to the offender will be adopted. The defendant is entitled to the benefit of every reasonable doubt, whether it arises out of a question of fact, or as to the true interpretation of words or the construction of language used in a statute. (People v. Stuart, (1956), 47 Cal.2d 167, 175, [7], 302 P.2d 5, 55 A.L.R.2d 705; People v. Smith, (1955) 44 Cal.2d 77, 79 [2], 279 P.2d 33; In re Bramble, (1947) supra, 31 Cal.2d 43, 51 [6,7], 187 P.2d 441; In re McVickers, (1946) 29 Cal.2d 264, 278, 176 P.2d 40; People v. Valentine, (1946 28 Cal.2d 121, 143 [20], 159 P.2d 1; People v. Ralph, (1944), 24 Cal.2d 575, 581 [2], 150 P.2d 401).

1    There is no other criteria in the statute for denying parole to
2    a prisoner. It appears from the language that "consideration of
3    the public safety" is nonetheless limited to the gravity of the
4    offense and/or the timing and gravity of any past "convicted"
5    offense or offenses. The statute does not encompass or authorize
6    some of the criteria set forth by the California Code of
7    Regulations, Title 15, §2402. It does appear that the statute
8    has been enlarged to include additional criteria not expressly
9    authorized by the statute.

10        Nothwithstanding, the argument set forth in the petition is
11   not merely an argument about a state law violation. The
12   presumption vested by the statue is substantial, while the
13   statutory criteria the board must meet in order to deny parole
14   is limited to criminal conduct at the time of the offense. For
15   the board to interpret the statute in such a manner as to deny
16   parole solely on the commitment offense after the board had
17   denied petitioner on the exact same point three times, deprives
18   petitioner of a substantial liberty interest protected by
19   federal due process. (See Biggs at 334 F.3d 917). The effect of
20   such an interpretation, established by practice, is to subject
21   all prisoners to pro forma decisions, where the board goes
22   through the motion of due processs review, citing post hoc
23   rationalizations to justify the parole denial, that is now
24   always the result. This is little different that a decision to
25   deny parole made without any evidence to support it. Thus, by
26   misinterpretation, whether inadvertently or intentionally, the
27   result is not merely a violation because it is an action the
28   board is simply not authorized to take by the enabling statute

                                    -10-

1   that   impinges   on   federally   protected   liberty   interests.

2   Petitioner relies on this claim which is now brought before the

3   state court.

> A. THE BOARD DID NOT MEET THE BURDEN OF PROOF THAT
> PETITIONER   POSES   AN   "UNREASONABLE   RISK"   OF
> THREAT TO PUBLIC SAFETY IF RELEASED ON PAROLE.
> THE   DECISION   WAS   WITHOUT   EVIDENCE   AND   WAS
> ARBITRARY AND CAPRICIOUS, VIOLATING FUNDAMENTAL
> DUE PROCESS.

8       The regulatory law requires the board to set a release date

9   unless it finds that the prisoner poses an "unreasonable risk"

10  to public safety if released at that time. (15 CCR, §2402). This

11  is consistent with the enabling state which requires the setting

12  of a release date.

13      If the preponderate record before the board demonstrates

14  that petitioner does not post the "unreasonable risk" (which the

15  record shows that he does not, from petitioner's last 3  parole

16  hearings), a release date must be set.

17      If the board denies petitioner parole without making this

18  requisite finding based on relevant and credible facts in the

19  record, then this is not merely a state law violation, but a

20  deprivation of the substantial liberty interest he has in

21  obtaining a release date. Failure of the board to act in accord

22  with   the   regulations,   in   such   situations,   constitutes   a

23  substantive due process violation because it constitutes an

24  abuse of discretion that unfairly and inaccurately deprives the

25  prisoner of his right to that federally protected liberty

26  interest. The board needs more than "some evidence" to arrive at

27  their decision, even though once the decision is made, the

28  reviewing court needs only to find "some evidence" to support

-11-

1  the decision or findings that were made. As petitioner will

2  point out, the "some evidence" standard is not a "burden of

3  proof" - although the board and the governor seems to think it

4  is. Petitioner will demonstrate by clear and convincing facts

5  that the board's burden of proof is the "preponderance of

6  evidence" standard, but they totally ignore this in arriving at

7  their post hoc rationalization to deny parole in nearly every

8  case. There must be a weighing and balancing process according

9  to a burden of proof.

10    Thus, petitioner alleges that the board's decision in his

11  case exceeded the bounds of "review" and was made without the

12  procedural safeguards required by the Constitution, and without

13  applying the proper proof necessary to overcome the presumptive

14  right to release delineated in Penal Code §3041.

15    Statutory law in California applies the "rock bottom"

16  burden of proof in judicatory proceedings at the "preponderance

17  of evidence" level. (Evidence Code §115). The board lists under

18  "good cause," the preponderance evidence (15 CCR, Division 2,

19  §2001(b)(49), and also lists "relevant" and "material" evidence

20  as the standard for being valid "evidence." (15 CCR, Div. 2,

21  §2000(b)(62)(material evidence), and (90)(relevant evidence).

22  The "good cause" provision is a requirement for decision making

23  that applise to all substantive decisions. These regulatory and

24  statutory provisions initiate the weighing and balancing process

25  of evidence at parole hearings. A responsibility the board must

26  undertake. The board cannot apply the "some evidence" standard

27  because it is not a burden of proof. (In re Ramirez, (2001) 94

28  Cal.App.4th 549 at 564-565; Edwards v. Balisok, (1997) 520 U.S.

-12-

1  641, at 648). The "some evidence" applies only to questions of

2  evidentiary sufficiency as an "additional requirement of due

3  process, not substituted for other due process requirements."

4  (Ibid.) The "some evidence" standard is applied only by the

5  reviewing court to determine if the board's (governor's)

6  decision is supported by "some evidence," if the court finds the

7  board complied with all other requisite due process

8  requirements. If the board failed to apply a critical element in

9  the weighng and balancing of evidence, such as a burden of

10  proof, then the court cannot deny the petition because there

11  isn't "some evidence" in the record to support the decision.

12  (Scott I, supra, 119 Cal.App.4th at p.899, In re Elkins, supra,

13  144 Cal.App.4th at 489). As the Appellate Court in In re Caswell

14  92 Cal.App.4th 1017, 1029, pointed out, there is always some

15  evidence in the record of unsuitability of parole, which if

16  invoked, would subject every consideration of parole to an

17  arbitrary standard or political whim, but for a burden of proof,

18  and the burden of producing evidence, is clearly in California

19  law, e.g. People v. Dubon, 90 Cal.App.4th 949, 952, (2001), and

20  applies to all state agencies.

21      Here, where the statute presumes that a parole date "shall

22  normally" be set, the board must, in their weighing and

23  balancing of all relevant, material and reliable evidence,

24  present by a preponderance of that evidence, a "rational

25  connection" between the basic facts the board is asserting as

26  sufficient to deny parole, and the ultimate fact statutorily

27  presumed, i.e., that the prisoner is more than likely not

28  "suitable" for setting a parole release date.

1    Petitioner submits that the board and the governor have
2    broad discretion in parole matter, but the requirement of
3    procedural due process embodied in the California Constitution
4    places some limitations upon these discretionary powers.

5    As heretofore shown, the board's burden of proof is the
6    preponderance of relevant and material evidence standard. This
7    is the "rock bottom" standard allowed by California law.
8    (Evidence Code §115; see e.g. Charlton v. Federal Trade Comm.,
9    543 F.2d, 903-907, 908, (D.C. Cir. 1976)(speaking to this
10   standard as being "rock bottom" burden of proof). "Good Cause"
11   is defined in the BPT's regulations as "a finding by the board
12   based upon a preponderance of the (material and relevant)
13   evidence that there is a factual basis and good reason for the
14   decision made." (Ibid. 2000). Here, in petitioner's case, the
15   board, based on the "material and relevant" evidence found
16   petitioner unsuitable for parole on the basis of the commitment
17   offense which petitioner has been denied three times base
18   primarily on the same issues, i.e., unchanging factors. This is
19   a clear due process violation and especially where the relevant
20   and reliable evidence concerning public safety that was
21   presented at petitioner's subsequent parole consideration
22   hearings that show that petitioner does not pose an
23   "unreasonable risk to the public if released at this time.

24   The mandatory language in §3041 of the Penal Code
25   established a rebuttable presumption affecting the board's
26   burden of producing evidence and the burden of proof
27   implementing public policy regarding the parole of "term to
28   life" prisoners.

-14-

1    Petitioner asserts that the ultimate facts sought is a
2    determination whether the prisoner is currently in "unreasonable
3    risk" of danger to the public safety if released on parole.
4    (Subd. (b), Penal code §3041; 15 CCR. §2402(a)).

5    The presumption created by mandatory language in both
6    subdivision (a) and (b) of P.C. §3041 is that the petitioner
7    "shall normally" have a parole release date set "unless" the
8    presumption is overcome by the board which carries the burden of
9    proof as to the existence of the presumed fact. McQuillion v.
10   Duncan, 306 F.3d, 901-902, (9th Cir. 2002): Biggs v. Terhune,
11   334 F.3d 910, 916-917 (9th Cir. 2003)(regarding the presumption
12   in Penal Code §3041). If the board cannot produce the evidence
13   according to the burden of proof required, then the presumption
14   stands, and the court is obliged to uphold the presumption, and
15   under In re Smith, 109 Cal.App.4th 489 (2003), must order
16   petitioner released from custody.

17       B. THE DUE PROCESS CLAUSE OF THE 14TH AMENDMENT
18          PROHIBITS STATE ACTION THAT DEPRIVES A PERSON
            OF LIFE, LIBERTY, OR PROPERTY, WITHOUT DUE
19          PROCESS OF LAW.

20   The due process clause of the 14th Amendment prohibits
21   state action that deprives a person of life, liberty, or
22   property, without due process of law, A person alleging a due
23   process violation must first demonstrate that he or she was
24   deprived of liberty or property interest protected by the due
25   process clause, and then show that the procedures that led to
26   the deprivation were constitutionally insufficient. Kentucky
27   Dept. of Corrections v. Thompson, 490 U.S. 454, 459-460 (1989);
28   McQuillion v. Duncan, 306 F.3d, 895, 900 (9th Cir. 2002).

-15-

1    In the parole context, a prisoner alleging a due process

2 claim must demonstrate the existence of a protected liberty

3 interest in parole, and the denial of one or more of the

4 procedural protections that must be afforded when a prisoner has

5 a liberty interest in parole. The Supreme Court held in 1979,

6 and reiterated in 1987, that "a state's statutory scheme, if it

7 uses mandatory language, creates a presumption that parole

8 release will be granted when or unless certain designated

9 findings are made, and thereby gives rise to a constitutional

10 liberty interest." McQuillion, supra, 306 F.3d, 16, 901 (citing

11 Greenholtz v. Inmates of Nebraska Penal, 442 U.S. 1, 7 (1979)

12 and Board of Pardon v. Allen, 482 U.S. 369, 373 (1987).

13    The Ninth Circuit has held that California's parole scheme

14 creates a cognizable liberty interest in release on parole

15 because Penal Code §3041 uses mandatory language and is similar

16 to the Nebraska and Montana statutes addressed in Greenholtz and

17 Allen, respectively. McQuillion, 306 F.3d 15, 901-902. As the

18 Ninth Circuit has explained, "§3041 of the California Penal Code

19 creates in every inmate a cognizable interest in parole which is

20 protected by the procedural safeguards of the due process

21 clause," and that interest arises "upon the incarceration of the

22 inmate." Biggs v. Terhune, 334 F.3d 910, 914-915 (9th Cir.

23 2003).

24 GROUND THREE:

25    THE BOARD VIOLATES DUE PROCESS BY REPEATEDLY
RELYING ON THE UNCHANGING FACTS OF THE CRIME IN
26    THE FACE OF CLEAR EVIDENCE OF REHABILITATION
AND BY MAKING RECOMMENDATIONS OF WHAT TO DO TO
27    BE FOUND SUITABLE AT EACH HEARING. A FINDING OF
EGREGIOUSNESS    IS    BARRED    BY    THE    INMATE'S
28    COMPLIANCE WITH THOSE AGREED TERMS.

-16-

1    When the board repeatedly relies on the unchanging facts of
2    the crime to deny parole, in the face of clear evidence that the
3    inmate has been rehabilitated, due process is violated. Biggs v.
4    Terhune, supra, at 915-916, Ramirez, supra, at 571). However,
5    here, the board goes a step further. At the conclusion of each
6    hearing attended by petitioner, the board gave him a series of
7    what to do to be found suitable for parole. If the crime was
8    going to continue to be an impediment to parole, then what
9    difference would it make whether petitioner followed those
10   recommendations, since parole would be denied in any event as
11   the crime will never change? How could the board make those
12   recommendations in good faith if the crime was such that parole
13   was not going to occur no matter how well petitioner programs?
14   Even worse, if he complies with those recommendations and the
15   board gives him a parole date, if the governor is permitted to
16   effectively negate this whole process unilaterally taking that
17   parole date away, then the recommendations and compliances are
18   rendered useless acts.

19   The board has a duty to make all recommendations
20   "sufficiently clear" to inform petitioner what conduct will
21   result in a grant of parole. (U.S. v. Guagliardo, 278 F.3d
22   868-872, (9th Cir. 2002)[citing Graynet v. City of Rockford, 408
23   U.S. 104, 108-109, (1972]). "A prisoner's due process rights are
24   violated if parole conditions are not made 'sufficiently clear'
25   so as to inform him of what conduct will result in his being
26   returned to prison. Likewise, the Board of Prison Terms has a
27   duty to make recommendations for parole eligibility
28   'sufficiently clear' so as to inform the inmate of conduct that

-17-

1 will warrant a finding of suitability." <u>U.S. V. Guagliardo</u>,

2 <u>supra</u>, 278 F.3d 868. Thus, the onus is on the board to clearly

3 and specifically stated what conduct will warrant a finding of

4 suitability. Therefore, it follows that there is only one way to

5 interpret the recommendatins given to petitioner at the

6 Documentation hearing and at each of the Subsequent parole

7 hearings. They constitute the board's "sufficiently clear"

8 instructions as to what petitioner must do to be found suitable.

9 As stated, it is indisputable but that petitioner has complied

10 with every single one of the board's directives to him, and

11 thus, the board must finally find petitioner suitable for

12 release. If the board's directions to the inmate are not

13 acknowledged as sincere offers providing legitimate goals for

14 achieving a status of parole suitability, then they are mere

15 "hoops" designated to support elaborate ruse and a further

16 affront to the due process rights of all prisoners who rely upon

17 them.

18      As noted, petitioner sincerely relied upon the

19 recommendations of the prior board panels, and he partook to

20 fulfill each one. Petitioner's fulfillment may be recognized

21 through his educational and vocational accomplishments and

22 gains, his ongoing self-help work and his crime free behavior

23 throughout his nearly 17 years of incarceration. Petitioner has

24 complied with those directives following each and every hearing,

25 and the board should finally recognize his compliance by

26 granting parole.

27      A. CONTINUED RELIANCE ON THE UNCHANGING FACTS OF THE
        CRIME VIOLATES DUE PROCESS.
28

1    In Biggs v. Terhune, the 9th Circuit held that even if the

2   commitment offense(s) are sufficient to support a denial of

3   parole based upon considerations of due process. Biggs v.

4   Terhune, supra, 334 ₁F.3d at 916. The Ramirez court also

5   acknowledged that there will always be "some evidence" to

6   support a finding that a prisoner committed the underlying

7   offense. Those facts alone, however, do not justify the denial

8   of parole. Thus, while concluding that there was factual support

9   for the findings as to the crime and priors, the Ramirez, court

10  still found the board's decision arbitrary since there had been

11  7 hearings at that point, 9 years had passed beyond the minimum

12  term and it was 17 years after entering prison, and all evidence

13  showed rehabilitation.(Id. at 571). Likewise, as the Biggs court

14  more recently said, despite the fact that there may remain

15  evidence to support a finding of egregiousness of the crime:

16          "A continued reliance in the future on an
            unchanging factor, the circumstances of the
17          offense and conduct prior to imprisonment,
            runs contrary to the rehabilitative goals
18          espoused by the prison system and could result
            in a due process violation." (Biggs, supra, at
19          916-917).

20       In the published case of Irons v. Warden, 358 F.Supp.2d 936

21  (E.D. Cal. 2005), the federal court found that the board

22  violated the prisoner's due process by continuing to rely on the

23  immutable factors. (e.g. the commitment offense and history

24  prior to incarceration) to support the denial of parole. In

25  doing so, the federal judge there ruled that continuing to rely

26  on those factors that can never change, such as the commitment

27  offense, or history prior to imprisonment, where there is no

28  proof of continuing bad conduct to support a finding of current

                                   -19-

1  threat to the public, offends due process.

2      In interpreting the rule set forth in Biggs, and the plain
3  language of Penal Code §3041, it is clear that even if the crime
4  may  be  considered  egregious,  under  federal  due  process
5  priciples, the denial of parole based on the immutable facts of
6  the crime is only authorized at the first parole consideration
7  hearing. The provisions of Penal Code §3041 only talk of the use
8  of the crime to defer setting of a date at the initial hearing.
9  (Penal  Code  §3041(a)).  After  that,  to  give  the  statute  a
10 constitutional interpretation that is not unreasonably vague,
11 further denials would have to be based on some facts arising
12 subsequent to the crime that show a continued propensity for
13 violence, making the inmate a danger to the public. (Biggs v.
14 Terhune, supra, 334 F.3d at 914-915). To rule otherwise would
15 put petitioner in an impossible situation, where no matter what
16 he shows in terms of positive behavior, reformation,, self-help,
17 work skills, parole plans, or just rehabilitation in general, he
18 would never be able to overcome the unchanging facts of the
19 crime.  The  only  logical  application  of  Constitutionaly  Due
20 Process dictates what the court in Irons held, i.e., that any
21 subsequent  denial  requires  the  presence  of  some  in-prison
22 behavior  showing  that  the  inmate  currently  presents  an
23 unreasonable risk of danger if paroled.

24     Here, the facts of the crime have been used as the real
25 reason for denying parole on 3  separate occasions, yet, those
26 facts  have  never  been  tied  to  current  behaviors  showing
27 petitioner still presents an unreasonable risk of danger to the
28 public at this time. A rule requiring the presence of in-prison,

                              -20-

1   adverse behavior to justify further denial based on the crime,

2   simply recognizes what the 9th Circuit in Biggs alluded to when

3   it talked of the rehabilitative goals of the system, and, the

4   need to take into consideration that a person can change. At

5   this point, petitioner has been incarcerated for 17 years,

6   eligible for parole for more than six of those years. His

7   programming clearly shows his full rehabilitation. In drawing

8   the line as to when further denials become arbitrary, it is

9   obvious that the line has clearly been crossed in this case, and

10  in fact, was crossed as soon as the crime was used in the second

11  parole hearing without the presence of facts showing a continued

12  risk of danger based on how petitioner was programming in

13  prison. To the contrary, the in-prison facts are exclusively

14  positive.

15      As the Ramirez court noted, the paroling authority must do

16  more than merely commend petitioner for the hard work done to

17  rehabilitate himself while in prison. They must actually

18  consider these factors "as...circumstance[s] tending to show his

19  suitability for parole." Ramirez, supra, 94 Cal.App.4th at

20  571-572 [emphasis original]. Of course, all the board did with

21  petitioner's extensive accomplishments was to brush them aside

22  with several terse lines, and issue superficial compliments. The

23  Biggs rule is clear that if an inmate continue[s] to demonstrate

24  exemplary behavior and evidence of rehabilitation, denying him a

25  parole date simply because of the nature of his offense and

26  prior conduct would raise serious questions involving his

27  liberty interest in parole. Biggs v. Terhune, supra, 334 F.3d at

28  916. Here, the evidence of rehabilitation is beyond dispute.

-21-

1    In comparing the present case with Biggs, it is undeniably

2    clear that the board lacks any justification whatsoever to

3    continue to deny petitioner a parole date. In Biggs, the inmate

4    was convicted of the premeditated and deliberate First Degree

5    Murder of a witness in a major theft case against the

6    defendants, and yet, the court was quick to caution the board

7    that it could not continue to solely rely on the commitment

8    offense to deny the inmate parole, even though it was only his

9    initial hearing at that point. Yet, petitioner has been denied

10   parole on 3 separate occasions, each time effectively relying

11   virtually exclusively upon the unchanging facts of his

12   commitment offense. The continued reliance upon the commitment

13   offense is simply arbitrary, particularly in the fact of the

14   board's acknowledgements of petitioner's model behavior in

15   prison and extensive accomplishments, all of which are conceded

16   by the statement of decision. Therefore, as the court states in

17   Biggs, denying him a parole date simply because of the nature of

18   the offense, not only raises serious questions involving his

19   liberty interest in parole, but blatantly violates due process.

20   (See Biggs v. Terhune, supra, 334 F.3d at 915-916; Irons,

21   supra).

22       B. CONTINUED RELIANCE UPON FACTS OF THE CRIME VIOLATES
            DUE PROCESS.

23       First, continued reliance upon these unchanging factors

24   makes a sham of California's parole system and amounts to an

25   arbitrary denial of petitioner's "liberty interest in release on

26   parole," and his "presumption that a parole release date will be

27   granted." (See McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir.

28   2002), Biggs, 334 F.3d at 9144-915, Rosenkrantz, 29 Cal.4th at

.  -22-

1  654, 661). Petitioner has been denied parole on   3   different

2  occasions. continued reliance upon these unchanging factors

3  amounts to converting petitioner's offense to a term of life

4  without the possibility of parole. (See Irons, 358 F.Supp.2d at

5  947 ["continuous reliance on the unchanging circumstances

6  transforms an offense into a de facto life imprisonment without

7  the possibility of parole"]; Scott, 34 Cal.Rptr.3d at 919-920,

8  133 Cal.App.4th at 594-595; Shaputis, 37 Cal.Rptr.3d at 335).

9  Second, the circumstances of the crime and petitioner's conduct

10 prior to imprisonment do not amount to some evidence supporting

11 the conclusion that petitioner "currently" (underline added)

12 poses an unreasonable risk of danger if released at this time."]

13 In re Shaputis, (2006) 37 Cal.Rptr.3d 324, 334-335). In the

14 parole context, the requirments of due process can only be met

15 if "some evidence" supports the decision and the evidence

16 underlying the decision is supported by "some indicia of

17 reliability." Biggs, 334 F.3d at 914; Caswell v. Calderon, 353

18 F.3d 832, 839 (9th Cir. 2004); Scott, 119 Cal.4th at 899;

19 Superintendent v. Hill, 472 U.S. 445, 455-457 (1985);

20 McQuillion v. Duncan, 306 F.3d 895, 903 (9th Cir. 2002).

21        Petitioner presents a stronger case than Biggs for several

22 reasons. First petitioner's commitment offense was less serious

23 than the petitioner in Biggs. The Biggs petitioner was involved

24 in a violent, manipulative and premeditated murder, the

25 petitioner here has a much lesser serious offense than

26 petitioner Biggs. Second, the Biggs petitioner had not yet

27 served the full terms of his sentence, while petitioner here has

28 exceeded his sentence by approximately three years. Finally,

-23-

1  petitioner here has demonstrated exemplary behavior and evidence

2  of rehabilitation; as required by Biggs court, for a significant

3  period of time. Therefore, the sole reliance on petitioner's

4  commitment offense in denying him parole impinges on

5  petitioner's constitutional liberty interest in parole. (Martin

6  v. Marshall, supra, 431 F.Supp.2d at p.1047). (In re Lawrence,

7  (May 22, 2007), Cal.Rptr.3d WL1475283 (Cal.App.2d Dist.).

8      While it may have been reasonable to rely on petitioner's

9  offense and conduct prior to imprisonment as an indicator of

10  dangerousness for some period of time, continued reliance on

11  such unchanging circumstances after 17  years of incarceration

12  and three parole suitability hearings, violates due process

13  because these factors now lack predictive value with regards to

14  petitioner's present and future dangerousness. After 17 years

15  of rehabilitation in which petitioner's eligible parole date for

16  release was passed on  May 6, 2000    , (Exhibit "D" , Initial

17  M.E.P.D.), the ability to predict petitioner's future

18  dangerousness based simply on the circumstances of the crime is

19  nil. (See Irons, 358 F.Supp.2d at 947 n.2 ["four prior times in

20  finding [Irons] unsuitable for parole" and "after 15 years" of

21  imprisonment, ability to assess dangerousness "is near zero."];

22  Scott, 133 Cal.App.4th at 595, 34 Cal.Rptr.3d at 919-920 ["the

23  predictive value of the commitment offense may be very

24  questionable after a long period of time."].

25      Petitioner's record is replete with evidence of

26  petitioner's rehabilitation, which was expressed by the board,

27  including Psychological Reports, Correctional Counselor's

28  Reports, extensive self-improvement through vocational,

1 | educational, self-help therapy and disciplinary free
2 | incarceration for the past 3 years. (See Exhibit "D").

3 |     While the board may initially have been entitled to rely
4 | upon the commitment offense and petitioner's conduct prior to
5 | imprisonment to find petitioner unsuitable for parole, under
6 | these circumstances, petitioner submits that the continued
7 | reliance and sole reliance of the convicted offense do not now
8 | constitute "some evidence" with "some indicia of reliability" of
9 | petitioner's current dangerousness. (See Hill, 472 U.S. at 445;
10 | Biggs, 334 F.3d at 917; Irons, 358 F.Supp.2d at 947; Masoner,
11 | 2004 WL1090188 *1-2; Bair, 2005 WL2219220, *12 n.3; Scott, 133
12 | Cal.App.4th at 594-595, 34 Cal.Rptr.3d at 919-920; Rosenkrantz,
13 | 2002 29 Cal.4th 616, 665; Dannenberg, (2005) 34 Cal.4th 1061,
14 | 1100; In re Lee, (2006) 143 Cal.App.4th 1400, 1408; In re
15 | Lawrence, (2007) Cal.Rptr.3d WL1475283; In re Barker, (2007)
16 | DJDAR 7548).

17 |     C. JUDICIAL OVERSIGHT IS CRITICAL TO SAFEGUARD THE
   |       UNDERLYING PURPOSE OF CALIFORNIA'S PAROLE SYSTEM
18 |       AND THE LIBERTY INTERESTS OF INMATES. THE
   |       ESSENCE OF THE PAROLE SYSTEM IS THE RE-ENTRY OF
19 |       PRISONERS WHO NO LONGER POSE A PUBLIC THREAT.

20 |     Parole, the release of the imprisoned before they have
21 | served the maximum time set by their sentence, has long been
22 | part of the California penal system. The Indeterminate
23 | Sentencing Law, requiring the trial judge to set a minimum but
24 | not a maximum sentence was enacted in 1971. In re Minnis, (1972)
25 | 7 Cal.3d 639, 643, n.2 ("the court in imposing the sentence
26 | shall not fix the term or duration of the period of
27 | imprisonment")(citation and internal quotations omitteds). The
28 | goal of indeterminate sentences and the California parole system

1  is not only to punish but also to provide for reformation and

2  rehabilitation:

3         "The belief no longer prevails that every
        offense in a like legal category calls for an
4       identical punishment without regard to the
        past life and habits of a particular offender
5       ... retribution is no longer the dominant
        objective of the criminal law. Reformation and
6       rehabilitation of offenders have become
        important goals of criminal jurisprudence."
7  People v. Morse, (1964) 60 Cal.2d 631, 643, n.8 (quoting

8  Williams v. State of New York, (1949) 337 U.S. 241, 247). In a

9  lengthy discussion of this topic, the California Supreme Court

10 states as follows:

11        [T]he purpose of the indeterminate sentence
        law, like other modern laws in relation to the
12      administration of the criminal law, is to
        mitigate the punishment which would otherwise
13      be imposed upon the offender. These laws place
        emphasis upon the reformation of the offender.
14      They seek to make the punishment fit the
        criminal rather than the the crime. The
15      endeavor to put before the prisoner great
        incentive to well-doing, in order that his
16      will to do well would be strengthened and
        confirmed by the habit of well-doing.

17        [...]

18        [T]he interests of society require that under
19      prison discipline every effort should be made
        to produce a reformation of the prisoner ...
20      The Legislative policy [was to provide a
        system whereby] a hope was to be held out to
21      prisoners that through good conduct in prison
        and a disposition shown toward reformation,
22      they might be permitted a conditional liberty
        upon restraint under which they might be
23      restored again to society...

24        [...]

25        Although good conduct while incarcerated and
        potential for reform are not the only relevant
26      factors, the court has acknowledged their
        significance. Furthermore, authority has
27      declared that these factors are among those of
        "paramount importance."

28 In re Minnis, Cal.3d at 644-645. The Rosenkrantz court, citing

1  <u>Minnis</u>, reaffirmed the principles. "[E]ven before factors

2  relevant to parole decisions had been set forth expressly by

3  state statute and by regulations, we concluded that [a]ny

4  official or board with discretion, is under obligation to

5  consider all relevant factors [citations], and the [official or

6  board] cannot, consistently with its obligation, ignore post

7  conviction factors unless directed to do so by Legislature." <u>In</u>

8  <u>re Rosenkrantz</u>, (2002) 29 Cal.4th 515, 656 (quoting <u>Minnis</u>, 7

9  Cal.3d at 645).

10      D. PRISONERS HAVE A CONSTITUTIONAL LIBERTY INTEREST
           IN PAROLE DECISIONS.

11      "[P]arole applicants in California have an expectation that

12  they will granted parole unless the board finds, in the exercise

13  of its discretion, that they are unsuitable for parole in light

14  of the circumstances specified by statute and by regulation."

15  <u>Rosenkrantz</u>, 29 Cal.4th at 659-61 (holding that the California

16  Constitution, Article V, §8(b) and the California Penal Code

17  §3041, "give rise to a protected liberty interest in that "a

18  prisoner granted parole by the board has an expectation that the

19  governor's decision to affirm, modify, or reverse, the board's

20  determination will be based upon the same factors the board is

21  required to consider," and that "liberty interest underlying a

22  governor's parole review decision is protected by due process of

23  law.").

24      Federal courts have also unequivically held that

25  California's parole system gives rise to a liberty interest

26  constitutionally protected by due process. (See <u>Board of Pardons</u>

27  <u>v. Allen</u>, (1987) 482 U.S. 369, 376-78; <u>Greenholtz v. Inmates of</u>

28  <u>Neb. Penal & Correctional Complex</u>, (1979) 442 U.S. 1, 11-12,

1  (holding a state's statutory parole scheme that uses mandatory
2  language may create a presumption that parole release will be
3  granted upon certain circumstances or findings, thus giving rise
4  to a constitutionally protected liberty interest); McQuillion v.
5  Duncan, (9th Cir. 2002) 306 F.3d 896, 902-903, n.1, 903 (holding
6  that because California's parole scheme uses mandatory language
7  and is largely parallel to the schemes found in Allen and
8  Greenholtz, that give rise to a protected liberty interest in
9  release on parole, "California's parole scheme gives rise to a
10 cognizable liberty interest in release on parole"). Biggs v.
11 Terhune, (9th Cir. 2003) 334 F.3d 910, 915-916.

12     E. STANDARD OF REVIEW REQUIRES AN EVIDENTIARY HEARING.

13        On habeas corpus, a petitioner is entitled to an
14 evidentiary hearing where the petitioner has established a
15 "colorable" claim for relief and where the petitioner has never
16 been accorded a state or federal hearing on his claim. Earp v.
17 Oronski, (9th Cir. 2003) 372 U.S 293 (1963) and Keeney v.
18 Tamaya-Reyes, 504 U.S. 1, 5 (1992). In stating a "colorable"
19 claim, a petitioner is merely required to allege specific facts
20 which, if true, would entitle him to relief. (Ibid.). Granted,
21 under AEDPA, a federal court is not required to order a hearing
22 where petitioner failed to develope the facts in state court. In
23 such cases, the federal court accords a presumption of
24 correctness to the facts found by the state court and need not
25 hold a evidentiary hearing, unless those facts are rebutted by
26 clear and convincing evidence. On the other hand, no deference
27 is due where state had made an unreasonable determination of the
28 facts and where a state court makes evidentiary finding without

-28-

1 holding a hearing and giving petitioner an opportunity to

2 present evidence. Such findings clearly result in an

3 "unreasonable determination" of the facts. <u>Taylor v. Maddox</u>,

4 (9th Cir. 2004) 336 F.3d 992, 1001.

5     In summation, an evidentiary hearing is required under the

6 AEDPA and the Appellate court will remand for a hearing if the

7 District Court rules without granting one, "where petitioner

8 establishes a colorable claim for relief and has never been

9 accorded a state or federal hearing on his claim." <u>Earp</u>, <u>supra</u>,

10 at 1167.

11     Here, petitioner requests an evidentiary hearing at every

12 level of the state's habeas proceedings and each of the court's

13 to which he appealed who rule without granting him an evidentiary

14 hearing. As a result, (1) petitioner is entitled to an

15 evidentiary hearing in this court before the court can make any

16 credibility determination of the facts alleged in the petition

17 and supporting exhibits; (2) any contrived facts found by the

18 state court while denying a request for an evidentiary hearing

19 necessarily resulting from an "unreasonable determination" of

20 the facts and hence are <u>not</u> entitled to any presumption of

21 correctness. (<u>Earp</u>, <u>supra</u>, at 1167; <u>Taylor</u>, <u>supra</u>, at

22 1101)["when state court's legal error infects the fact finding

23 process, thus resulting in factual determinations will be

24 unreasonable and no presumption of correctness can attach to

25 it"].

26

27

28

## CONCLUSION

1   All criminal convictions represent the basest form of human
2   behavior. Our laws however, provide mechanisms by which even
3   some murderers are entitled to be paroled. The judiciary has an
4   obligation to faithfully execute those laws. The record
5   establishes that petitioner does not pose an unreasonable risk
6   to public safety. Any contrary conclusion lacks any evidentiary
7   support. As the record is void of any evidence to substantiate a
8   claim of "present danger" and allows only for a contrary
9   conclusion, it (justice) can only be served by an order from
10  this court directing an evidentiary hearing; and because there
11  is nothing which, either singly or in conjunction with other
12  evidence that could support any decision other than parole
13  suitable, the board's decision should be vacated; the petition
14  issued; the petitioner remanded back to the board with
15  directions to find petitioner suitable; set a parole release
16  date within 30 days; and/or petitioner ordered released. Only in
17  this way can the liberty interest petitioner continues to be
18  denied be restored.
19

20  ///
21  ///
22
23
24
25
26
27
28

1

**PRAYER FOR RELIEF**

2     Petitioner is without remedy save for Habeas Corpus.

3  Accordingly, petitioner requests that the court:

4          1. Issue a Writ of Habeas Corpus granting petitioner's

5             Due Process violation claims;

6          2. Issue an Order to Show Cause;

7          3. Declare the rights of petitioner;

8          4. Appoint counsel to represent petitioner;

9          5. Issue an Order directing an Evidentiary Hearing;

10         6. Issue an Order releasing petitioner based on

11            supporting evidence;

12         7. Grant any and all relief found necessary or

13            appropriate.

14

15  Dated this 17ᵗʰ day of July , 2008.

16                              Respectfully submitted,

17

18                              _Charles Brown_

19                              Charles Brown

20                              Petitioner in Pro Per

21  ///

22  ///

23

24

25

26

27

28

# EXHIBIT "A"

BOARD OF PRISON TERMS                                    STATE OF CALIFORNIA
LIFE PRISONER:  PAROLE CONSIDERATION PROPOSED DECISION:
                        DENY PAROLE

[X] **PAROLE DENIED FOR:**          1     2     3     (4)    5      **YEARS**

Place the prisoner on the ___Jul/2010___ calendar for his next subsequent hearing.

If this decision is final, you WILL NOT get paroled.  The Board will send you a copy of the decision.  It will indicate the reasons you did not get paroled.  If this decision is not final, the Board will set up another hearing.  You can read the laws about your hearing.  You can find the laws at California Code of Regulations, Title 15, section 2041.

## RECOMMENDATIONS

**The Board Recommends:**

[X] No more 115's or 128A's                    [ ] Learn a trade*
[ ] Work to reduce custody level               [X] Get therapy*
[X] Get self-help*                             [X] Earn positive chronos
[X] Stay discipline free                       [ ] Get a GED*

[ ] Recommend transfer to _____
[ ] Other

_____
_____
_____

*  These programs are recommended if they are offered at your prison and you are eligible/able to participate.

## HEARING PANEL

Name _____M. Ruler_____          Date ____>____

Name __K. Moira__                Date ____>____

Name _____               Date ____>____

| NAME | CDC# | PRISON | DATE |
|------|------|--------|------|

BROWN, CHARLES          E25371

**BPT 1005(b)**
**(REV 04/04)**

Distribution: White-C File
Canary-BPT
Pink-Prisoner

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life ) 
Term Parole Consideration ) 
Hearing of: ) CDC Number E-25371
)
CHARLES BROWN )
_____ )

**INMATE COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

JULY 24, 2006

PANEL PRESENT:

MICHAEL PORTER, Presiding Commissioner
RUFUS MORRIS, Deputy Commissioner

OTHERS PRESENT:

CHARLES BROWN, Inmate
CANDICE CHRISTENSEN, Attorney for Inmate

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____ No        See Review of Hearing
_____ Yes       Transcript Memorandum

**Myra Severtson, Northern California Court Reporters**

INDEX

                                                              Page

Proceedings ....................................... 1

Case Factors ...................................... 8

Pre-Commitment Factors ........................... 20

Post-Commitment Factors .......................... 31

Parole Plans ..................................... 55

Closing Statements ............................... 65

Recess ........................................... 66

Decision ......................................... 67

Adjournment ...................................... 71

Transcriber Certification ........................ 72

--oOo--

1

1    P R O C E E D I N G S

2        DEPUTY COMMISSIONER MORRIS:  We're on record.

3        PRESIDING COMMISSIONER PORTER:  This is a

4    subsequent parole consideration hearing for Mr. Charles

5    Brown, CDC number E as in Edward, 25371.  Today's date is

6    7/24/2006.  We're located at the Correctional Training

7    Facility in Soledad.  The inmate was received on 8/08/89

8    in Placer County.  The life term began on 12/08/89 and

9    the minimum eligible parole date is 5/06/2000.  The

10   controlling offense for which the inmate had been

11   committed is murder second-degree case number 1251 count

12   one Penal Code Section 187.  The inmate received a term

13   of 15 years to life plus two with a minimum eligible

14   parole date of 5/06/2000.  This hearing is being tape-

15   recorded and for the purpose of voice identification each

16   of us will say our first and last name and spell our last

17   name.  When it comes to you Mr. Brown, please give us

18   your CDC number after you spell your last name.  I'll

19   start with myself and go to my left, Michael Porter, P-O-

20   R-T-E-R, Commissioner.

21       DEPUTY COMMISSIONER MORRIS:  Rufus Morris, M-O-R-

22   R-I-S, Deputy Commissioner.

23       ATTORNEY CHRISTENSEN:  Candice Christensen, C-H-R-

24   I-S-T-E-N-S-E-N, attorney for Mr. Brown.

25       INMATE BROWN:  Charles Brown, B-R-O-W-N, E-25371.

26       PRESIDING COMMISSIONER PORTER:  Okay, Mr. Brown.

27   Before we begin can you please read that ADA statement

2

1    out loud.

2        **INMATE BROWN:**

3        "The Americans With Disability Act is a

4        law to help people with disabilities.

5        Disabilities are problems that make it

6        hard for some people to see, hear,

7        breathe, talk, walk, learn, think, work

8        or take care of themselves than it is for

9        others.  Nobody can be kept out of public

10       places or activities because of a

11       disability.  If you have a disability you

12       have the right to ask for help to get

13       ready for your BPT hearing, get to the

14       hearing, talk, read forms and papers, and

15       understand the hearing process.  BPT will

16       look at what you have asked for to make

17       sure that you have a disability that is

18       covered by the ADA, and that you have

19       asked for the right kind of help.  If you

20       do not get help, or if you don't think

21       you got the kind of help you need, ask

22       for a BPT 1074 grievance form.  You can

23       also get help filling it out."

24       **PRESIDING COMMISSIONER PORTER:**  Thank you sir.

25  The record reflects that you signed a BPT 1073 form on

26  12/2005 indicating that you do not have a disability as

27  defined under the Americans With Disabilities Act.  Is

3

1    that true?

2            INMATE BROWN:  That's true.

3            PRESIDING COMMISSIONER PORTER:  Is that

4    information still correct?

5            INMATE BROWN:  That is still correct.

6            PRESIDING COMMISSIONER PORTER:  Okay.  Did you

7    have any problem walking up the stairs getting here?

8            INMATE BROWN:  No.

9            PRESIDING COMMISSIONER PORTER:  Okay.  And do you

10   have any problems seeing?  I see you've got glasses on--

11           INMATE BROWN:  No.

12           PRESIDING COMMISSIONER PORTER:  -- and glasses are

13   for reading.

14           INMATE BROWN:  No, I can see fine.

15           PRESIDING COMMISSIONER PORTER:  Okay.  Do you have

16   any type of hearing impairment?

17           INMATE BROWN:  No, I don't.

18           PRESIDING COMMISSIONER PORTER:  Okay.  Have you

19   ever been included in the triple CMS or DOP programs?

20           INMATE BROWN:  No, I haven't.

21           PRESIDING COMMISSIONER PORTER:  Do you know what

22   those terms mean?

23           INMATE BROWN:  Something to do with a psychiatric

24   (inaudible).

25           PRESIDING COMMISSIONER PORTER:  (Inaudible)  Have

26   you ever taken any kind of medication for mental health

27   either in prison or on the street?

4

1        **INMATE BROWN:**  No, I haven't.

2        **PRESIDING COMMISSIONER PORTER:**  Then finally, do

3    you suffer from any disability that will prevent you from

4    participating in today's hearing?

5        **INMATE BROWN:**  No.  I'm okay.

6        **PRESIDING COMMISSIONER PORTER:**  Counsel are there

7    any ADA issues that you believe need further discussion

8    regarding your client's ability to fully participate in

9    today's hearing?

10       **ATTORNEY CHRISTENSEN:**  No.  He has prescription

11   glasses and (inaudible).

12       **PRESIDING COMMISSIONER PORTER:**  Okay.  Thank you.

13   This hearing is being conducted pursuant to the Penal

14   Code and the Rules and Regulations of the Board of Parole

15   Hearings governing parole consideration hearings for life

16   inmates.  The purpose of today's hearing is to once again

17   consider your suitability for parole.  In doing so we

18   will consider the number and nature of the crimes for

19   which you were committed, your prior criminal and social

20   history, your behavior and programming since your

21   commitment and your plans if released.  We have had the

22   opportunity to review your central file and you will be

23   given the opportunity to correct or clarify the record.

24   We will consider your progress since your commitment and

25   your counselor's report and your mental health

26   evaluation.  We will focus on your progress and any new

27   reports since our last hearing.  Any change in parole

5

1    plans should be brought to our attention.  We will reach

2    a decision today and inform you whether or not we find

3    you suitable for parole and the reasons for our decision.

4    If you are found suitable for parole the length of your

5    confinement will be explained to you.  Before we recess

6    for deliberation the District Attorney's representative

7    -- stand by.  Are we going to have a -- is this a

8    videoconference, or do we have a District Attorney at

9    all?

10          DEPUTY COMMISSIONER..MORRIS:  I'll check for

11   (inaudible).

12          PRESIDING COMMISSIONER PORTER:  Thank you, sir.

13   We're going to take a quick recess here.

14          DEPUTY COMMISSIONER..MORRIS: Yeah, we're off the

15   record.

16                     [Off the record]

17          DEPUTY COMMISSIONER..MORRIS:  Okay, we're back on

18   record.

19          .PRESIDING COMMISSIONER PORTER:  Okay.  Before we

20   recess for deliberation your attorney and you will be

21   given the opportunity to make a final statement regarding

22   your parole suitability.  Your statement shall be limited

23   to why you are suitable for parole.  We will then recess,

24   clear the room and deliberate.  Once we have completed

25   our deliberations we will resume the hearing and announce

26   our decision.  The California Code of Regulations states

27   that regardless of time served a life inmate shall be

6

1    found unsuitable for and denied parole, if in the

2    judgment of the panel the inmate will pose an

3    unreasonable risk of danger to society if released from

4    prison.  Mr. Brown, you have certain rights.  Those

5    rights include the right to a timely notice of this

6    hearing, the right to review your central file and the

7    right to present any relevant documents.  Counsel, have

8    all of your client's rights been met?

9         **ATTORNEY CHRISTENSEN:**  Yes, they have.

10        **PRESIDING COMMISSIONER PORTER:**  Okay.  Mr. Brown

11   you have an additional right to be heard by an impartial

12   panel.  We are your panel.  Do you have any objection to

13   us?

14        **INMATE BROWN:**  No.

15        **PRESIDING COMMISSIONER PORTER:**  You will receive a

16   copy of our written tentative decision today.  That

17   decision becomes final within 120 days.  A copy of that

18   decision and a copy of the transcript will be sent to

19   you.  On May 1st, 2004 the regulations regarding your

20   right to appeal a decision made at this hearing were

21   repealed.  The current policy is entitled,

22   "Administrative Appeals, Correspondence and Grievances

23   Concerning Board of Prison Terms Decisions."  Please

24   consult your attorney if you have any questions, or you

25   can review the policy in the prison law library.  What

26   that basically states is that if you disagree with a

27   decision made at this panel today you can have a recourse

7

1   through the court of (inaudible).  Mr. Brown, you are not

2   required to admit to or discuss your offense.  However,

3   this panel does accept as true the findings of the court.

4   Do you understand that?

5           **INMATE BROWN:**  I do.

6           **PRESIDING COMMISSIONER PORTER:**  Deputy

7   Commissioner sir, are we using any confidential

8   information?

9           **DEPUTY COMMISSIONER MORRIS:**  There are no

10  confidential materials in the C File (inaudible).

11          **PRESIDING COMMISSIONER PORTER:**  I have got a

12  checklist marked Exhibit One given to the panel to make

13  sure we are all operating from the same documentation.

14  Sir, could you pass this around.

15          **ATTORNEY CHRISTENSEN:**  (Inaudible)

16          **PRESIDING COMMISSIONER PORTER:**  Okay.  Counsel,

17  are there any additional documents that you will be

18  submitting?

19          **ATTORNEY CHRISTENSEN:**  I have none.

20          **PRESIDING COMMISSIONER PORTER:**  Counsel, do you

21  have any preliminary objections?

22          **ATTORNEY CHRISTENSEN:**  I don't.

23          **PRESIDING COMMISSIONER PORTER:**  And will your

24  client being addressing the panel today.

25          **ATTORNEY CHRISTENSEN:**  (Inaudible)

26          **PRESIDING COMMISSIONER PORTER:**  Okay.  Mr. Brown

27  since you will be speaking with us today we need to swear

8

1    you in.  Will you please raise your right hand?  Do you

2    solemnly swear or affirm that the testimony you give at

3    this hearing will be the truth, the whole truth, and

4    nothing but the truth?

5            INMATE BROWN: Yes.

6            PRESIDING COMMISSIONER PORTER:  Thank you, sir.

7    Okay, I'm going to read into the record or I'm going to

8    incorporate by reference the Statement of Facts from the

9    Board Report dated November 2004, if you have no

10    objections Counsel.

11            ATTORNEY CHRISTENSEN:  I have no objections.

12            PRESIDING COMMISSIONER PORTER:  And Mr. Brown on

13    4/23/88, that's the day of the commitment, can you please

14    tell me what happened (inaudible)?

15            INMATE BROWN:  I went over to Michael Defew's

16    (phonetic) residence and got into a altercation.  And it

17    ended up with him -- I shot Michael (inaudible).

18            PRESIDING COMMISSIONER PORTER:  Okay.  Could you

19    get in a little bit more detail for us?  How did you come

20    to know Mr. Defew?  State how'd you come to know him?

21            INMATE BROWN:  I just know him from the

22    neighborhood.

23            PRESIDING COMMISSIONER PORTER:  Okay.  I'm sorry

24    (inaudible) for your microphone.

25            INMATE BROWN:  Oh, I'm sorry.  I had known Mike

26    for quite a few years, we were friends, I knew him for

27    five or six years.

9

1          **PRESIDING COMMISSIONER PORTER:**  Okay.  How old
2     were you at the time of the --
3          **INMATE BROWN:**  I believe I was 35.
4          **PRESIDING COMMISSIONER PORTER:**  Thirty-five.  So
5     you had known him since you were about 30?
6          **INMATE BROWN:**  Uh-huh, and his sister Patty.
7     (phonetic)
8          **PRESIDING COMMISSIONER PORTER:**  Okay.  And how'd
9     you find out he was over at Mr. Defew's house?
10         **INMATE BROWN:**  I didn't know he was over there.
11         **PRESIDING COMMISSIONER PORTER:**  Okay.
12         **INMATE BROWN:**  (Inaudible) were waiting for me
13    when I come home.
14         **PRESIDING COMMISSIONER PORTER:**  Oh, you were --
15         **INMATE BROWN:**  We were already fighting.  We
16    already had a little war going between us and --
17         **PRESIDING COMMISSIONER PORTER:**  Okay.
18         **INMATE BROWN:**  And I was over there earlier.  And
19    (inaudible) to get out.
20         **PRESIDING COMMISSIONER PORTER:**  What was the war
21    about?
22         **INMATE BROWN:**  Money.
23         **PRESIDING COMMISSIONER PORTER:**  This is by you and
24    the victim, right?
25         **INMATE BROWN:**  And his sister, yeah.
26         **PRESIDING COMMISSIONER PORTER:**  And his sister?
27         **INMATE BROWN:**  Over owed money.

10

1          **PRESIDING COMMISSIONER PORTER:**  What do you mean?

2   He owed you money or --

3          **INMATE BROWN:**  He owed me money.

4          **PRESIDING COMMISSIONER PORTER:**  Okay.  All right.

5   How'd he owe you money?

6          **INMATE BROWN:**  He owed me money because I loaned

7   him money to pay the rent in (inaudible).

8          **PRESIDING COMMISSIONER PORTER:**  How much money did

9   you loan him.

10         **INMATE BROWN:**  Three hundred dollars.  That's

11  where it all started.  (Inaudible)

12         **PRESIDING COMMISSIONER PORTER:**  So when was he

13  supposed to pay you back?

14         **INMATE BROWN:**  Well, he was supposed to have

15  already paid me back before then.  (Inaudible)

16         **PRESIDING COMMISSIONER PORTER:**  (Inaudible) was it

17  like months or (inaudible)

18         **INMATE BROWN:**  (Inaudible) almost a year.

19         **PRESIDING COMMISSIONER PORTER:**  (Inaudible)  So

20  what did you say to him?

21         **INMATE BROWN:**  It wasn't really the issue on owing

22  the money, you know, just we got to fighting back and

23  forth.  We got, we had gotten --

24         **PRESIDING COMMISSIONER PORTER:**  Well, what did the

25  fighting start about?  That's what I'm trying to get you

26  to --

27         **INMATE BROWN:**  It was over the money, because the

11

1    money was what we started the fight over.

2        **PRESIDING COMMISSIONER PORTER:**  Okay.

3        **INMATE BROWN:**  We got into a fight earlier that

4    year.  And he had gotten a (inaudible) shotgun shells.

5    (Inaudible).

6        **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

7        **INMATE BROWN:**  And we had gotten in a fight before

8    that.  And we was just going back and forth and then that

9    night it just happened to come to a head.

10       **PRESIDING COMMISSIONER PORTER:**  So, when did you

11   ask him to pay you back the three hundred bucks?

12       **INMATE BROWN:**  I had asked him several times.

13       **PRESIDING COMMISSIONER PORTER:**  And what was his

14   response?

15       **INMATE BROWN:**  You know, I really can't remember.

16       **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

17       **INMATE BROWN:**  I mean I can't -- it's been so long

18   and a lot of it's foggy to me now.

19       **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

20       **INMATE BROWN:**  Because I don't remember those

21   little parts, you know.  I mean I remember the incident

22   going down and things like that.  And part of that I

23   don't really remember anymore.

24       **PRESIDING COMMISSIONER PORTER:**  Okay.

25       **INMATE BROWN:**  I don't remember all the little

26   conversations and things back then because I was using

27   drugs too.  And my prior recollection of (inaudible) is

12

1   foggy.

2       **PRESIDING COMMISSIONER PORTER:**  Okay.  So you got

3   to the place and he was already in the place --

4       **INMATE BROWN:**  Right.

5       **PRESIDING COMMISSIONER PORTER:**  -- the apartment.

6       **INMATE BROWN:**  Right.

7       **PRESIDING COMMISSIONER PORTER:**  -- and did you ask

8   for him once you got there?

9       **INMATE BROWN:**  No, no I didn't.  I didn't know he

10  was there.  They said that in there, but I never knew he

11  was in there.  I couldn't see him.

12      **PRESIDING COMMISSIONER PORTER:**  (Inaudible) and

13  what police said is you got there and you started yelling

14  for him (inaudible).

15      **INMATE BROWN:**  Well, you see the -- that was their

16  court story to say that they didn't know who that I was,

17  that I just came in and asked for him.

18      **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

19      **INMATE BROWN:**  But then when they got down to

20  telling the story that they knew it was (inaudible), and

21  that they made up all them parts in there because I never

22  even knew he was in there in the back room.

23      **PRESIDING COMMISSIONER PORTER:**  Okay.  So you got

24  there and he  --

25      **INMATE BROWN:**  Because we were already fighting at

26  that time.

27      **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

13

1      **INMATE BROWN:**  In fact the only reason I went in

2   the back room (inaudible) and he was standing around up

3   there.

4      **PRESIDING COMMISSIONER PORTER:**  When you say

5   fighting what had you done to him and what had he done to

6   you?

7      **INMATE BROWN:**  We had got into a fistfight down

8   near (inaudible) house and I beat him up.

9      **PRESIDING COMMISSIONER PORTER:**  Okay.  How did

10  that fight start?

11     **INMATE BROWN:**  It started when I came in the

12  house.

13     **PRESIDING COMMISSIONER PORTER:**  You just came in

14  the house and you guys just started --

15     **INMATE BROWN:**  Came in and then we started

16  fighting, yeah.  And then that's when he got pulled over

17  by the police that day with the shotgun --

18     **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

19     **INMATE BROWN:**  -- that sawed-off shotgun in his

20  hands and (inaudible).

21     **PRESIDING COMMISSIONER PORTER:**  Okay.  So you're

22  in the apartment, you don't know he's there, so how'd you

23  guys --

24     **INMATE BROWN:**  I walked in and he just pulled a

25  gun on me.

26     **PRESIDING COMMISSIONER PORTER:**  So you walked in

27  and he pulled a gun on you?

14

1      **INMATE BROWN:**  Yeah, I walk into the back room and

2    he pulled a gun on me, started to pull the gun on me.

3      **PRESIDING COMMISSIONER PORTER:**  Oh, he had a gun

4    to you then?

5      **INMATE BROWN:**  Yeah, at the time, a silver pistol.

6    I noticed it was a pistol with black handles.

7      **PRESIDING COMMISSIONER PORTER:**  Okay.  And what'd

8    you do after you saw him pull the gun on you.

9      **INMATE BROWN:**  We got into it.  I grabbed his arm,

10   and we started to fight.

11     **PRESIDING COMMISSIONER PORTER:**  So you saw him

12   pulling it and before he got you (inaudible) --

13     **INMATE BROWN:**  Right.  (Inaudible) to him and got

14   a hold of his hand, and then we fought out into the front

15   room.

16     **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

17     **INMATE BROWN:**  And that's when some of the other

18   people in the house got involved in it.

19     **PRESIDING COMMISSIONER PORTER:**  Did you bring

20   anybody with you?

21     **INMATE BROWN:**  Yeah, I did.

22     **PRESIDING COMMISSIONER PORTER:**  Who was that?

23     **INMATE BROWN:**  I don't know.  I was just giving

24   him a ride.

25     **PRESIDING COMMISSIONER PORTER:**  Okay.

26     **INMATE BROWN:**  I never did know his name.  I was

27   giving him a ride and I stopped over there because

15

1    (inaudible) told (inaudible) I was supposed to

2    (inaudible) friend of mine that was (inaudible).  And

3    that was the main reason that I went over that day.

4         **PRESIDING COMMISSIONER PORTER:**  Okay.  So you're

5    wrestling with for him for the gun --

6         **INMATE BROWN:**  Right.

7         **PRESIDING COMMISSIONER PORTER:**  -- at some point

8    you overpowered him and took the gun?

9         **INMATE BROWN:**  No, I pulled a gun out myself.

10        **PRESIDING COMMISSIONER PORTER:**  Oh you had a gun.

11        **INMATE BROWN:**  I had a gun and he had a gun.

12        **PRESIDING COMMISSIONER PORTER:**  Okay, so and then

13   what?  Both you guys have pulled your guns and are just

14   standing there?

15        **INMATE BROWN:**  He had a gun and I had a gun and

16   what just happened before that, (inaudible).

17        **PRESIDING COMMISSIONER PORTER:**  Okay.

18        **INMATE BROWN:**  (Inaudible) and I started hitting

19   him with --

20        **PRESIDING COMMISSIONER PORTER:**  Where'd the knife

21   come from?

22        **INMATE BROWN:**  It was mine.

23        **PRESIDING COMMISSIONER PORTER:**  Where'd you have

24   it?

25        **INMATE BROWN:**  In between the (inaudible) and my

26   belt.

27        **PRESIDING COMMISSIONER PORTER:**  All right so

16

1    (inaudible) --

2            **INMATE BROWN:**  I didn't want to shoot him.

3            **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

4            **INMATE BROWN:**  And I told him that as I pulled the

5    gun.

6            **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

7            **INMATE BROWN:**  And I told him two or three times

8    as I pulled the gun.  Then I started hitting him with my

9    pistol and he grabbed the gun barrel.  And while we were

10   still fighting it went off, and the first shot hits the

11   window and the next one hit his head.

12           **PRESIDING COMMISSIONER PORTER:**  So he's holding on

13   to it and you're stabbing him, and you're both

14   (inaudible) --

15           **INMATE BROWN:**  No, I lost the knife by then.  I

16   lost the knife during the fight; I got kicked in the face

17   during the fight.

18           **PRESIDING COMMISSIONER PORTER:**  Did anybody else

19   jump in the fight or just you and him?

20           **INMATE BROWN:**  Yeah, yeah there was other people

21   in the fight but --

22           **PRESIDING COMMISSIONER PORTER:**  Who else jumped

23   in?

24           **INMATE BROWN:**  Emile Hammond.  (phonetic)

25           **PRESIDING COMMISSIONER PORTER:**  Who did he jump in

26   to help, you or to help --

27           **INMATE BROWN:**  No, to help him.

17

1          **PRESIDING COMMISSIONER PORTER:** To help him.

2          **INMATE BROWN:** Because they were all together in

3     the (inaudible).

4          **PRESIDING COMMISSIONER PORTER:** Okay.

5          **INMATE BROWN:** All I can say is just a lot of the

6     details are foggy to me now.  I guess I could have read

7     about it before I came in, you know, the transcripts

8     but --

9          **PRESIDING COMMISSIONER PORTER:** Okay.  And was

10    there something to the effect that you were saying that

11    he tried to blow your car up or --

12         **INMATE BROWN:** Yeah, there was a bomb (inaudible).

13         **PRESIDING COMMISSIONER PORTER:** What happened

14    there?  How did he do that?

15         **INMATE BROWN:** He wired a bomb in my car.  And the

16    D.A., it was in his opening statements (inaudible) bomb

17    dog and that he had planted it in my car.  I had found

18    the bomb.

19         **PRESIDING COMMISSIONER PORTER:** How'd you find the

20    bomb?

21         **INMATE BROWN:** I was called and told where it was.

22    And then when I had (inaudible) it went off in the house.

23         **PRESIDING COMMISSIONER PORTER:** Um-hmm.

24         **INMATE BROWN:** And it blew up.

25         **PRESIDING COMMISSIONER PORTER:** Okay.  Where was

26    the bomb located?

27         **INMATE BROWN:** Where was it located?

18

1      **PRESIDING COMMISSIONER PORTER:**  Yeah, inside the

2    car?

3      **INMATE BROWN:**  Well, it never got into the car.

4    It never got all the way in the car.

5      **PRESIDING COMMISSIONER PORTER:**  Where was it?

6      **INMATE BROWN:**  It was over at somebody's house.

7      **PRESIDING COMMISSIONER PORTER:**  Okay.

8      **INMATE BROWN:**  Yeah.

9      **PRESIDING COMMISSIONER PORTER:**  And you went over

10   to somebody's house and picked it (inaudible) --

11     **INMATE BROWN:**  (Inaudible) proceeded at

12   (inaudible) time to put it over at the -- (inaudible) be

13   on my property to do it.  They had tried and then the

14   dogs had gotten a hold (inaudible).

15     **PRESIDING COMMISSIONER PORTER:**  All right.  Let's

16   go back a little bit, sir.  You and him are -- go back to

17   the fight.  So you're struggling over the gun.  You tell

18   him to let go of the gun and the gun shoots off one time

19   and goes through the ceiling --

20     **INMATE BROWN:**  Hits the window and hits the door

21   jam -- window jam.

22     **PRESIDING COMMISSIONER PORTER:**  Okay.  And then

23   the next round hits him in the head and (inaudible) him.

24     **INMATE BROWN:**  (Inaudible)

25     **PRESIDING COMMISSIONER PORTER:**  How did that

26   happen?

27     **INMATE BROWN:**  I had the gun and we were just

19

1    struggling over it.  The gun was like this and it went

2    off and clipped him in the back of the head.

3        PRESIDING COMMISSIONER PORTER:  And then what'd

4    you do?

5        INMATE BROWN:  I got up and run.

6        PRESIDING COMMISSIONER PORTER:  Did you make any

7    comments when you left?

8        INMATE BROWN:  No, I didn't say (inaudible).  Me

9    and Mike were friends.  And I won't ever; whatever I'm

10   saying (inaudible) put the blame on them.  I'm not trying

11   to do that.

12       PRESIDING COMMISSIONER PORTER:  Okay.  I'm just

13   getting your version of the story.

14       INMATE BROWN:  All right.

15       PRESIDING COMMISSIONER PORTER:  Okay, good.  And

16   then before that -- how many days before that had you

17   discovered the bomb?

18       INMATE BROWN:  The bomb was months before that.

19       PRESIDING COMMISSIONER PORTER:  Oh, so you

20   hadn't --

21       INMATE BROWN:  I already had fought with him over

22   the bomb (inaudible).  We'd already had that fight over

23   all of that.  And then the shotgun and all them issues

24   were, you know, that was months before that.

25       PRESIDING COMMISSIONER PORTER:  Okay, so you guys

26   had several fights (inaudible).

27       INMATE BROWN:  Yeah, yeah.

20

1          **PRESIDING COMMISSIONER PORTER:** And at some point

2    you (inaudible) got a restraining order against him,

3    'This guy just tried to blow me up.' (inaudible).

4          **INMATE BROWN:** No, I never thought of that.

5          **PRESIDING COMMISSIONER PORTER:** All right,

6    anything else about the story that you just want to add

7    that we didn't cover?

8          **INMATE BROWN:** No. (Inaudible)

9          **PRESIDING COMMISSIONER PORTER:** All right let's

10   talk about some of your pre-conviction factors, your

11   juvenile record. How many times were you arrested as a

12   juvenile?

13         **INMATE BROWN:** When I was 10 or 12.

14         **PRESIDING COMMISSIONER PORTER:** It looks like

15   twice, once in '68 and once in '69. In '68 you took a

16   (inaudible) the owner's consent and then were arrested

17   for (inaudible). What happened there?

18         **INMATE BROWN:** I don't --

19         **PRESIDING COMMISSIONER PORTER:** You don't

20   remember?

21         **INMATE BROWN:** Well, I remember being arrested for

22   stealing a car.

23         **PRESIDING COMMISSIONER PORTER:** How old were you

24   in '68?

25         **INMATE BROWN:** About 16 I think.

26         **PRESIDING COMMISSIONER PORTER:** Sixteen.

27         **INMATE BROWN:** (Inaudible)

21

1      **PRESIDING COMMISSIONER PORTER:**  And you had

2   another arrest in '69.  (Inaudible).  Do you remember

3   that case?

4      **INMATE BROWN:**  I just remember I was stealing cars

5   when I was a kid.  (Inaudible) I do remember that.

6      **PRESIDING COMMISSIONER PORTER:**  Why were you

7   stealing cars?

8      **INMATE BROWN:**  I was joyriding.

9      **PRESIDING COMMISSIONER PORTER:**  Did you try to

10   sell them?

11      **INMATE BROWN:**  No.

12      **PRESIDING COMMISSIONER PORTER:**  Did you steal

13   anything from them?

14      **INMATE BROWN:**  No.

15      **PRESIDING COMMISSIONER PORTER:**  Radio and all that

16   stuff?

17      **INMATE BROWN:**  No, just (inaudible) driving around

18   in them.

19      **PRESIDING COMMISSIONER PORTER:**  Where'd you go

20   with them?

21      **INMATE BROWN:**  Just (inaudible) you know, what

22   kids do.

23      **PRESIDING COMMISSIONER PORTER:**  How long did you

24   have it before you ditched it?

25      **INMATE BROWN:**  I don't know.  Well, I got caught

26   with them so probably a couple of weeks.

27      **PRESIDING COMMISSIONER PORTER:**  All right.  So you

22

1    only (inaudible) a couple of weeks where you had

2    (inaudible)?

3         **INMATE BROWN:**  No, I can't remember.  I just

4    remember getting caught.

5         **PRESIDING COMMISSIONER PORTER:**  Okay.  All right,

6    let's go to your adult convictions.  In '71 you were

7    arrested by Los Angeles County sheriffs for the

8    kidnapping and grand theft person.  What happened there?

9         **INMATE BROWN:**  I had a fight at a party.

10        **PRESIDING COMMISSIONER PORTER:**  Okay, how did the

11   kidnapping get involved in that?

12        **INMATE BROWN:**  I never really could figure that

13   part out except that when we were fighting we went from

14   one room to the other.

15        **PRESIDING COMMISSIONER PORTER:**  Did you drag

16   somebody?

17        **INMATE BROWN:**  Well, we were just in a fistfight

18   but I never really knew what the kidnapping was all

19   about.  You know, but then there again I was just

20   (inaudible).

21        **PRESIDING COMMISSIONER PORTER:**  And grand theft

22   person, did you take some money from him and then he

23   said, 'Hey, give it back to me,' and then the fight

24   started --

25        **INMATE BROWN:**  Well, there was four of us in

26   there.  I think some things got taken and we left, yeah.

27   (Inaudible).

23

1      **PRESIDING COMMISSIONER PORTER:**  Okay.  Do you

2      remember how your fight started?

3          **INMATE BROWN:**  No, not really, I remember fighting

4      though.  I remember picking the fight.  And I remember

5      fighting with the guy.

6          **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

7          **INMATE BROWN:**  But I don't remember how it got

8      started now.

9          **PRESIDING COMMISSIONER PORTER:**  And you don't

10     remember the part about how you guys were kidnapping?

11         **INMATE BROWN:**  Well, I never really figured it --

12     the only thing I could figure out was going from one room

13     to the next in the fight.  And I think that's what was

14     reported.

15         **PRESIDING COMMISSIONER PORTER:**  Okay.

16         **INMATE BROWN:**  Because they dropped it when they

17     let us go in the Army.  (inaudible) dropped the case.

18         **PRESIDING COMMISSIONER PORTER:**  Oh, you went to

19     the Army after that case?

20         **INMATE BROWN:**  Yeah, this was just (inaudible).

21         **PRESIDING COMMISSIONER PORTER:**  How long were you

22     in the Army?

23         **INMATE BROWN:**  Six months.

24         **PRESIDING COMMISSIONER PORTER:**  What happened?

25         **INMATE BROWN:**  I had a medical discharge for my

26     knee.

27         **PRESIDING COMMISSIONER PORTER:**  You already busted

24

1    your knee while on basic training or how did that --

2         **INMATE BROWN:**  I tore a cartilage in it.  So out

3    of the four of us I was -- I went home and the rest of

4    them stayed in the service.

5         **PRESIDING COMMISSIONER PORTER:**  Okay.  Oh, all

6    four of you guys went in.

7         **INMATE BROWN:**  We all went in, yeah.

8         **PRESIDING COMMISSIONER PORTER:**  So the judge told

9    you, you go to jail or go to the Army.

10        **INMATE BROWN:**  Yeah, per the judge either go in

11   the Army and grow up or (inaudible).

12        **PRESIDING COMMISSIONER PORTER:**  Okay.

13        **INMATE BROWN:**  And that's what he told us.

14        **PRESIDING COMMISSIONER PORTER:**  All right, so in

15   '73 there was another arrest.  It just says a ordinance

16   violation, some kind of (inaudible) trouble.  What'd you

17   do?

18        **INMATE BROWN:**  I don't remember.

19        **PRESIDING COMMISSIONER PORTER:**  Okay.

20        **INMATE BROWN:**  I really don't.

21        **PRESIDING COMMISSIONER PORTER:**  And then in '83

22   you're out of L.A. County and live in Sacramento.

23        **INMATE BROWN:**  Uh-huh.

24        **PRESIDING COMMISSIONER PORTER:**  And (inaudible)

25   there for fighting.

26        **INMATE BROWN:**  Yeah, it was a bar fight.

27        **PRESIDING COMMISSIONER PORTER:**  All right.  What

25

1   happened there?

2          **INMATE BROWN:**  Got into a fight.

3          **PRESIDING COMMISSIONER PORTER:**  You don't remember

4   who started it or anything.

5          **INMATE BROWN:**  No, not really, I just remember

6   fighting and (inaudible).

7          **PRESIDING COMMISSIONER PORTER:**  Okay.  And in 1988

8   a Sacramento sheriff arrested you again.  This was for

9   possession of a controlled substance.  What happened

10  there?  (Inaudible).

11         **INMATE BROWN:**  I don't remember.  I really don't

12  remember.

13         **PRESIDING COMMISSIONER PORTER:**  Okay.

14         **INMATE BROWN:**  I think I got arrested in a motel.

15         **PRESIDING COMMISSIONER PORTER:**  All right.  They

16  say you tried to sell a dangerous weapon.  What was the

17  dangerous weapon?

18         **INMATE BROWN:**  I was trying to sell (inaudible) --

19         **PRESIDING COMMISSIONER PORTER:**  Uh-huh.

20         **INMATE BROWN:**   -- because I was (inaudible).

21         **PRESIDING COMMISSIONER PORTER:**  Okay,

22  manufacturing and selling a dangerous weapon.

23         **INMATE BROWN:**  I had a pistol when I got arrested,

24  but I wasn't trying to sell it.  I was just sleeping when

25  they arrested me.

26         **PRESIDING COMMISSIONER PORTER:**  Okay.

27         **INMATE BROWN:**  (Inaudible).

26

1        **PRESIDING COMMISSIONER PORTER:**  And you got --

2        **INMATE BROWN:**  And that was dropped to down to a

3    drug diversion, the whole thing was.

4        **PRESIDING COMMISSIONER PORTER:**  And you got three

5    years probation, correct.  And okay, here a year later

6    basically you got convicted of the murder.  And we don't

7    have too much personal facts (inaudible) where were you

8    born and raised?

9        **INMATE BROWN:**  I was born in Tacoma, Washington.

10   And I was raised in California.  (Inaudible) --

11       **PRESIDING COMMISSIONER PORTER:**  And how old were

12   you when you --

13       **INMATE BROWN:**  Since 1970.

14       **PRESIDING COMMISSIONER PORTER:**  And how old were

15   you when you moved to Los Angeles?

16       **INMATE BROWN:**  Oh, probably (inaudible) six or

17   seven years old.

18       **PRESIDING COMMISSIONER PORTER:**  Seven.  All right.

19   And you got married in '73.

20       **INMATE BROWN:**  Um-hmm.

21       **PRESIDING COMMISSIONER PORTER:**  To a Miss Linda

22   Brown. (phonetic)  What happened there?

23       **INMATE BROWN:**  We were married and had two

24   children.

25       **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

26       **INMATE BROWN:**  And then we got divorced, I believe

27   in, I can't remember.  I can't recollect the year the

27

1    divorce was.

2              **PRESIDING COMMISSIONER PORTER:**  In '84?

3              **INMATE BROWN:**  I'm think (inaudible) there.

4              **PRESIDING COMMISSIONER PORTER:**  And you married

5    again, a Miss Rebecca Lee (phonetic) in 1990.

6              **INMATE BROWN:**  I'm sorry?

7              **PRESIDING COMMISSIONER PORTER:**  You were already

8    in prison weren't you, at that time?

9              **INMATE BROWN:**  Yeah.

10             **PRESIDING COMMISSIONER PORTER:**  Had you been

11   seeing her?

12             **INMATE BROWN:**  Uh-huh, yeah basically when I was

13   free.

14             **PRESIDING COMMISSIONER PORTER:**  Okay.  How did

15   that marriage turn out?

16             **INMATE BROWN:**  It's good, just she has a hard time

17   getting up here because it's so far but --

18             **PRESIDING COMMISSIONER PORTER:**  You're still

19   married?

20             **INMATE BROWN:**  Yeah, we're still (inaudible).

21             **PRESIDING COMMISSIONER PORTER:**  Where does she

22   live?

23             **INMATE BROWN:**  She lives in North Highlands

24   outside of Sacramento.

25             **PRESIDING COMMISSIONER PORTER:**  Okay.  All right.

26   You guys have any kids in that marriage?

27             **INMATE BROWN:**  No.

28

1    PRESIDING COMMISSIONER PORTER:  That's good, she's

2    actually still hanging with you.

3    INMATE BROWN:  Yeah, still waiting (inaudible) a

4    long time.

5    PRESIDING COMMISSIONER PORTER:  So you attended

6    high school, Marshall High School.  And how'd did you do

7    in school?

8    INMATE BROWN:  Oh, not too good.

9    PRESIDING COMMISSIONER PORTER:  What happened?

10    INMATE BROWN:  I just couldn't (inaudible).

11    PRESIDING COMMISSIONER PORTER:  Grade-wise or

12    would you get suspended or --

13    INMATE BROWN:  Oh, just getting in trouble.

14    PRESIDING COMMISSIONER PORTER:  Yeah?  What kind

15    of trouble were you getting in?

16    INMATE BROWN:  I was cutting class and just not

17    going to school.  Can I get a drink of water?

18    (Inaudible) thank you.

19    PRESIDING COMMISSIONER PORTER:  (Inaudible)

20    INMATE BROWN:  Thank you.

21    PRESIDING COMMISSIONER PORTER:  So when'd you

22    start having problems in school?

23    INMATE BROWN:  Well, I had a (inaudible).

24    PRESIDING COMMISSIONER PORTER:  Um-hmm, and you

25    just started cutting school?

26    INMATE BROWN:  Hanging around with (inaudible).

27    PRESIDING COMMISSIONER PORTER:  All right.  So did

29

1    you graduate?

2        **INMATE BROWN:**  No, I got a GED when I was in

3    Folsom prison.

4        **PRESIDING COMMISSIONER PORTER:**  Okay.  And it says

5    that you got your diploma in '71.

6        **INMATE BROWN:**  No, that's --

7        **PRESIDING COMMISSIONER PORTER:**  (Inaudible).

8        **INMATE BROWN:**  I was going to night school but I

9    told them the last time I was at the last Board that that

10   was not correct.

11       **PRESIDING COMMISSIONER PORTER:**  Okay.  Well, you

12   got let your counselor know that (inaudible) not

13   corrected.  And so what kind of jobs did you have?

14       **INMATE BROWN:**  I was a roofer.  I was in the union

15   (inaudible).

16       **PRESIDING COMMISSIONER PORTER:**  At what age did

17   you start?

18       **INMATE BROWN:**  Well, I started when I was pretty

19   young because my dad had a roofing company.  And then

20   when I got older I entered the union (inaudible) and I

21   worked for union companies.

22       **PRESIDING COMMISSIONER PORTER:**  And you did black

23   top, sheet metal --

24       **INMATE BROWN:**  Yeah, I did commercial high rises

25   and I did all of it.  I was a supervisor for (inaudible).

26       **PRESIDING COMMISSIONER PORTER:**  (Inaudible)

27       **INMATE BROWN:**  (Inaudible) everything fell apart,

30

1   well my marriage fell apart, and that's when I started

2   kind of going down hill, or that (inaudible).

3          PRESIDING COMMISSIONER PORTER:  You were a

4   foreman, sounded like you were doing pretty good.

5          INMATE BROWN:  Yeah, I was doing good.

6          PRESIDING COMMISSIONER PORTER:  What happened?

7   Why'd you go and mess with these guys and --

8          INMATE BROWN:  I don't know.

9          PRESIDING COMMISSIONER PORTER:  -- (inaudible) at

10  that time you were using drugs.

11         INMATE BROWN:  I started yeah, at that time, after

12  the divorce.  I (inaudible) --

13         PRESIDING COMMISSIONER PORTER:  How old were you

14  when you started using drugs?

15         INMATE BROWN:  I was in my thirties.

16         PRESIDING COMMISSIONER PORTER:  That was the first

17  time you started using drugs?

18         INMATE BROWN:  Yeah.  I experimented when I was

19  (inaudible) but really all I did was smoke and drink beer

20  and that was pretty much it.

21         PRESIDING COMMISSIONER PORTER:  Um-hmm.

22         INMATE BROWN:  And when that happened, I started

23  riding motorcycles and -- well, I always rode motorcycles

24  but after the divorce I (inaudible).

25         PRESIDING COMMISSIONER PORTER:  Did you join a

26  motorcycle club?

27         INMATE BROWN:  No, I never was in a club, no.

31

1          **PRESIDING COMMISSIONER PORTER:**  Did you hang

2      around with bikers when you used to ride motorcycles?

3          **INMATE BROWN:**  Yeah, well we all did, yeah.

4          **PRESIDING COMMISSIONER PORTER:**  What'd you call

5      yourselves?

6          **INMATE BROWN:**  Well, it wasn't never no club.  I

7      was never in a club.

8          **PRESIDING COMMISSIONER PORTER:**  And then basically

9      you started using drugs in your thirties --

10         **INMATE BROWN:**  Yeah.

11         **PRESIDING COMMISSIONER PORTER:**  -- and everything

12     just kind of --

13         **INMATE BROWN:**  It got kind of (inaudible).

14         **PRESIDING COMMISSIONER PORTER:**  How'd you go about

15     your work?  Could you still work when you did drugs?

16         **INMATE BROWN:**  Yeah, at first I was still running

17     a crew for Erik's and Rogers (phonetic).

18         **PRESIDING COMMISSIONER PORTER:**  Um-hmm.

19         **INMATE BROWN:**  And then I quit that and within

20     like a year or so I was in here (inaudible).

21         **PRESIDING COMMISSIONER PORTER:**  All right.  We're

22     going to change gears and go to post-conviction factors

23     with the Deputy Commissioner.

24         **DEPUTY COMMISSIONER MORRIS:**  All right Mr. Brown

25     this looks like -- I saw something that said (inaudible)

26     in prison.  (Inaudible) looks like it says two

27     (inaudible).

32

1          **INMATE BROWN:**  This will be my third one.

2          **DEPUTY COMMISSIONER MORRIS:**  This will be your

3     third one.  (Inaudible)

4          **INMATE BROWN:**  Well, at the time I came in they

5     postponed it for a year because of a psych evaluation.

6          **DEPUTY COMMISSIONER MORRIS:**  Oh.

7          **INMATE BROWN:**  So they (inaudible).

8          **DEPUTY COMMISSIONER MORRIS:**  Well it looks like

9     the last (inaudible) December of '02.  And that's when

10    you were denied (inaudible) then you came back in

11    (inaudible).

12         **INMATE BROWN:**  Oh, that's in '93 and that's '92

13    and then I came back and got one.

14         **DEPUTY COMMISSIONER MORRIS:**  And that brings us up

15    to --

16         **INMATE BROWN:**  That brings us up to --

17         **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) and I'm

18    looking at a classification score of 19 and that's as low

19    as a lifetime is allowed.  I'm also looking at a gang

20    sheet(inaudible).  You've been in prison since '89?

21         **INMATE BROWN:**  Uh-huh.

22         **DEPUTY COMMISSIONER MORRIS:**  How did you manage to

23    avoid gang affiliation?

24         **INMATE BROWN:**  I've just never been affiliated

25    with no gangs, you mean in prison?

26         **DEPUTY COMMISSIONER MORRIS:**  Uh-huh.

27         **INMATE BROWN:**  I just (inaudible) --

33

1          **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) or

2    nothing.

3          **INMATE BROWN:**  Huh?

4          **DEPUTY COMMISSIONER MORRIS:**  Bikers?

5          **INMATE BROWN:**  No.

6          **DEPUTY COMMISSIONER MORRIS:**  They weren't

7    interested in you?

8          **INMATE BROWN:**  No, no.

9          **DEPUTY COMMISSIONER MORRIS:**  Well I don't see any

10   association and that's a good thing.

11         **INMATE BROWN:**  I'm just not that kind of person to

12   be hooked up with any kind of gang members.

13         **DEPUTY COMMISSIONER MORRIS:**  Okay.  It also says

14   you managed to accrue three or four enemies here.

15   (Inaudible) and how you doing on the enemies, you all

16   right?

17         **INMATE BROWN:**  Yeah.

18         **DEPUTY COMMISSIONER MORRIS:**  No problems.

19         **INMATE BROWN:**  No.

20         **DEPUTY COMMISSIONER MORRIS:**  You haven't been

21   assaulted?

22         **INMATE BROWN:**  No.

23         **DEPUTY COMMISSIONER MORRIS:**  You haven't assaulted

24   anyone?

25         **INMATE BROWN:**  No.  I was in a fight a few years

26   ago but it was --

27         **DEPUTY COMMISSIONER MORRIS:**  That's what got you

34

1    the 115s.

2             **INMATE BROWN:**  Uh-huh.

3             **DEPUTY COMMISSIONER MORRIS:**  Valid?

4             **INMATE BROWN:**  Yeah.

5             **DEPUTY COMMISSIONER MORRIS:**  We will get to that

6    in a minute.  I'm looking at the adult basic education

7    scoring and I finally found it dated July 29, 1999 and

8    you had tested at that time at 11.02.  And in '91 you

9    tested higher than that at 11.12.  (Inaudible) I do see

10   eventually you talk about (inaudible) and there was

11   confusion about the 71 versus the 91 (inaudible).

12            **INMATE BROWN:**  Uh-huh.

13            **DEPUTY COMMISSIONER MORRIS:**  (Inaudible)

14            **INMATE BROWN:**  Right.

15            **DEPUTY COMMISSIONER MORRIS:**  Okay.  I see also

16   that you attended Marshall High School in (inaudible).

17            **INMATE BROWN:**  Uh-huh.

18            **DEPUTY COMMISSIONER MORRIS:**  You completed 10th

19   grade?

20            **INMATE BROWN:**  Yes.

21            **DEPUTY COMMISSIONER MORRIS:**  Did you do well in

22   school?

23            **INMATE BROWN:**  Well, I did when I applied myself

24   but (inaudible)  I never really showed up (inaudible).

25            **DEPUTY COMMISSIONER MORRIS:**  Right, you told me.

26   And you were received 8/08/89.  You were about 36 years

27   old --

35

1          **INMATE BROWN:**  Yeah.

2          **DEPUTY COMMISSIONER MORRIS:**  -- at the time of

3    your life term?

4          **INMATE BROWN:**  I was I think 35 when I was

5    arrested.  I got arrested on 8/08/88 so I was maybe 35.

6          **DEPUTY COMMISSIONER MORRIS:**  Okay.  (Inaudible)

7    regard to disciplinaries I see that you have earned

8    (inaudible) 4/03 of '03.  And that was basically a few

9    months after your last face-to-face.

10         **INMATE BROWN:**  Yeah, I know.

11         **DEPUTY COMMISSIONER MORRIS:**  At that face-to-face

12   they spent a lot time talking about being -- they talk

13   about your disciplinaries and the need to be clean, do

14   you recall this conversation?

15         **INMATE BROWN:**  I don't recall that last

16   (inaudible).

17         **DEPUTY COMMISSIONER MORRIS:**  Do you recall some

18   language that, it went something like this, 'you need to

19   be squeaky.'

20         **INMATE BROWN:**  I remember that (inaudible).

21         **DEPUTY COMMISSIONER MORRIS:**  What happened.

22         **INMATE BROWN:**  I was just working, and I was

23   trying to work on some plumbing and Abram (phonetic) was

24   there.  And I had a guy on me from the Armenian Army.

25         **DEPUTY COMMISSIONER MORRIS:**  He was on you?  On

26   your back (inaudible)?

27         **INMATE BROWN:**  No, he just kept -- I don't know

36

1    how to explain it.  I asked him four or five times to,

2    you know, 'You're just wandering over here, so why don't

3    you mind your own business?'

4            DEPUTY COMMISSIONER MORRIS:  Had he touched you?

5            INMATE BROWN:  Huh?

6            DEPUTY COMMISSIONER MORRIS:  Did he lay his hands

7    on you?

8            INMATE BROWN:  Yeah, he just come up on me and

9    then --

10           DEPUTY COMMISSIONER MORRIS:  Then you put hands on

11   him?

12           INMATE BROWN:  No, I did not.

13           DEPUTY COMMISSIONER MORRIS:  Okay.

14           INMATE BROWN:  And I knocked him away from the

15   plumbing.

16           DEPUTY COMMISSIONER MORRIS:  Okay.

17           INMATE BROWN:  And the police were at the door.

18           DEPUTY COMMISSIONER MORRIS:  So he was talking and

19   you knocked him out?

20           INMATE BROWN:  I didn't knock him out, no.  I

21   knocked him back away from me.  But no, I didn't knock

22   him out.  I didn't hurt him.

23           DEPUTY COMMISSIONER MORRIS:  I actually have a

24   statement.

25           INMATE BROWN:  Yeah?

26           DEPUTY COMMISSIONER MORRIS:  Let's see you got

27   maximum-security housing for that one.

37

1          INMATE BROWN:  Right.

2          DEPUTY COMMISSIONER MORRIS:  And you also got a

3     (inaudible) out of that one.

4          INMATE BROWN:  Yeah.

5          DEPUTY COMMISSIONER MORRIS:  It looks to me like

6     (inaudible) reflexes were pretty (inaudible) with him.

7     You were assessed (inaudible) time to serve one month, 15

8     days and then you were back out (inaudible)?

9          INMATE BROWN:  Yeah, we were both back on the

10    lines again.

11         DEPUTY COMMISSIONER MORRIS:  Okay.

12         INMATE BROWN:  Yeah.

13         DEPUTY COMMISSIONER MORRIS:  So were you guys all

14    right?

15         INMATE BROWN:  Yeah, we were fine.  I was on the

16    line a week after that happened.  And we were just

17    staying away and we were okay afterwards.

18         DEPUTY COMMISSIONER MORRIS:  (Inaudible) talked

19    about you and this guy James had some sort of face off on

20    the yard not even a month later, what was that about?

21         INMATE BROWN:  I don't know anything about that.

22    I was in the (inaudible).

23         DEPUTY COMMISSIONER MORRIS:  I'm talking about

24    something when you got out, when you got out.  I saw a

25    chrono that talked about some aggressive behavior.

26         INMATE BROWN:  (Inaudible)

27         DEPUTY COMMISSIONER MORRIS:  Come on now, I'm

38

1    going to find it in a minute, you know about it.

2            **INMATE BROWN:**  No, no, no I don't.

3            **DEPUTY COMMISSIONER MORRIS:**  Was the guy's name

4    James?

5            **INMATE BROWN:**  No.

6            **DEPUTY COMMISSIONER MORRIS:**  What was his name?

7            **INMATE BROWN:**  I don't even remember.

8            **PRESIDING COMMISSIONER PORTER:**  We've got a -- you

9    signed a (inaudible) chrono along that because that's in

10   there.

11           **INMATE BROWN:**  He got 60 days for that and I got

12   90 days.

13           **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) got for

14   both?

15           **INMATE BROWN:**  Probably both.

16           **DEPUTY COMMISSIONER MORRIS:**  Yeah, a mutual non-

17   aggression chrono here dated 6/26/03 and this was a month

18   after your hearing.  You were involved in a -- and it

19   says here, the language says, you were involved in an

20   infraction (inaudible) CDC 115 for conduct in the use of

21   violence(inaudible) inmates James and Brown (inaudible).

22   (Inaudible) animosity provoked between the two of them.

23   (Inaudible) you agreed (inaudible) May 9th.  You don't

24   remember that?

25           **INMATE BROWN:**  Oh, yeah they called me in to sign

26   the agreement.

27           **DEPUTY COMMISSIONER MORRIS:**  Yes.

39

1          **INMATE BROWN:**  Because they said we couldn't be on
2    the line together and as we had signed a (inaudible)
3    chrono but there was no -- that was coming before when
4    the incident --
5          **DEPUTY COMMISSIONER MORRIS:**  Oh, okay.
6          **INMATE BROWN:**  -- we never had another problem.
7          **DEPUTY COMMISSIONER MORRIS:**  Okay.  So this was an
8    effort on the part of the staff to make sure that there
9    was peace on the yard.
10          **INMATE BROWN:**  In case we had got into it.
11          **DEPUTY COMMISSIONER MORRIS:**  Right.
12          **INMATE BROWN:**  In case we got into it again
13    (inaudible) --
14          **DEPUTY COMMISSIONER MORRIS:**  Right
15          **INMATE BROWN:**  (Inaudible)
16          **DEPUTY COMMISSIONER MORRIS:**  (Inaudible)
17          **INMATE BROWN:**  Uh-huh.
18          **DEPUTY COMMISSIONER MORRIS:**  Was that your
19    (inaudible) in that case?
20          **INMATE BROWN:**  Yeah.
21          **DEPUTY COMMISSIONER MORRIS:**  Okay.  I thought it
22    was a new behavior.
23          **INMATE BROWN:**  No.
24          **ATTORNEY CHRISTENSEN:**  (Inaudible)
25          **DEPUTY COMMISSIONER MORRIS:**  Okay.  Fine then
26    that's (inaudible) driving at (inaudible) and you got out
27    and you went right back in (inaudible).

40

1    **INMATE BROWN:**  Oh no, no (inaudible).

2    **DEPUTY COMMISSIONER MORRIS:**  That didn't happen?

3    **INMATE BROWN:**  No it didn't.

4    **DEPUTY COMMISSIONER MORRIS:**  All right, I

5    misunderstood.  So the last serious disciplinary was

6    (inaudible).

7    **INMATE BROWN:**  Yeah.

8    **DEPUTY COMMISSIONER MORRIS:**  At your last hearing

9    you talked about (inaudible).  (Inaudible) so you come to

10    this hearing now about three years later than the last

11    disciplinary hearing.  (Inaudible) business between that

12    disciplinary and the disciplinary hearing.  And that's

13    not to say that you're not (inaudible) trustworthy

14    (inaudible).  We'll come back (inaudible).  I'm also

15    looking at 128s, negative chronos.  I see your last

16    negative chrono was dated 2/02/2000.  (Inaudible) seem to

17    be doing pretty well on that but you don't want to get

18    any negative chronos at all because (inaudible) negative

19    chronos will hurt you.

20    **INMATE BROWN:**  (Inaudible)

21    **DEPUTY COMMISSIONER MORRIS:**  Blue paper, the 115s,

22    I would just describe here as a stake in the chest.  They

23    will hurt you (inaudible).  Let me talk to you about

24    academics now.  I see that you got your GED in

25    (inaudible) laborer.  I don't see that you've done

26    anything (inaudible).

27    **INMATE BROWN:**  Well, I (inaudible) school courses.

41

1

2          **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) I'm

3     talking about --

4          **INMATE BROWN:**  (Inaudible) vocational welding, I

5     completed that.

6          **DEPUTY COMMISSIONER MORRIS:**  I'm not talking about

7     vocational welding now.  (Inaudible).

8          **INMATE BROWN:**  Oh, okay.  (Inaudible)

9          **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) about.

10         **INMATE BROWN:**  No, well that's all I've done

11    (inaudible).

12         **DEPUTY COMMISSIONER MORRIS:**  Why is that?

13         **INMATE BROWN:**  I thought that would be enough.

14         **DEPUTY COMMISSIONER MORRIS:**  It's not enough.

15    (Inaudible).

16         **INMATE BROWN:**  The college courses and stuff has

17    just started back up again.

18         **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) I really

19    (inaudible).

20         **INMATE BROWN:**  Uh-huh.

21         **DEPUTY COMMISSIONER MORRIS:**  All right?

22         **INMATE BROWN:**  Yeah.

23         **DEPUTY COMMISSIONER MORRIS:**  All right.  December

24    (inaudible) hours (inaudible).

25         **INMATE BROWN:**  I've no call to really.

26         **DEPUTY COMMISSIONER MORRIS:**  Okay.  (Inaudible) so

27    (inaudible) AAs and BAs, even (inaudible).  I'm just

42

1    going to tell you that.  I know (inaudible) GED but your

2    GED is not enough.  The last time (inaudible).  Let's see

3    here.  Vocations now.  I saw in your C file, and you

4    talked to Mr. Porter about it, your working trade.  You

5    got about 20 years (inaudible).  You came to prison in

6    '89.  It looks to me like you started vocation in about

7    '97 so you started (inaudible) vocation.

8         **INMATE BROWN:**  Uh-huh.

9         **DEPUTY COMMISSIONER MORRIS:**  So you sat around for

10   about eight years and (inaudible) no vocations.  And then

11   in '97 you started welding --

12        **INMATE BROWN:**  No I started welding before that.  I

13   stared welding in Folsom.

14        **DEPUTY COMMISSIONER MORRIS:**  When were you in

15   Folsom?

16        **INMATE BROWN:**  In '90 or '91 I worked in -- I was

17   at PIA. I was a welder, I was in machine shop vocation,

18   then I went into the welding.  And then when I went to

19   (Inaudible) prison in '93 I went into vocational welding

20   there.

21        **DEPUTY COMMISSIONER MORRIS:**  Okay.  I didn't see

22   all that.

23        **INMATE BROWN:**  Yeah, well I've got files for all

24   of those.

25        **DEPUTY COMMISSIONER MORRIS:**  So you've been in the

26   vocational welding since about '91 then?

27        **INMATE BROWN:**  I think it was --

43

1         **DEPUTY COMMISSIONER MORRIS:** '91, '93, or both?

2         **INMATE BROWN:** Well, I was at PIA in '91 and then

3    I went into vocational -- I got (inaudible) level course

4    so in '93 when I got to (inaudible) --

5         **DEPUTY COMMISSIONER MORRIS:** '93.

6         **INMATE BROWN:** I started in a vocational welding

7    program (inaudible).

8         **DEPUTY COMMISSIONER MORRIS:** (Inaudible).

9         **INMATE BROWN:** Uh-huh.

10        **DEPUTY COMMISSIONER MORRIS:** You completed

11   vocational welding July of '02.

12        **INMATE BROWN:** Um-hmm.

13        **DEPUTY COMMISSIONER MORRIS:** (Inaudible) Now I saw

14   the -- that's the only certificate of completion that you

15   have.  Is that correct?

16        **INMATE BROWN:** Yeah, that's correct.

17        **DEPUTY COMMISSIONER MORRIS:** All right, now I see

18   an attempt -- I saw something about (inaudible).  Did you

19   work in plumbing for a bit?

20        **INMATE BROWN:** I was, yeah I was.

21        **DEPUTY COMMISSIONER MORRIS:** What year did you do

22   that and tell me about it, what happened?

23        **INMATE BROWN:** I got into that fight.  I got into

24   that fight and went to the hole and I lost my job.

25        **DEPUTY COMMISSIONER MORRIS:** That was in '03?

26        **INMATE BROWN:** Uh-huh.

27        **DEPUTY COMMISSIONER MORRIS:** Okay.  (Inaudible) I

44

1    saw something here; I saw a chrono that talked about it,

2    vocational machine shop but I only saw one chrono

3    regarding that.

4            **INMATE BROWN:**   I believe it was here.

5            **DEPUTY COMMISSIONER MORRIS:**   (Inaudible)

6    terminated your plumbing.

7            **INMATE BROWN:**   (Inaudible) vocational machine shop

8    in Folsom.

9            **DEPUTY COMMISSIONER MORRIS:**   And what year was

10   that?

11           **INMATE BROWN:**   I believe '90 --

12           **DEPUTY COMMISSIONER MORRIS:**   '98?

13           **INMATE BROWN:**   '90 or '91.

14           **DEPUTY COMMISSIONER MORRIS:**   (Inaudible)

15           **INMATE BROWN:**   I left Folsom in '93.

16           **DEPUTY COMMISSIONER MORRIS:**   So how long did you

17   participate in vocational machine?

18           **INMATE BROWN:**   About six months to a year.

19           **DEPUTY COMMISSIONER MORRIS:**   Did you drop it?

20           **INMATE BROWN:**   No they dropped it, the class.

21   (Inaudible) and there was no one to take his place.  And

22   that's why I went on to the PIA welding after that

23   because they just disbanded the whole classroom because

24   there was no other instructor to take his place.

25           **DEPUTY COMMISSIONER MORRIS:**   So you went

26   (inaudible) to machine shop?

27           **INMATE BROWN:**   Uh-huh.

45

1    **DEPUTY COMMISSIONER MORRIS:**  And went to PIA

2    welding.

3    **INMATE BROWN:**  Yes, (inaudible).

4    **DEPUTY COMMISSIONER MORRIS:**  That's (inaudible).

5    How long did you work there?

6    **INMATE BROWN:**  A year.

7    **DEPUTY COMMISSIONER MORRIS:**  And was that in '93

8    and '94.

9    **INMATE BROWN:**  No, '93 or '92, I think '92.

10    **DEPUTY COMMISSIONER MORRIS:**  And then I saw

11    another chrono dated 1999 in (inaudible)?

12    **INMATE BROWN:**  That's right (inaudible).

13    **DEPUTY COMMISSIONER MORRIS:**  (Inaudible)

14    **INMATE BROWN:**  That's right, that would be the

15    Solano (inaudible).

16    **DEPUTY COMMISSIONER MORRIS:**  As a welder

17    (inaudible)?

18    **INMATE BROWN:**  (Inaudible).

19    **DEPUTY COMMISSIONER MORRIS:**  Any other institution

20    work?

21    **INMATE BROWN:**  Yeah.

22    **DEPUTY COMMISSIONER MORRIS:**  On what?

23    **INMATE BROWN:**  I just worked in plant ops always

24    in a welding capacity.  I worked at PIA (inaudible) Mule

25    Creek as a maintenance welder.  I worked in plant ops

26    here (inaudible) as a welder.

27    **DEPUTY COMMISSIONER MORRIS:**  As a welder in plant

46

1    ops?

2        **INMATE BROWN:** Yeah.

3        **DEPUTY COMMISSIONER MORRIS:** Okay, so that tells

4    me that you have good scores.

5        **INMATE BROWN:** Right. I do work --

6        **DEPUTY COMMISSIONER MORRIS:** And you did work for

7    PIA, you did work for a machine plant in plant ops

8    (inaudible) some experience there.

9        **INMATE BROWN:** I work in trade (inaudible) there.

10        **DEPUTY COMMISSIONER MORRIS:** Okay. Let me talk to

11    you about self-help for a minute. As I reviewed the C

12    file and as I listened to your conversation with the

13    Commissioner, there's a history of drug use and

14    (inaudible) habitual cocaine abuse, and amphetamine use,

15    and marijuana. Anything else that we're missing here?

16        **INMATE BROWN:** No.

17        **DEPUTY COMMISSIONER MORRIS:** Now as regards to

18    that history of drug use I'm going to ask you about some

19    self-help programs. And I realize you were asked these

20    questions before, (inaudible) hear this a lot. What have

21    you done in terms of self-help? What I see is AA

22    participation in '06. How long have you been (inaudible)

23    AA?

24        **INMATE BROWN:** Well, I tried to get into the

25    program in North.

26        **DEPUTY COMMISSIONER MORRIS:** Just tell me how long

27    you've been (inaudible).

47

1        **INMATE BROWN:**  Probably six or eight months.

2        **DEPUTY COMMISSIONER MORRIS:**  And what is your

3  (inaudible)?

4        **INMATE BROWN:**  (Inaudible) came back.

5        **DEPUTY COMMISSIONER MORRIS:**  What year?

6        **INMATE BROWN:**  Oh, this was -- it has just been

7  this year so.

8        **DEPUTY COMMISSIONER MORRIS:**  Because all it says

9  is (inaudible)

10        **INMATE BROWN:**  Yeah, I did some NA, probably in

11  Solano.

12        **DEPUTY COMMISSIONER MORRIS:**  Yeah, I want to ask

13  you why did you not participate in AA earlier.

14        **INMATE BROWN:**  Well, it took me awhile to come

15  around (inaudible).

16        **DEPUTY COMMISSIONER MORRIS:**  And I'm asking that

17  in the face of -- I'm looking at a number of hearings

18  where they talked about you needed to do that.  So

19  (inaudible) --

20        **INMATE BROWN:**  I didn't feel I needed before.

21        **DEPUTY COMMISSIONER MORRIS:**  You didn't think you

22  needed it.

23        **INMATE BROWN:**  No, I didn't.

24        **DEPUTY COMMISSIONER MORRIS:**  I'm going back to

25  here's one dated 1993 authored by Mr. Deacons. (phonetic)

26  And this was a document and he says here that, "The

27  inmate needs self-help and would benefit from AA and NA."

48

1    And it goes on (inaudible) talked about that AA program.

2    You still think you don't need it.

3        **INMATE BROWN:**  No, I think I need it.  But like I

4    said it could be (inaudible).

5        **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) I think

6    you needed (inaudible) if you participated (inaudible).

7    AA/NA is one of them.  And I would be less than honest

8    with you if I told you that (inaudible).  The good thing

9    about AA and NA is if you are part of a group that's a

10   good thing, but you don't have to be a part of the group.

11   It's steady (inaudible) and (inaudible) independent

12   (inaudible).

13       **INMATE BROWN:**  Right.

14       **DEPUTY COMMISSIONER MORRIS:**  In order to do that

15   when you come here and you say you've done it

16   (inaudible).  This help applies to your life, some good

17   principles for managing your life, with or without

18   (inaudible) wherever you are in (inaudible), okay.  I see

19   here under self-help that you did participate in Project

20   Change.  And before that I see a chrono dated

21   (inaudible).  Now Project Change has a number of

22   (inaudible) to it outlined.  Is that when you took the

23   anger management?

24       **INMATE BROWN:**  That was the anger management.

25       **DEPUTY COMMISSIONER MORRIS:**  Okay.

26       **INMATE BROWN:**  That I took, yeah.

27       **DEPUTY COMMISSIONER MORRIS:**  All right, that's

49

1   what I kind of suspected because the anger management is

2   not itself a self-help break out.  It was a part of the

3   Project Change (inaudible).

4         **INMATE BROWN:**  Well, they just called in anger

5   management.

6         **DEPUTY COMMISSIONER MORRIS:**  How many chronos for

7   Project Change (inaudible)?

8         **INMATE BROWN:**  I don't know.  I didn't even know

9   it was called Project Change until I talked to the

10  counselor, but I thought that the whole program was just

11  anger management --

12        **DEPUTY COMMISSIONER MORRIS:**  Yes.

13        **INMATE BROWN:**  -- and that's all the uses that we

14  got when I was in there.  There was (inaudible).

15        **DEPUTY COMMISSIONER MORRIS:**  And you're saying

16  that all you did was anger management?

17        **INMATE BROWN:**  That's all we did (inaudible) --

18        **DEPUTY COMMISSIONER MORRIS:**  Because (inaudible).

19        **ATTORNEY CHRISTENSEN:**  Actually Commissioner, I

20  think he has a certificate here and it says, "Project

21  Change (inaudible) February 9, 2004."  And then it says

22  he satisfactorily completed the 44 (inaudible) anger

23  (inaudible) certificate.

24        **DEPUTY COMMISSIONER MORRIS:**  Okay, and the chronos

25  say something here.  The chronos keep (inaudible) Project

26  Change, and I think that's what you said, is that

27  correct?

50

1          **INMATE BROWN:**  Well, I think (inaudible).

2          **DEPUTY COMMISSIONER MORRIS:**  Okay, so I understand

3    and it's a good thing that you participated in the

4    project.  And it's a good thing that you participated in

5    the anger management.  And what I'm just trying to

6    establish here is where are we in terms of (inaudible),

7    when did it happen and how long ago and what have you

8    done since.

9          **INMATE BROWN:**  Oh, all right.

10         **DEPUTY COMMISSIONER MORRIS:**  So you have no

11   participation since 2004 (inaudible).

12         **INMATE BROWN:**  No.

13         **DEPUTY COMMISSIONER MORRIS:**  Okay.  Now I was also

14   looking for laudatory chronos and I see one and that was

15   authored by someone (inaudible) Project Change chrono.

16   That's an '04 chrono (inaudible) laudatory Project Change

17   authored by a Skinner. (phonetic)  And that's dated

18   November 9 of 2004.  And here's a  chrono that talked

19   about something (inaudible) self-esteem, assertiveness,

20   goal setting, anger management, (inaudible) skills,

21   stress reduction, drug and alcohol abuse, (inaudible),

22   parenting, (inaudible), life skills and parole release.

23         **INMATE BROWN:**  We did cover those, yeah.  I

24   remember those.

25         **DEPUTY COMMISSIONER MORRIS:**  That's not

26   (inaudible).  It doesn't just say what they were.

27         **INMATE BROWN:**  I just thought that was part of the

51

1    (inaudible).

2        **DEPUTY COMMISSIONER MORRIS:**  Yes, okay.

3    (Inaudible) watch your step.   (Inaudible)

4        **INMATE BROWN:**  (Inaudible)

5        **DEPUTY COMMISSIONER MORRIS:**  I'm also looking at

6    the psych report so before I leave the post-conviction

7    factors (inaudible) is there anything else that you've

8    done since you've been incarcerated that you need to

9    share with this Board (inaudible)?

10        **INMATE BROWN:**  (Inaudible)

11        **DEPUTY COMMISSIONER MORRIS:**  Okay.  Then let me

12    just review the psych report dated 2/14/02 authored by

13    Joe Reed, (phonetic) staff psychologist.  I'm looking at

14    page three and going right to current diagnostic

15    impressions and the psychologist has considered the five

16    axis.  Under Axis I he describes you as cocaine and

17    amphetamine abuse in sustained full remission in a

18    controlled environment.  Axis II, no contributory

19    personality disorder.  Axis III, no contributory physical

20    disorder.  Under Axis IV (inaudible) incarceration

21    (inaudible).  And under Axis V, that's the global

22    assessment functioning test, and that measured

23    (inaudible) scored a 90, which (inaudible).  The

24    psychologist goes on to say that your current level of

25    insight and judgment (inaudible) are good.  And he

26    (inaudible) a positive relation and successful adaptation

27    to community living.  Under Section 14 assessment of

52

1    dangerousness the psychologist states that (inaudible)

2    within a controlled (inaudible) is considered

3    (inaudible).  The low average relative to this level

4    (inaudible).  This conclusion was based on certain

5    factors.  He says on the one hand you have received four

6    115s since '92, you have received three 128s and the last

7    was March (inaudible).  In addition to that he says that

8    you have received no disciplinaries since (inaudible) in

9    over four years.  (Inaudible).

10        **INMATE BROWN:**  That's not the updated one.

11        **DEPUTY COMMISSIONER MORRIS:**  No, that's not an

12    updated --

13        **INMATE BROWN:**  I have an updated psych report.

14        **DEPUTY COMMISSIONER MORRIS:**  Yeah, because you

15    (inaudible) those four years away and you got a April 20,

16    '03 disciplinaries.  However you are currently on a

17    three-year one of being disciplinary free.  (Inaudible).

18    And let me just kind of for the record state that the

19    June 14, 2002 evaluation is authored by Bill Uikas (sic),

20    U-I-K-A, staff psychologist.  And what he does in this

21    2002 report is reference the June 19, 1999 report.  So

22    these statements that I've read, the diagnostic

23    impression as well as the assessment of dangerous is all

24    in the 1999 report.

25        **ATTORNEY CHRISTENSEN:**  Commissioner, do you not

26    have the current report dated June 1st, 2006?  It's in my

27    packet of (inaudible).

53

1          **DEPUTY COMMISSIONER MORRIS:**   (Inaudible) note

2     here.

3          **ATTORNEY CHRISTENSEN:**   I also have (inaudible) to

4     me?

5          **DEPUTY COMMISSIONER MORRIS:**   Let me see what I

6     have in the C file, hold on.

7          **ATTORNEY CHRISTENSEN:**   All right.

8          **DEPUTY COMMISSIONER MORRIS:**   You have a new copy

9     of the C file.   (Inaudible) I didn't notice that

10    (inaudible) 2002.

11         **ATTORNEY CHRISTENSEN:**   (Inaudible) Dr. Newcomber,

12    (phonetic)(inaudible) document.

13         **DEPUTY COMMISSIONER MORRIS:**   (Inaudible)

14         **ATTORNEY CHRISTENSEN:**   Is it in your pack,

15    Commissioner?

16         **PRESIDING COMMISSIONER PORTER:**   Yes.   (Inaudible)

17         **DEPUTY COMMISSIONER MORRIS:**   Okay, my packet

18    (inaudible) with his document.   All right, let me start

19    this psych evaluation all over again for the transcriber.

20    What I'm going to do is talk about a July 2006, or June

21    2006 psych evaluation authored by Newcomber.   (Inaudible)

22    full diagnostic impressions.   Axis I, he indicates no

23    known disorder and with Axis II no personality disorder.

24    Axis III, no physical disorder.   Under Axis IV it talked

25    about the life term and (inaudible).   And Axis V it

26    talked about a GAF score of 90.   Okay, under Section 14

27    on page three under assessment of dangerousness the

54

1    psychologist talks about the (inaudible) of dangerous

2    behavior in the institution, speaks to the fact that the

3    inmate received a 4303 disciplinary as battery

4    (inaudible).  Talks about the fact that you're

5    (inaudible).  And he also speaks that you do not appear

6    to have anger management issues at this time and as a

7    result (inaudible).  Going to Section three he makes an

8    assessment as relates to prediction or expectation, he

9    says (inaudible).  He talked about the measurement of

10   (inaudible) global assessment functioning test and that

11   last thing (inaudible) paragraph the psychologist states

12   that (inaudible) appears to be below average in terms of

13   dangerousness in an institution setting and (inaudible).

14   Here under Section C, paragraph C (inaudible) states that

15   at this time (inaudible) there are no significant visible

16   factors in this case.  On reading that it also reminded

17   (inaudible) cocaine and drug abuse (inaudible).  Under

18   Section 14 clinical observation and recommendations

19   (inaudible) talks about (inaudible).  Those are

20   statements made by the psychologist.  Having heard those

21   statements made by the doctor (inaudible) or anything

22   that you want to add to that (inaudible)?

23           **ATTORNEY CHRISTENSEN:**  Okay, really the agreement

24   is just that.  I also would point out the divorce he was

25   under (inaudible).  And that because of the inmate's age,

26   Mr. Brown is age 53, (inaudible) are paroled over the age

27   of 55 there is only a 1.4 percent rate of recidivism.

55

1   And for the lifers, which have been here in prison the

2   rate is even lower than (inaudible) I think that's

3   fantastic.

4       **DEPUTY COMMISSIONER MORRIS:**  Okay, Mr. Brown we've

5   covered a lot of materials.  Is there anything else

6   that's specific post-prediction factors that was

7   (inaudible) since you came here, anything else that we

8   need to talk about at this point?

9       **INMATE BROWN:**  I don't believe so.

10      **DEPUTY COMMISSIONER MORRIS:**  (Inaudible) back to

11  the Commissioner.

12      **PRESIDING COMMISSIONER PORTER:**  Thank you.  Tell

13  the Board some of your parole plans.  Mr. Brown, if you

14  are released where are you going to live?

15      **INMATE BROWN:**  With my daughter in (inaudible).

16      **PRESIDING COMMISSIONER PORTER:**  Okay, where's

17  that?

18      **INMATE BROWN:**  That's in Oakland. (phonetic)  I

19  was going to live with my wife but she had a bad car

20  accident and (inaudible).  She's working everything out

21  (inaudible) situation (inaudible).  So we're changing my

22  plans from her to my daughter.

23      **PRESIDING COMMISSIONER PORTER:**  Would you change

24  it to whether or not they've got self-help programs for

25  NA or AA, things like that around the neighborhood?

26      **INMATE BROWN:**  Well, I hadn't checked into them

27  but I know they do.

56

1     **PRESIDING COMMISSIONER PORTER:**  How do you know?

2     **INMATE BROWN:**  Well, I had a package that I asked

3     for from pre-release.  And it had a list of all the

4     programs available out her.  I explained to them I was a

5     lifer and that I would like to know what kind of options

6     I'd have when I got out in the community.  So they sent

7     me a package of some of the programs.

8     **PRESIDING COMMISSIONER PORTER:**  Okay.

9     **INMATE BROWN:**  I haven't contacted any of the

10    programs (inaudible).

11    **PRESIDING COMMISSIONER PORTER:**  Don't you think

12    that's something you need to do since your offense was

13    (inaudible), you were involved in these, you know, drugs

14    and alcohol.

15    **INMATE BROWN:**  Yeah, because of if I don't -- if I

16    start using again I'm (inaudible), I know that.  So

17    (inaudible) --

18    **PRESIDING COMMISSIONER PORTER:**  (Inaudible)

19    parole.  And what about employment, what do you plan on

20    doing?

21    **INMATE BROWN:**  Well, I plan on welding.  As far as

22    to go back to the community to start out (inaudible).

23    It's kind of hard on the (inaudible).  I (inaudible) job

24    offers in there (inaudible).

25    **PRESIDING COMMISSIONER PORTER:**  Oh, you do?

26    **INMATE BROWN:**  Uh-huh.

27    **PRESIDING COMMISSIONER PORTER:**  Let me see.

57

1        **INMATE BROWN:**  They were from the last time I went

2   to the Board.  I held (inaudible) --

3        **PRESIDING COMMISSIONER PORTER:**  From the last

4   hearing?

5        **INMATE BROWN:**  -- yeah, the last hearing.  I mean

6   it's the same documents but I haven't had them updated.

7        **PRESIDING COMMISSIONER PORTER:**  You've got to have

8   them updated.

9        **INMATE BROWN:**  (Inaudible)

10       **PRESIDING COMMISSIONER PORTER:**  And how do you

11  plan on getting around, transportation (inaudible)?

12       **INMATE BROWN:**  Well, I'll probably take the bus

13  (inaudible).

14       **PRESIDING COMMISSIONER PORTER:**  Got any bus

15  schedules?  Do you know when the buses run or anything?

16       **INMATE BROWN:**  No.

17       **PRESIDING COMMISSIONER PORTER:**  Okay.  So it seems

18  like you've got a little work you need to be doing here.

19  So, now your daughter's (inaudible) to support you in any

20  kind of way until you get on your feet?

21       **INMATE BROWN:**  Oh yeah.  They have a four-bedroom

22  home, and they both, she and her husband work.  She'll be

23  a R.N. within the year but she still works for

24  (inaudible) administration.  And (inaudible) and her

25  husband makes his living (inaudible) cars.

26       **PRESIDING COMMISSIONER PORTER:**  All right, give me

27  a minute.

58

1        **ATTORNEY CHRISTENSEN:**  Commissioner, can I just
2    ask one more question?

3        **PRESIDING COMMISSIONER PORTER:**  Yes.

4        **ATTORNEY CHRISTENSEN:**  That (inaudible) lived a
5    year here but never appeared (inaudible)?

6        **INMATE BROWN:**  No, I don't think so but I could
7    check into it.  (Inaudible) they weren't local
8    (inaudible).  And I've never had any reason (inaudible).

9        **ATTORNEY CHRISTENSEN:**  Okay.

10       **PRESIDING COMMISSIONER PORTER:**  And then let's go
11   to some of your letters.  I do have a letter here from
12   Barbara Terra. (phonetic)  Who is she?

13       **INMATE BROWN:**  A friend of the family's.

14       **PRESIDING COMMISSIONER PORTER:**  All right.  She
15   sends you a letter of support.  She thinks that you would
16   be a wonderful asset to the community, and not only for
17   your family but for the general public.  She's supportive
18   of you and she's supportive of your release.  And that's
19   the only one I could find.  Do you have any more?

20       **INMATE BROWN:**  No, not recent ones.  The last
21   hearing I had quite a few in there, and I thought they
22   would still be good.  I didn't understand that they had
23   to be updated like that.

24       **PRESIDING COMMISSIONER PORTER:**  Yeah.

25       **INMATE BROWN:**  I have them from my daughters and
26   my family.  My mother's (inaudible) and (inaudible)
27   brothers and sisters.  And they've all sent support

59

1    letters to the files.

2        **PRESIDING COMMISSIONER PORTER:**  Okay.  And we sent

3    out Penal Code section number 3042 notices.  And those

4    notices go to any agencies have a direct interest in your

5    case, like at least one went to the District Attorney's

6    office and the Sheriff's office.  And we do have a

7    response from the District Attorney's office.  It is a --

8    I'm not going to read it all.  It's a (inaudible) one,

9    two, three, four-page letter and basically they're not

10   supportive of your release.  And they feel that if

11   released you would be a danger to society.  And they feel

12   at this point that they are definitely not supportive of

13   your release (inaudible).  And then (inaudible).  So I'm

14   going to ask the Deputy Commissioner if he has any

15   questions of you regarding of the subjects that we talked

16   about.

17       **DEPUTY COMMISSIONER MORRIS:**  I've got one

18   question.  It has to do with the (inaudible).  Did you

19   know the victim's sister, or what was your relationship

20   with her?

21       **INMATE BROWN:**  I used to (inaudible).

22       **DEPUTY COMMISSIONER MORRIS:**  Who?

23       **INMATE BROWN:**  (Inaudible).

24       **DEPUTY COMMISSIONER MORRIS:**  (Inaudible)?

25       **INMATE BROWN:**  I used to (inaudible).

26       **DEPUTY COMMISSIONER MORRIS:**  Does she owe you

27   money?

60

1        **INMATE BROWN:**  She owed me money.  She was the one

2    that owed me the money.

3        **DEPUTY COMMISSIONER MORRIS:**  Do you recall the

4    conversation we had where the relation (inaudible) you

5    said, or it inferred in the hearing that she was the one

6    that owed you money, not her brother.

7        **INMATE BROWN:**  Right, she owed me the money.

8        **DEPUTY COMMISSIONER MORRIS:**   You didn't say that

9    before.

10        **INMATE BROWN:**  (Inaudible) It started out with her

11    owing me money.

12        **DEPUTY COMMISSIONER MORRIS:**  She owes you money.

13    How'd the brother get involved?

14        **INMATE BROWN:**  He got involved in it, in the

15    argument because of his sister.

16        **DEPUTY COMMISSIONER MORRIS:**  Okay, how --

17        **INMATE BROWN:**  (Inaudible) they lived together.  I

18    gave them money to help pay the rent.

19        **DEPUTY COMMISSIONER MORRIS:**  All right, you

20    understand how just by me asking this additional question

21    it changes (inaudible).  So she owes you the money and

22    you're trying to get your money from her.  The brother

23    gets involved and there's some sort of a fight, and two

24    or three other males are around but nobody appears to be

25    fighting.  Nobody tries to stop the fight.

26        **INMATE BROWN:**  (Inaudible) we started (inaudible)

27    we had seven.

61

1    **DEPUTY COMMISSIONER MORRIS:** Why did you

2    (inaudible) time?

3    **ATTORNEY CHRISTENSEN:** (Inaudible).

4    **INMATE BROWN:** No, there was other people involved

5    in the fight. I told you (inaudible) there was other

6    people involved in the fight in the house.

7    **DEPUTY COMMISSIONER MORRIS:** Why'd you bring the

8    gun with you in that house?

9    **INMATE BROWN:** I always carried a gun.

10   **DEPUTY COMMISSIONER MORRIS:** (Inaudible)?

11   **INMATE BROWN:** No, I just carried a gun because

12   that was the lifestyle I was living. I always had to

13   carry pistols.

14   **DEPUTY COMMISSIONER MORRIS:** All right

15   (inaudible).

16   **PRESIDING COMMISSIONER PORTER:** Mr. Amrie,

17   (phonetic) do you know him? Did he tell you about

18   (inaudible)?

19   **INMATE BROWN:** (Inaudible).

20   **PRESIDING COMMISSIONER PORTER:** A-M-R-I-E.

21   **INMATE BROWN:** (Inaudible).

22   **PRESIDING COMMISSIONER PORTER:** Basically, he

23   (inaudible) fight with him and you busted into his house.

24   Did you ever hit anybody in the head with a hammer?

25   **INMATE BROWN:** No.

26   **PRESIDING COMMISSIONER PORTER:** You never hit

27   anybody in the head or the elbow, or the elbows and

62

1    knees?

2        **INMATE BROWN:**  No.

3        **PRESIDING COMMISSIONER PORTER:**  Did you ever throw

4    a burning iron at (inaudible)?

5        **INMATE BROWN:**  No.  I know what case we're talking

6    about and I didn't do any of that.

7        **PRESIDING COMMISSIONER PORTER:**  Can you tell me

8    about that case, sir?

9        **INMATE BROWN:**  I was (inaudible) case -- I'm

10   trying to remember it now.  I really can't recall much of

11   it.  I remember that case, I remember --

12       **PRESIDING COMMISSIONER PORTER:**  This case happened

13   two years before your commitment case.

14       **INMATE BROWN:**  Right.  And there was a fight in

15   the house I was at.  But it wasn't -- I didn't do any of

16   those things to that guy.

17       **PRESIDING COMMISSIONER PORTER:**  What happened?

18       **INMATE BROWN:**  That's why I never got arrested for

19   it.  Okay, I was there.

20       **PRESIDING COMMISSIONER PORTER:**  What happened?

21       **INMATE BROWN:**  (Inaudible) came in there and guys

22   got into it, and the guys found out that he was child

23   molester.  And so we started beating on him in the house

24   (inaudible).  I was there but as you see I never got

25   arrested for it.  (Inaudible) this case came up --

26       **PRESIDING COMMISSIONER PORTER:**  Okay.

27       **INMATE BROWN:**  It was like two years before that

63

1    or a year and half before that.

2        **PRESIDING COMMISSIONER PORTER:**   Right.   You were

3    charged in this though.

4        **INMATE BROWN:**   Yeah, in the end.   Yeah, because I

5    just took a guilty to get out of the county jail.   I

6    didn't want to stay in (inaudible) I just went to the

7    court hearing on the murder case and I was wore out.   So

8    I went ahead and took that guilt.   And the other case

9    we're talking about with the controlled substance, when I

10   had a drug diversion and the gun, I took that guilty just

11   to get out of the county jail.   But I never, I didn't do

12   any of that that was in that statement and that's why

13   they'd never arrested me for two years.   They questioned

14   me (inaudible) and I told them I'd been in the house but

15   I hadn't done those things to that guy.

16       **PRESIDING COMMISSIONER PORTER:**   Um-hmm.

17       **INMATE BROWN:**   And they were looking for the guys

18   that had done it.

19       **PRESIDING COMMISSIONER PORTER:**   You don't even

20   know his name?

21       **INMATE BROWN:**   I knew it was Dave that was all I

22   knew.   And that's all the victim knew too.   I mean that

23   should be in there but like I said I took them guilts in

24   there just because I was --

25       **PRESIDING COMMISSIONER PORTER:**   But you didn't

26   know the victim's name?   Did you know the victim's name?

27       **INMATE BROWN:**   I cannot remember, I can't remember

64

1    his name.  I had just met him.

2        **PRESIDING COMMISSIONER PORTER:**  Amrines,

3    (phonetic) that's --

4        **INMATE BROWN:**  Amrines.

5        **PRESIDING COMMISSIONER PORTER:**  That's A-M-R-I-N-

6    E-S (inaudible).  Okay, we're going to Counsel now and

7    see if she -- you got any questions of your client,

8    Counsel?

9        **ATTORNEY CHRISTENSEN:**  I do.  So how would you

10   avoid getting into arguments (inaudible)?

11       **INMATE BROWN:**  Well, I've just gotten older and

12   I've learned how to avoid complications that (inaudible).

13       **ATTORNEY CHRISTENSEN:**  Okay.  (Inaudible) or would

14   you walk away from (inaudible)?

15       **INMATE BROWN:**  The best way is just to walk away

16   from them.

17       **ATTORNEY CHRISTENSEN:**  Are there any other self-

18   help plans that (inaudible)?

19       **INMATE BROWN:**  Well, I'm thinking I'll take more

20   anger management (inaudible) and I'm staying with AA.  I

21   tried NA and with AA it was a little older process,

22   that's why I went there instead.

23       **ATTORNEY CHRISTENSEN:**  Did you take full

24   responsibility for this crime?

25       **INMATE BROWN:**  Yes, (inaudible).

26       **ATTORNEY CHRISTENSEN:**  What are you thinking that

27   (inaudible) did on (inaudible)?

65

1      **INMATE BROWN:**  (Inaudible)  I think that his

2    sister's (inaudible).  I know what it does to her, we're

3    pretty close.

4      **ATTORNEY CHRISTENSEN:**  You were on probation when

5    you (inaudible) crime (inaudible)on parole (inaudible).

6      **INMATE BROWN:**  Well, I'm going to do (inaudible).

7    I mean I'm going to do whatever I can to stay out,

8    (inaudible) NA or AA for the rest of my life and

9    (inaudible) programs that's I'm going to do.

10      **ATTORNEY CHRISTENSEN:**  (Inaudible) with you

11    (inaudible).

12      **INMATE BROWN:**  Well, I've taken care of one of the

13    (inaudible).  (Inaudible) my family.  (Inaudible).

14      **ATTORNEY CHRISTENSEN:**  I don't have any more

15    questions (inaudible).

16      **PRESIDING COMMISSIONER PORTER:**  Thank you Counsel,

17    and would you like to make a final statement?

18      **ATTORNEY CHRISTENSEN:**  I would love to.  Mr. Brown

19    has accomplished a great deal (inaudible) before he even

20    came to prison.  And we know that there are positive

21    things going for him.  Number one, he can get a

22    (inaudible).  He has a very good work history and

23    (inaudible).  He was also a union member.  He was not the

24    member of gang before he came to prison and he now has a

25    (inaudible) before but (inaudible).  (Inaudible) positive

26    change (inaudible).  So (inaudible) in two prisons he has

27    completed a vocational trade, that's welding.  He also

66

1    has other skills, machine shop and plumbing.  The psych

2    report is very positive (inaudible).  Actually this is

3    the second positive psych report.  (Inaudible) the one in

4    1991 was also (inaudible).  He is three years away from

5    his last 115 (inaudible).  But I'm (inaudible) 115s.  He

6    has learned through Project Change and (inaudible).  He

7    has a stable, (inaudible) marriage and plans to live with

8    his daughters and (inaudible) skills that involve

9    (inaudible).  So I think (inaudible) successful parole

10   and (inaudible) favorably on this man today.

11        **PRESIDING COMMISSIONER PORTER:**  Thank you

12   Counselor.  Mr. Brown would you like to make a final

13   comment?

14        **INMATE BROWN:**  No, I think we've pretty much

15   covered everything.

16        **PRESIDING COMMISSIONER PORTER:**  Okay, we will now

17   recess for deliberation.

18        **DEPUTY COMMISSIONER MORRIS:**  For the transcriber,

19   we will be turning the tape over now.

20                         R E C E S S

21                          --o0o—

22

23

24

25

26

27

67

1       CALIFORNIA BOARD OF PAROLE HEARINGS

2               D E C I S I O N

3           PRESIDING COMMISSIONER PORTER:  In the manner of

4    Mr. Charles Brown, CDC number E as in Edward 25371, the

5    panel has reviewed all the information received from the

6    public and relied on the following circumstances in

7    concluding that the prisoner is not suitable for parole

8    and would pose an unreasonable risk of danger to society,

9    or a threat to public safety if released from prison.

10   The offense was carried out in an especially cruel and

11   callous manner.  Multiple victims were attacked and

12   killed in the same instance.  Basically there were not

13   only the victim that was killed, there were children and

14   women in the room.  And you would not let them intervene

15   or stop it.  You had a partner there, he wasn't just a

16   hitchhiker, he was actively participating and keeping

17   everybody at bay while the victim took a beating.  The

18   offense was carried out in a dispassionate and calculated

19   manner such as an execution style murder..  The coroner's

20   report said that gun was about a quarter of an inch from

21   his head when he was shot.  The victim was abused and

22   defiled during the offense.  The offense was carried out

23   in a manner, which demonstrates an exceptionally callous

24   disregard for human suffering.  This man was beaten;

25   dragged to his own room, beat some more, stabbed and then

26   he was shot.  The motive for the crime was very trivial

27   **CHARLES BROWN    E-25371    DECISION PAGE 1    7/24/06**

68

1    in relation to the offense.  The only motive sir, you

2    come up with is that you guys had a rocky relationship.

3    You had fights in the past, so that's very trivial for

4    the offense that committed.  The prisoner has on previous

5    occasion inflicted serious injuries on victims.  The

6    prisoner has an escalating pattern of violence.  The

7    prisoner has failed previous grants of probation and

8    cannot be counted upon to avoid criminal elements.  The

9    prisoner has failed to profit from society's previous

10    attempts to correct his criminality such as adult

11    probations.  You were already on probation when this

12    occurred, sir.  The prisoner has failed, the prisoner has

13    programmed in a limited manner while incarcerated.

14    You've had very little self-help programming, sir.  And

15    you need a lot of it.  The prisoner has failed to

16    demonstrate evidence of positive change citing the

17    misconduct while incarcerated.  He has a total of four

18    128As.  The last one was February of 2000.  (Inaudible)

19    You've had a total of five 115s and you've had one since

20    your previous Board hearing.  And that was for battery

21    with serious injury and basically you (inaudible).  The

22    prisoner lacks realistic parole plans.  You do not have

23    acceptable employment plans.  You need to firm up in your

24    parole plans.  Nevertheless, the prisoner should be

25    commended for completing his GED in 1991, that's very

26    good positive work.  You have completed your vocation in

27    **CHARLES BROWN    E-25371    DECISION PAGE 2    7/24/06**

69

1    July of 2002, welding.  You had AA participating in 2006,

2    when (inaudible) it was this year, 2006?

3         **INMATE BROWN:**  2006.

4         **PRESIDING COMMISSIONER PORTER:**  And basically

5    you were involved in Project Change in 2004.  However,

6    these positive aspects in your behavior does not outweigh

7    the factors of (inaudible).  In a separate decision the

8    hearing panel finds that it is not reasonable to expect

9    that parole will be permitted at a hearing for the

10   following four years.  You have a four-year denial, sir.

11   The offense was carried out in an especially cruel and

12   callous manner, multiple victims were attacked and

13   killed.  The offense was carried out in a dispassionate

14   and calculated manner such as in an execution-style

15   murder.  The victim was abused during the offense.  And

16   the offense was carried out in a manner, which

17   demonstrates an exceptionally callous disregard for human

18   suffering.  The motive for the crime was inexplicable and

19   trivial in relation to the offense.  And sir, you have

20   inconsistencies in your story.  You know, I don't think

21   you were being very truthful with the panel.  I would ask

22   you about certain crimes, you wouldn't remember.  That's

23   fine but when I would start mentioning names then you

24   could (inaudible) truthful about that.  And you were also

25   present; if you weren't involved in it you were present

26   when another man was beaten in the head with a hammer.

27   **CHARLES BROWN  E-25371  DECISION PAGE 3  7/24/06**

70

1    He was beaten in the head with a hammer; he was beaten on
2    his elbows and his knees.  And he was struck several
3    times with guns, pipes and other (inaudible).  And he was
4    beat and tortured with a burning iron.  So sir, I do
5    believe that you've got to start being more truthful with
6    the panel about what you know and what you participated
7    in so we can evaluate your insight regarding the crime.
8    The prisoner has failed on previous occasions, and has
9    inflicted serious injury upon a victim.  The prisoner has
10   an escalating pattern of violence.  The prisoner has
11   failed previous grants of probation.  The prisoner has
12   failed to profit from society's repeated attempts to
13   break his criminality since (inaudible) probation.
14   That's going to conclude the reading of the decision.
15   Deputy Commissioner do you have anything to add?

16       **DEPUTY COMMISSIONER MORRIS:**  No, but just in
17   closing I want to say, Mr. Brown I reviewed many years of
18   documentation hearings and prior (inaudible).  All of
19   those (inaudible) talked about programming, they talked
20   about self-help (inaudible) and they talked about the
21   need to be disciplinary free.  (Inaudible) I also
22   question your ability to (inaudible) and your Counsel
23   talked with me about that.  And I understand the
24   statistics (inaudible).  (Inaudible) you received your
25   last serious 115 (inaudible) behavior identical to
26   (inaudible).  That behavior also was subject to a
27   **CHARLES BROWN    E-25371    DECISION PAGE 4   7/24/06**

71

1   (inaudible) very short (inaudible).  So in closing I'll

2   say you have a bunch of work to do.  (Inaudible).  I wish

3   you good luck, sir.

4          INMATE BROWN:  All right, thank you.

5          PRESIDING COMMISSIONER PORTER:  That concludes

6   this hearing.  Success and good luck to you, sir.

7          INMATE BROWN:  All right.

8          ATTORNEY CHRISTENSEN:  (Inaudible).

9                A D J O U R N M E N T

10                     --o0o--

11

12

13

14

15

16

17

18

19

20

21

22

23   PAROLE DENIED FOUR YEARS

24   THIS DECISION WILL BE FINAL ON _____NOV 2 1 2006_____

25   YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT DATE,

26   THE DECISION IS MODIFIED.

27   CHARLES BROWN   E-25371   DECISION PAGE 5   7/24/06

72

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, MYRA SEVERTSON, a duly designated transcriber,
NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare
and certify under penalty of perjury that I have
transcribed tape which totals one in number and covers a
total of pages numbered 1 through 71, and which recording
was duly recorded at the CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA in the matter of the SUBSEQUENT
PAROLE CONSIDERATION HEARING of CHARLES BROWN, CDC number
E-25371, on JULY 24, 2006, and that the foregoing pages
constitute a true, complete, and accurate transcription
of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party
in the above-captioned matter and have no interest in the
outcome of the hearing.

Dated October 26, 2006 at Sacramento County,
California.



Myra Severtson
Transcriber
**NORTHERN CALIFORNIA COURT
REPORTERS**

51

1        CALIFORNIA BOARD OF PRISON TERMS

2              D E C I S I O N

3        **DEPUTY COMMISSIONER MCBEAN:**  Wait a minute.

4    Okay.

5        **PRESIDING COMMISSIONER LAWIN:**  Thank you.

6    We're back on record in the hearing for Charles

7    Brown and all parties have returned to the room.

8    The Panel has reviewed all information received

9    from the public and relied on the following

10   circumstances in concluding that the inmate is not

11   suitable for parole and would pose an unreasonable

12   risk of danger to society or a threat to public

13   safety if released from prison.  The commitment

14   offense was the murder of Michael Konz.  He was

15   stabbed -- first beaten, then stabbed, then shot

16   to death, this after the inmate and Mr. Konz had

17   had an ongoing -- had had many confrontations with

18   an ongoing dispute over money that was owed to the

19   inmate.  And ultimately, on the night of April

20   23rd, 1988 it culminated in the death of Mr. Konz

21   at a mutual friend's home where the two

22   encountered one another.  The inmate, according to

23   the records, and the victim got into a physical

24   altercation where Mr. Brown hit Mr. Konz, that

25   thus constitutes the beating.  Then that moved or

26   escalated to the point where Mr. Brown produced

27   **CHARLES BROWN   E-25371    DECISION PAGE 1   12/3/02**

52

1   the knife or used the knife that he had, and then

2   ultimately the gun that he had with him he used

3   and shot Mr. Konz with.  This offense shows a

4   disregard for the life and suffering of another.

5   And the motive for the crime is really trivial in

6   that Mr. Konz lost his life over a debt, monetary

7   debt.  The inmate had a history of criminality.

8   He had been detained on a number of occasions.

9   Ultimately, he had been sent as a juvenile to

10  juvenile hall for taking a vehicle without owner's

11  consent.  He was again detained for taking a

12  vehicle without owner's consent in 1969 and

13  released to his parents, so juvenile probation

14  essentially.  As an adult, he was arrested and

15  convicted for grand theft person and served some

16  time in county jail, a matter of days perhaps.  He

17  also was arrested and convicted of 415 and paid a

18  fine, arrested and convicted for possession of

19  controlled substance, paraphernalia, and

20  possession, manufacture, or sale of dangerous

21  weapon receiving adult probation.  Thus, he had

22  failed to benefit from society's previous attempts

23  to correct his criminality, and those attempts

24  included juvenile hall, juvenile probation, adult

25  probation, and county jail.  He also had an

26  unstable social history in that he was a user of

27  **CHARLES BROWN   E-25371    DECISION PAGE 2   12/3/02**

53

1    illegal drugs on the outside, methamphetamine,

2    marijuana, cocaine.  And the inmate has not

3    sufficiently participated in beneficial self-help

4    programs.  In terms of institutional behavior, he

5    has had a total of four 115s.  The most recent was

6    1998 for grooming.  Prior to that, it was 1996,

7    possession of methamphetamine.  He has four 128(a)

8    counseling chronos, and the most recent of those

9    was February 2nd of 2000 for failure to report.

10   The Hearing Panel notes that responses to P.C.

11   3042 letters generated opposition to a finding of

12   parole suitability, specifically from the District

13   Attorney's office of Placer County.  The inmate

14   does have adequate parole plans.  He has places to

15   live, several offers of living arrangements, and

16   he also has a couple of offers of employment.  The

17   report by Dr. Joe Reed dated July 2nd, 1999

18   concludes that his violence potential on the

19   outside would be no more than that of the average

20   citizen.  The Hearing Panel -- The inmate's to be

21   commended, pardon me, for the fact that he

22   acquired his GED early on and that he worked very

23   hard to acquire his welding certification.  Also,

24   he's involved currently in the plumbing program as

25   an apprentice plumber.  It's not a vocational

26   program, but he's certainly learning skills in

27   **CHARLES BROWN    E-25371    DECISION PAGE 3    12/3/02**

54

1   that program and gaining real-life experience.

2   He's also to be commended for the fact that at

3   some point he did spend about six months attending

4   NA meetings.  The Panel makes the following

5   findings:  That the prisoner needs continued

6   therapy in order to further delve into the

7   causative factors of his participation in this

8   life crime, and to further explore the ways of

9   dealing with stress in a nondestructive manner, of

10  being able to deal with authority, and to be able

11  to stay away from alcohol and drug abuse.  The

12  inmate also has gains that are recent, and this

13  would be specifically dealing with his 115s.  The

14  fact that he's been disciplinary-free for four

15  years that would be recent gain.  He must

16  demonstrate an ability to maintain those gains

17  over a longer period of time.  The Panel, in a

18  separate decision, concluded that the inmate has

19  been convicted of murder and it is not reasonable

20  to expect that parole would be granted at a

21  hearing during the following two years.  The

22  specific reasons for this two-year denial are as

23  follows:  First is the commitment offense which

24  was carried out in a manner that demonstrates a

25  disregard for human suffering.  Michael Konz was

26  beaten, stabbed, and shot to death.  The motive

27  **CHARLES BROWN  E-25371    DECISION PAGE 4    12/3/02**

55

1    for the crime was trivial; it was over a debt.

2    And the second would be the inmate's prior history

3    of criminality which included detentions as a

4    juvenile, went to juvenile hall, was on probation

5    for taking a vehicle without owner's consent, both

6    of them were.  And then as an adult for grand

7    theft person, for possession of controlled

8    substance, paraphernalia, possession, manufacture,

9    or sale of dangerous weapon.  Also, his past

10   unstable social history which included drug use.

11   Third, would be the lack of sufficient programming

12   in the institution, and that goes, Mr. Brown, to

13   your lack of participation in self-help.  The fact

14   that you don't think that you need any assistance

15   is troubling because we all learn something

16   positive from self-help programs.  You have a very

17   recent gain as far as your drug use goes.

18   There's, you know, a number of instances where you

19   explain that you were with a group of people or

20   amongst a group of people that were detained in

21   the institution while they investigated, for

22   instance, trafficking.  That tied in with your

23   possession of methamphetamine is troubling, so

24   you're going to have to put distance between

25   yourself and your 115s.  You've got to show the

26   Board that you can live by the rules of the

27   **CHARLES BROWN   E-25371   DECISION PAGE 5   12/3/02**

56

1    institution.  So the Panel finds that a longer

2    period of incarceration is required before we can

3    find you suitable for parole.  During the course

4    of the next two years, we recommend that you

5    remain disciplinary-free.  To be serious, you've

6    got to come back here with not even a new 128.

7    You need to be squeaky clean.  Also, participate

8    in whatever self-help becomes available to you.  I

9    would recommend that you look into Impact and that

10   you look into Parenting because those are just two

11   that I know that are at this institution.  You

12   have to get on a waiting list for everything, but

13   you're probably going to get something positive

14   out of either one of them.  But I'm not trying to

15   direct you just to those two.  Anything that

16   becomes available you should participate in.  We

17   want to see that you're not the same person you

18   were when you came in and one of the ways to do

19   that is through education, and if there's no other

20   way to educate you than through self-help then

21   that's the way it will have to be.  And you've

22   done a good job in terms of welding.  We just

23   recommend that you continue to upgrade as you can

24   learning new skills, which you're doing in

25   plumbing.  You'll need to get new letters again

26   from your family in two years, similar letters to

27   **CHARLES BROWN   E-25371   DECISION PAGE 6  12/3/02**

57

1    what you have this time.  And I would recommend

2    that you keep a copy and bring a copy with -- or

3    keep the originals and bring the originals with

4    you and give a copy of them to your counselor so

5    that you have them here at the hearing.  And I

6    wish you good luck.

7            INMATE BROWN:  Okay, thank you.

8            PRESIDING COMMISSIONER LAWIN:  Commissioner?

9            DEPUTY COMMISSIONER MCBEAN:  Good luck to

10   you.  Thank you.

11           INMATE BROWN:  Thank you.

12           PRESIDING COMMISSIONER LAWIN:  And this is

13   your copy.

14           INMATE BROWN:  Okay.

15           ATTORNEY TARDIFF:  Thank you.

16                      --o0o--

17

18

19

20

21

22

23

24

25   PAROLE DENIED TWO YEARS

26   EFFECTIVE DATE OF THIS DECISION_____DEC 2 6 2002__

27   CHARLES BROWN  E-25371    DECISION PAGE 7   12/3/02

58

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, PATRICIA M. JOHNSON, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 57, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING of CHARLES BROWN, CDC No. E-25371, on DECEMBER 3, 2002, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated December 12, 2002, at Sacramento County, California.

Patricia M. Johnson
Transcriber
**CAPITOL ELECTRONIC REPORTING**

BOARD OF PRISON                                                    STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☐ INITIAL HEARING          ☒ SUBSEQUENT HEARING

| PRISONER'S NAME<br>BROWN, CHARLES | CDC NUMBER<br>E-25371 |
|---|---|
| DATE OF HEARING<br>TUESDAY, DECEMBER 3, 2002 @ 11:00 a.m. | LOCATION<br>CORRECTIONAL TRAINING FACILITY - SOLEDAD |

## LEGAL STATUS

| DATE RECEIVED<br>08-08-1989 | DATE LIFE TERM STARTS (IF DIFFERENT)<br>12-08-89 | COUNTY<br>PLACER |
|---|---|---|
| OFFENSE<br>MURDER 2nd | | CASE NUMBER<br>1259 |
| COUNT NUMBER(S)<br>01 | | PENAL CODE SECTIONS(S) VIOLATED<br>P187 |
| TERMS<br>15 TO LIFE PLUS 2 YRS | | MEPD<br>05-06-2000 |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | USE WPN | P12022.5 | PLACER | 1259 | 01 |
| ☐ | ADW | P245(A)(2) | PLACER | 1636 | 01 |
| ☐ | POSS WPN | P12020(A) | PLACER | 1635 | 01 |

## PRESENT AT HEARING

| PANEL MEMBER<br>LAWIN | PANEL MEMBER<br>MCBEAN | ~~PANEL MEMBER~~ |
|---|---|---|

OTHERS PRESENT

☒ PRISONER (IF ABSENT, WHY)

☒ ATTORNEY        MARIAN TARDIFF

☐ DEPUTY D. A.    NO REPRESENTATIVE

                                          COUNTY OF    PLACER

☐ OTHERS:

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____ , PAGES _____ THROUGH _____

☒ THE STATEMENT OF FACT IS

   ☐ QUOTED FROM THE BOARD REPORT, DATED _____ PAGE(S) _____

   ☒ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S)   2 - 4

   ☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT   1000 (Rev 8/90)

BOARD OF PRISON TERMS

**LIFE PRISONER: PAROLE CONSIDERATION**
**PROPOSED DECISION  (BPT §2041)**

I.  [ ✓ ]  PAROLE DENIED  *Two (2) Years*

> If this proposed decision denying parole is approved, the Board will send you a copy of the approved decision, including the reasons for denial of parole, within 30 days of the hearing.

II.  [ ]  PAROLE GRANTED

    A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

| Case No. | Count No. | Offense |
|----------|-----------|---------|
|          |           |         |

    B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

    C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

| Case No. | Count No. | Offense | ____ mos. |
|----------|-----------|---------|-----------|
|          |           |         |           |
|          |           |         | ____ mos. |
|          |           |         | ____ mos. |

    D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

    E.  Postconviction Credit From _____ To _____ − _____ Months
                              (Date)            (Date)

    F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days. At that time appropriate pre-prison credits will be applied and a parole release date computed.

You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or postponement of your parole date.

III.  If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be scheduled for a new hearing, as appropriate.

**PANEL HEARING CASE**

| Name | | Date |
|------|--|------|
| *Sharon Lawin* | | 12/3/02 |
| Name | | Date |
| *DWMcBean* | | |
| Name | | Date |
| | | |

| NAME | CDC NUMBER | INSTITUTION | HEARING DATE |
|------|-----------|-------------|--------------|
| *Brown, Charlis* | *E25371* | *CTF Soledad* | *12-3-02* |

BOARD OF PRISON TERMS                                          McPartlan
LIFE PRISONER DECISION FACE SHEET                        STATE OF CALIFORNIA

## PERIOD OF CONFINEMENT

*(RECORDS OFFICER USE ONLY)*

|                                          | YR   | MO | DAY |
|------------------------------------------|------|----|-----|
| Adjusted Period of Confinement.......... | +89  | 8  | 8   |
| Date Life Term Begins................... | +    |    |     |
| At Large Time........................... | +    |    |     |
| PAROLE DATE............................. | =    |    |     |

## MISCELLANEOUS

*3 YR. DENIAL*

Panel recommendations and requests:
_____ Become / Remain disciplinary free.
_____ Work towards reducing his/her custody level.
_____ Upgrade _____ vocationally _____ educationally
_____ Participate in _____ self-help (and) _____ therapy.
_____ Transfer to _____ Cat. X _____ Cat. T.

PENAL CODE SECTION 3042 NOTICES ☒ SENT    (Date) **AUGUST 13, 1999**

## COMMITMENT OFFENSE

| 187 W/12022.5 | MURDER 2ND W/USE F'ARM |
|---------------|------------------------|
| (Code Section) | (Title) |
| 1259 | **01** |
| (Case Number) | (Count Number) |

| Date Received by CDC 8/8/89 | Date Life Term Begins 12/8/89 | Controlling MEPD 5/6/00 |
|---|---|---|
| Type of Hearing ☒ INITIAL ☐ SUBSEQUENT (Hearing No.) | | If Subsequent Hearing, Date of Last Hearing |

Department Representative
**ROY KELLAM TYLER, C & PR**

| Counsel for Prisoner **RHONDA SKIPPER-DOTTA** | Address |
|---|---|
| District Attorney Representative | County PLACER |

## PAROLE HEARING CALENDAR

*This form and the panel's statement at the conclusion of the hearing constitute a proposed decision and order of the Board of Prison Terms. The decision becomes effective when issued following the decision review process.*

By:

| Presiding (Name) | Date 12/ / |
|---|---|
| Concurring (Name) | Date /14/ |
| Concurring (Name) | Date /99 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BROWN, CHARLES | E-25371 | CTF | 7/99 | 12/14/99 |

BPT 1001 (Rev. 1/91)

## BPT DECISION REVIEW CORRECTIVE SHEET

INMATE: _Charles Brown_     CDC NUMBER: _5-25371_

TYPE OF HEARING: _Initial_     DATE OF HEARING: _12-14-99_

A review of the hearing transcript and parole decision by the Decision Review Unit (DRU) has revealed the following error(s):

_Page 1, Line 8, Forgot Count ##_

Recommendation: To correct the error(s) set forth above in the hearing transcript, read the following language into the record at the next scheduled parole consideration hearing:

_Page 1, Line 8, after case # 1259, add "count 1"_

_[signature]_   _12-30-99_

APPROVED BY:     Commissioner/Deputy Commissioner     Date:

[9/93]                    PERMANENT ADDENDA

41

1          CALIFORNIA BOARD OF PRISON TERMS

2                  D E C I S I O N

3          PRESIDING COMMISSIONER ORTEGA:  The time now is

4    approximately 9:25 a.m.  The Panel has reviewed all

5    the information received from the public and has

6    relied on the following circumstances in concluding

7    that the prisoner is not suitable for parole and that

8    he would pose an unreasonable risk of danger to

9    society or a threat to public safety if released from

10   prison.  The number one and most compelling reason was

11   the commitment offense.  It was carried out in an

12   especially cruel and callous manner and it was carried

13   out in a dispassionate and calculated manner.  The

14   motive for the crime was inexplicable or very trivial

15   in relation to the offense.  These conclusions are

16   drawn from the Statement of Facts wherein the

17   prisoner, apparently, had had a running feud of some

18   type with the victim in this case.  And on the night

19   in question, April the 23rd, had gone to a residence

20   where the victim at that time was visiting.  During

21   the course of that period of time, the inmate beat the

22   victim with his fists, then stabbed him several times

23   with a knife, and eventually shot him in the head

24   which caused his death.  He had a previous record.  He

25   had an escalating pattern of criminal conduct and he

26   had a history of unstable or tumultuous relationships

27   CHARLES BROWN      E-25371      DECISION PAGE 1   12/14/99

42

1    with others.  He'd failed previous grants of probation

2    and cannot be counted upon to avoid criminality.  He

3    also failed to profit from society's previous attempts

4    to correct his criminality.  Those attempts did

5    include juvenile probation and adult probation and

6    county jail terms.  His unstable social history and

7    prior criminality included, by my count, approximately

8    six arrests as a juvenile and some of those arrests

9    included grand theft auto, kidnap, a grand theft

10   person, assault with a deadly weapon, exhibiting a

11   firearm in a rude or threatening manner and malicious

12   mischief.  Now, it should be noted that many of those,

13   although they were arrests, were not convictions.

14   They did show an arrest and conviction for the grand

15   theft person.  We also noted six adult arrests and

16   those range from assault to battery on a peace

17   officer, malicious mischief, disturbing the peace,

18   receiving known stolen property and numerous charges

19   of weapons violations and also some drug charges.

20   Institutional, we note that the prisoner has not

21   sufficiently participated in beneficial self-help

22   and/or therapy programming.  He's also failed to

23   demonstrate evidence of positive change.  His

24   misconduct while incarcerated has included, by my

25   count, a least three 128(a)s in 1991, 1995 and 1998,

26   and four 115s, the first one in 8/20 of '92, then one

27   CHARLES BROWN    E-25371    DECISION PAGE 2   12/14/99

43

1    in '95, one in '96 and then one in 1998.  Those are

2    the 115s.  We also note in the area of parole plans

3    that the prisoner lacks, at this point in time,

4    realistic parole plans.  He does not have viable

5    residential plans in the last county of legal

6    residence and at this time he does not have an

7    acceptable employment plan.  We also note that we did

8    receive, as a response to 3042 notices, opposition to

9    a finding of parole suitability, specifically, from

10   the District Attorney's Office of Placer County.

11   Under remarks, the Panel makes the following findings,

12   that the prisoner needs therapy in order to face,

13   discuss, understand and cope with stress in a

14   nondestructive manner.  Until progress is made, the

15   prisoner continues to be unpredictable and a threat to

16   others.  Nevertheless, the prisoner should be

17   commended for completing his GED in 1991 and having

18   been disciplinary-free, with the exception of an

19   administrative 115 for grooming, having been

20   disciplinary-free for approximately three and a half

21   years at this time.  However, these positive aspects

22   of his behavior do not outweigh the factors of

23   unsuitability.  This will be a three year denial.  In

24   a separate decision, the Hearing Panel finds that the

25   prisoner has been convicted of murder and it is not

26   reasonable to expect that parole would be granted at a

27   **CHARLES BROWN      E-25371      DECISION PAGE 3  12/14/99**

44

1   hearing during the next three years.   Specifically,

2   the reasons for this are, the commitment offense,

3   where the prisoner had confronted the victim in this

4   crime, somebody he had been having an ongoing feud

5   with.   At that time he beat the victim with his fists,

6   stabbed him several times with a knife and then

7   eventually shot him in the head, resulting in his

8   death.   We also note that the prisoner has a history

9   of misconduct while in prison.   Since his inception

10  which was, I believe, in 1989, he has received four

11  115s, two of those were serious, one of those for

12  battery in 1995, another one for possession of

13  methamphetamines in 1996.   We also note that the

14  prisoner has not completed the necessary programming

15  which is essential to his adjustment and needs

16  additional time to gain such programming, that he must

17  continue to participate in and become involved in

18  self-help and therapy programming.   The Panel

19  recommends, within the next three years, the prisoner

20  remain disciplinary-free, if available, he try to

21  upgrade vocationally.   We do acknowledge that he does

22  have a vocation, that he is a roofer by trade.   We

23  also note that he is doing the welding but it wouldn't

24  hurt to keep busy in some way if you can find a job to

25  upgrade your welding, something that will help you

26  keep busy.   And also, if available, participate in

27  **CHARLES BROWN     E-25371       DECISION PAGE 4   12/14/99**

45

1    self-help and therapy programming.  I would recommend

2    that Mr. Brown get back into NA if he can.  I think

3    that's only going to help you.  If, for no other

4    reason, it appeases the Board and the Board likes to

5    see those things and I think, basically, you'll get

6    something out of that as well.  Those still are grave

7    concerns to the Board, especially in light of the fact

8    it's been three and a half years only since that

9    possession of methamphetamine.  And that is a concern

10   to the Board.  And the one final thing is that you

11   work your parole plans and try to get something in

12   Placer County.  My suspicion is, that's where you're

13   going to have to go back to.  I would work on getting

14   parole plans in that area.  Now, your wife lives not

15   too far from there so it shouldn't be too difficult

16   for her to assist you in that.  Get as many letters as

17   you can in here of support as well, all right?

18   Anything you would like to add, Mr. Hepburn?

19            COMMISSIONER HEPBURN:  No comments.

20            PRESIDING COMMISSIONER ORTEGA:  Mr. Filangeri.

21            DEPUTY COMMISSIONER FILANGERI:  No, thank you.

22            PRESIDING COMMISSIONER ORTEGA:  Thank you.  And

23   Mr. Hepburn will give you that copy.  That's your

24   copy.  And that will conclude the hearing at this

25   time.

26            INMATE BROWN:  Thank you.

27   CHARLES BROWN    E-25371    DECISION PAGE 5    12/14/99

46

1          ATTORNEY SKIPPER-DOTTA:  Thank you.

2          PRESIDING COMMISSIONER ORTEGA:  Good luck to

3    you.

4                        --o0o--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED THREE YEARS

26   EFFECTIVE DATE OF THIS DECISION    DEC 3 0 1999

27   CHARLES BROWN    E-25371    DECISION PAGE 6   12/14/99

BOARD OF PRISON                                                          STATE OF CALIFORNIA

# LIFE PRISONER PAROLE CONSIDERATION WORKSHEET

☒ INITIAL HEARING          ☐ SUBSEQUENT HEARING

| PRISONER'S NAME | CDC NUMBER |
|---|---|
| **BROWN, CHARLES** | **E-25371** |
| DATE OF HEARING | LOCATION |
| **DECEMBER 14, 1999** | **CORRECTIONAL TRAINING FACILITY - SOLEDAD** |

## LEGAL STATUS

| DATE RECEIVED<br>8/8/89 | DATE LIFE TERM STARTS (IF DIFFERENT)<br>12/8/89 | COUNTY<br>PLACER |
|---|---|---|
| OFFENSE<br>MURDER 2ND W/USE F'ARM | | CASE NUMBER<br>1259 |
| COUNT NUMBER(S)<br>01 | PENAL CODE SECTIONS(S) VIOLATED<br>187 w/12022.5 | |
| TERMS<br>15-LIFE PLUS 2 YRS | MEPD<br>5/6/00 | |

## OTHER COMMITMENT OFFENSES *OR STAYED COUNTS*

| STAYED | OFFENSE | CODE SECTION | COUNTY | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|---|
| ☐ | ADW | 245(A)(2) | PLACER | 1636 | 01 |
| ☐ | MGF/POSS DW | 12020(A) | PLACER | 1635 | 01 |
| ☐ | | | | | |

## PRESENT AT HEARING

| PANEL MEMBER | PANEL MEMBER | PANEL MEMBER |
|---|---|---|
| *ORTEGA* | *FILANGERI* | *HEPBURN* |

OTHERS PRESENT

☐ PRISONER (IF ABSENT, WHY)

☑ ATTORNEY    *R. SKIPPER-DOTTA*

☐ DEPUTY D.A.    *NONE*                    COUNTY OF

☐ OTHERS:

## STATEMENT OF FACTS

☐ THE HEARING PANEL INCORPORATED BY REFERENCE FROM THE DECISION OF THE HEARING HELD

ON _____, PAGES _____ THROUGH _____

☑ THE STATEMENT OF FACT IS

☐ QUOTED FROM THE BOARD REPORT, DATED _____ , PAGE(S) _____

☑ QUOTED FROM THE PROBATION OFFICER'S REPORT, PAGE(S) *3*

☐ QUOTED FROM THE COURT OPINION, PAGE(S) _____

BPT   1000 (Rev 8/90)

BOARD OF PRISON TERMS                                                          STATE OF CALIFORNIA

LIFE PRISONER: PAROLE CONSIDERATION
PROPOSED DECISION  (BPT §2041)

I.    [✓]  PAROLE DENIED  3 YRS.

        If this proposed decision denying parole is approved, the Board will send you a copy of the approved
        decision, including the reasons for denial of parole, within 30 days of the hearing.

II.   [ ]  PAROLE GRANTED

        A.  Base Period of Confinement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . _____ Months

        _____
        Case No.              Count No.              Offense

        B.  Firearm Enhancement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

        C.  Other Crimes Total . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .+ _____ Months

        _____  _____ mos.
        Case No.              Count No.              Offense

        _____  _____ mos.
        Case No.              Count No.              Offense

        _____  _____ mos.
        Case No.              Count No.              Offense

        D.  Total Term . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

        E.  Postconviction Credit From _____ To _____ − _____ Months
                                          (Date)                    (Date)

        F.  Total Period of Confinement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . = _____ Months

        The period of confinement indicated is a tentative decision proposed by this panel. The decision will be reviewed
        pursuant to BPT §2041, and, if approved, a copy of the approved decision will be sent to you within 30 days.
        At that time appropriate pre-prison credits will be applied and a parole release date computed.

        You will not engage in any conduct specified in BPT §2451. Such conduct may result in rescission or post-
        ponement of your parole date.

II.   If the proposed decision denying or granting parole is disapproved, you will receive a copy of the proposed
      decision and the reasons for disapproval. You will then receive a copy of the modified decision or will be
      scheduled for a new hearing, as appropriate.

_____ PANEL HEARING CASE _____

Name _____    Date  12/

Name _____    Date  /14/

Name _____    Date  /99

NAME                            CDC NUMBER          INSTITUTION          HEARING DATE
BROWN, CHARLES                  E-25371             CTF                  12/14/99

Distribution: White—C. File

## BPT DECISION REVIEW CORRECTIVE SHEET

INMATE: _Charles Brown_          CDC NUMBER: _C-25371_

TYPE OF HEARING: _Initial_        DATE OF HEARING: _12-14-99_

A review of the hearing transcript and parole decision by the Decision
Review Unit (DRU) has revealed the following error(s):

_Page 1, Line 8,    Forgot Count #_

__Recommendation:__  To correct the error(s) set forth above in the hearing
transcript, read the following language into the record at the next
scheduled parole consideration hearing:

_Page 1, Line 8,   after Case # 1259,_
_add "Count 1",_

_12-30-99_

APPROVED BY:        Commissioner/Deputy Commissioner    Date:

[9/93]                    PERMANENT ADDENDA

BOARD OF PRISON TERMS

**LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)**

STATE OF CALIFORNIA

BPT REPRESENTATIVE   JAMES B. DOWLING

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE)          | BPT NO. | INSTITUTION | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|---|
| PT87 MURDER 2ND/PI2022.5 USE F'ARM/P245(A)(2) ASLT W/F'ARM | | | PLA 1259 &1635&1636 | 1,1,1 |

| DATE RECEIVED CDC | MIN ELIG PAROLE DATE | EARLIEST MIN ELIG PAROLE DATE |
|---|---|---|
| 8-18-89 | PI2020(A) POSS DW  3-7-2000 | |

| INITIAL HRG SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 2-99 | 1-11-93 TO PRESENT | 1-11-93 |

## INFORMATION CONSIDERED

### CDC 115 CHRONOS
- [ ] DISCIPLINARY FREE
- [x] MAJOR DISCIPLINARY (SERIOUS)  See BPT 1004
- [ ] MINOR DISCIPLINARY (ADMIN)

### LAUDATORY CHRONOS
| DATE | CIRCUMSTANCES |
|---|---|
| | None |

### CDC 128 CHRONOS (NEGATIVE)
| DATE | CIRCUMSTANCES |
|---|---|
| 5·2·95 | Unauthorized Property |

### CHRONOS — WORK, EDUCATIONAL, VOCATIONAL, ETC.
| DATE | CIRCUMSTANCES |
|---|---|
| 6-8-94 | Work chrono indicating his welding skills have have grown by leaps & bounds. |

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED  None

PSYCHIATRIC

REFER TO CATEGORY

COMPLETE PRIOR TO  Initial Parole Consideration Hearing

PLACE ON APPROPRIATE
- [ ] LIFE PRISONER DOCUMENTATION CALENDAR
- [x] LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR

OTHER

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BROWN | E25371 | MCSP | COPY TO INMATE VIA CC-1 3/19/96 DAW | 3/8/96 |

AFTER REVIEWING WITH THE PRISONER THE FACTS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE VOCATIONAL TRAINING _Voc. welding. Certificates for Voc Welding_

RE ACADEMICS _Has GED, encouraged to do some ed upgrading through self-study._

RE WORK RECORD _Working in PIA doing maintenance on equip & some welding_

RE GROUP ACTIVITIES _Encouraged to enroll in self help groups, especially N.A._

RE PSYCHIATRIC TREATMENT _None until IPCH_

RE PRISON BEHAVIOR _1 serious CDC 115 — see BPT 1004_

RE OTHER _____

BPT REPRESENTATIVE SIGNATURE

DATE _3-8-96_

NAME Brown    CDC NUMBER E 25371    INSTITUTION MCSP    CALENDAR 3/96    HEARING DATE 3/8/96

BPT 1009 (REV 4/86)    PAGE 2 of 2 PAGES    PERMANENT ADDENDA

TC-3-1
Burns

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

# LIFE PRISONER: DOCUMENTATION HEARING (BPT §2269.1)

BPT REPRESENTATIVE
*Richard Beekman*

## SENTENCE INFORMATION

| OFFENSE (CODE SECTION AND TITLE) | | CASE NUMBER | COUNT NUMBER |
|---|---|---|---|
| P187/P12022.5 | MURDER 2ND/W USE OF F/ARM | PLA 1259 | 01 |

| DATE RECEIVED CDC | MIN. ELIG. PAROLE DATE | EARLIEST MIN. ELIG. PAROLE DATE |
|---|---|---|
| 8-8-89 | 11-28-1999 | |

| INITIAL HRG. SCHEDULED | PERIOD COVERED BY THIS HEARING | PRIOR DOCUMENTATION HEARING DATES |
|---|---|---|
| 10/98 | 8-8-89 THRU 1-11-93 | N/A |

## INFORMATION CONSIDERED

| CDC 115 CHRONOS | LAUDATORY CHRONOS | |
|---|---|---|
| | DATE | CIRCUMSTANCES |
| ☐ DISCIPLINARY FREE | | *None* |
| ☒ MAJOR DISCIPLINARY (SERIOUS) | | |
| ☒ MINOR DISCIPLINARY (ADMIN.) | | |

| CDC 128 CHRONOS (NEGATIVE) | | CHRONOS — WORK, EDUCATIONAL, VOCATIONAL; ETC. | |
|---|---|---|---|
| DATE | CIRCUMSTANCES | DATE | CIRCUMSTANCES |
| 1-18-91 | Cell Conditions | 11-2-91 | GEO. |
| | | 8-1-92 | Industries - Welder/Brinder Satisfactory work. |

## INSTRUCTIONS TO CDC STAFF

DOCUMENTS STILL REQUIRED: *None*

PSYCHIATRIC:

REFER TO CATEGORY *N/A*

COMPLETE PRIOR TO

PLACE ON APPROPRIATE:

☒ LIFE PRISONER DOCUMENTATION CALENDAR

☐ LIFE PRISONER PAROLE CONSIDERATION HEARING CALENDAR *P/0 Doc #2 11-95*

OTHER

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BROWN, CHARLES | E-25371 | FSP | 12/92 | 1-11-93 |

AFTER REVIEWING WITH THE PRISONER THE FACTORS WHICH MIGHT BE OF CONCERN AT HIS/HER INITIAL PAROLE HEARING, THE PANEL MADE THE FOLLOWING EVALUATIONS AND FUTURE RECOMMENDATIONS:

RE: VOCATIONAL TRAINING    Needs voc. training - Interested in Welding.

RE: ACADEMICS    Has completed GED. Has interest in college.

RE: WORK RECORD    Presently working in kitchen. Wants better work assignment. Would like to get job in Industries back.

RE: GROUP ACTIVITIES    Needs self help. Would benefit from A.A. +/or N.A.

RE: PSYCHIATRIC TREATMENT    None indicated.

RE: PRISON BEHAVIOR    Become disciplinary free. Importance in relationship to "suitability" was explained to him.

RE: OTHER    Prisoner claims that 115 of 10/6/was dismissed but there is still Xerox copy in "C" file that doesn't show any disposition. This needs to be cleared up so that there is no confusion.

| BPT REPRESENTATIVE SIGNATURE | DATE |
|---|---|
| Richard Beckman | 1-11-93 |

| NAME | CDC NUMBER | INSTITUTION | CALENDAR | HEARING DATE |
|---|---|---|---|---|
| BROWN | E-25371 | PSP (OLD) | 12/92 | 1-11-93 |

BPT 1009 (REV. 4/86)        PAGE 2 of ___ PAGES        PERMANENT ADDENDA

EXHIBIT "B"

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE

FORM CR 29

SUPERIOR COURT OF CALIFORNIA, COUNTY OF __Placer__
BRANCH _____

COURT I.D.
3 1

FILED

JUL 17 1989

MARY ANN HULSE
COUNTY CLERK OF PLACER COUNTY
BY SHARYN VEIGA
DEPUTY

PEOPLE OF THE STATE OF CALIFORNIA    versus    [x] PRESENT
DEFENDANT:  CHARLES LLOYD BROWN    [ ] NOT PRESENT
AKA:

CASE NUMBER(S)
1259    - A
    - B
    - C
    - D
    - E

REPORT TO JUDICIAL COUNCIL OF: [x] INDETERMINATE SENTENCE
TO STATE PRISON [ ] SENTENCE CHOICE OTHER THAN STATE PRISON

| DATE OF HEARING [MO] [DAY] [YR] | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 07 17 89 | 3 | James L. Roeder | Sharyn Veiga |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| Dolores Gilbert | Richard Opich | David Brooks | Gaylen Halbert |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES:

A. [ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____

ENHANCEMENTS (CHARGED AND FOUND)

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY TRIAL | COURT TRIAL | PLEA | 654 STAY | 12022(a) | 12022(b) | 12022.7(b) | 12022.5 | 12022.6(b) | 12022.7 | 12022.8 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 189 | Second Degree Mur | 88 | 06 16 89 | x | | | | | | | x | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | |

2.  A.  Number of prior prison terms charged and found

| SECTION | NUMBER |
|---|---|
| 667.5(a) | |
| 667.5(b) | |
| 667.6(b) | |

B.  Number of prior felony convictions

| SECTION | NUMBER |
|---|---|
| 667.6(a) | |

3.  [ ] Defendant was sentenced to death on counts _____

4.  [x] Defendant was sentenced to State Prison:
    A.  [x] For life, or a term such as 15 or 25 years to life, with possibility of parole, on counts __1__ , _____ , _____ , _____
    B.  [ ] For life without the possibility of parole on counts _____ , _____ , _____ , _____
    C.  [ ] For other term prescribed by law on counts _____ , _____ , _____ , _____

5.  [ ] Counts _____ , _____ , _____ , were deemed misdemeanors.
    A.  [ ] Defendant sentenced to _____ days in county jail for all counts.
         NUMBER
    B.  [ ] Defendant fined in sum of $ _____ .

6.  [ ] For counts _____ , _____ , _____ , _____ , the defendant was placed on probation.
    A.  (1) [ ] Sentence pronounced and execution of sentence was suspended; or
        (2) [ ] Imposition of sentence was suspended.
    B.  Conditions of probation included [ ] Jail Time _____ days    [ ] Fine

7.  Other dispositions
    A.  [ ] Defendant was committed to California Youth Authority.
    B.  [ ] Proceedings suspended and defendant was committed to California Rehabilitation Center.
    C.  [ ] Proceedings suspended and defendant was committed as a Mentally Disordered Sex Offender.
    D.  [ ] Proceedings suspended, and defendant was committed as mentally incompetent.
    E.  [ ] Other (Specify) _____

NOTE:  PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON. THE REPORTS IMPLEMENT SECTION 1170.4 OF THE PENAL CODE AND SHALL BE MAILED TO: ADMINISTRATIVE OFFICE OF THE COURTS, 350 McALLISTER, 3200 STATE BUILDING, SAN FRANCISCO CALIFORNIA 94102

DATE   JUL 17 1989    SIGNATURE OF CLERK _____

REPORT—INDETERMINATE SENTENCE,    Const., Art. VI, §

ABSTRACT OF JUDGMENT – COMMITMENT
SINGLE OR CONCURRENT COUNT FORM
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

FORM DSL 290.1

SUPERIOR COURT OF CALIFORNIA, COUNTY OF _____ **Placer**

COURT I.D. **3 1**   BRANCH _____

SEP 15 1989

MARY ARCHIBALD
C. McLAURIN

PEOPLE OF THE STATE OF CALIFORNIA   versus
DEFENDANT:   CHARLES LLOYD BROWN   [X] PRESENT   [ ] NOT PRESENT
AKA:

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT   [X] AMENDED ABSTRACT   CASE NUMBER **1635**

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 8 07 89 | 3 | James L. Roeder | C. McLaurin |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| Delores Gilbert | Richard Opich | David A. Brooks | Michael Sipe |

DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONY:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO DAY YEAR | CONVICTION BY JURY/COURT/PLEA | TERM (L.M.U.) | TIME IMPOSED YEARS MONTHS |
|---|---|---|---|---|---|---|---|---|
| 1 | PC | 12020(a) | Possession of a DW | 87 | 07 19 89 | X | M | 2 |

ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):

| COUNT | 12022(a) C/F S I | 12022(b) C/F S I | 12022.3(a) C/F S I | 12022.3(b) C/F S I | 12022.5 C/F S I | 12022.6(a) C/F S I | 12022.6(b) C/F S I | 12022.7 C/F S I | 12022.8 C/F S I |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

OTHER ORDERS:

4. A. NUMBER OF PRIOR PRISON TERMS:

| § | C/F | S | I |
|---|---|---|---|
| 667.5(a) | | | |
| 667.5(a) | | | |
| 667.6(b) | | | |

B. NUMBER OF PRIOR FELONY CONVICTIONS:

| § | C/F | S | I |
|---|---|---|---|
| 667.6(a) | | | |

TIME STAYED §1170.1(f) [DOUBLE BASE LIMIT]: ──────────────►

TOTAL TERM IMPOSED: ──────────────►   **2**

[X] THIS SENTENCE IS TO RUN CONCURRENT WITH ANY PRIOR UNCOMPLETED SENTENCE(S).

Placer County Superior Court #1259

EXECUTION OF SENTENCE IMPOSED:
[X] AT INITIAL SENTENCING HEARING
B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL
C. [ ] AFTER REVOCATION OF PROBATION
D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC §1170(d))

| DATE SENTENCE PRONOUNCED: MO DAY YEAR | CREDIT FOR TIME SPENT IN CUSTODY: | TOTAL DAYS | ACTUAL LOCAL | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| 08 07 89 | | 462 | 310 | 152 | [ ] DMH   [X] CDC |

DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED

[X] FORTHWITH
[ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS

INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:

[ ] CALIF. INSTITUTION FOR WOMEN — FRONTERA
[X] CALIF. MEDICAL FACILITY — VACAVILLE
[ ] CALIF. INSTITUTION FOR MEN — CHINO
[ ] OTHER (SPECIFY):

CLERK OF SUPERIOR COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE
C. McLaurin

SEP 15 1989

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code §1203c. A copy of the sentencing proceedings and any supplementary probation report shall be transmitted to the Department of Corrections pursuant to Penal Code 1203.01. Attachments may be used but must be incorporated by reference.

Form Adopted by the
Judicial Council of California

ABSTRACT OF JUDGMENT — COMMITMENT
SINGLE OR CONCURRENT COUNT FORM

ABSTRACT OF JUDGMENT — COMMITMENT
SINGLE OR CONCURRENT COUNT FORM
(Not to be used for Multiple Count Convictions nor Consecutive Sentences)

FORM DSL 290.1

SUPERIOR COURT OF CALIFORNIA, COUNTY OF _____ Placer _____
BRANCH _____

COURT I.D.
3 1

FILED
SEP 15 1989
MARY ANN HULSE
COUNTY CLERK OF PLACER COUNTY
BY _____ C. McLAURIN
DEPUTY

PEOPLE OF THE STATE OF CALIFORNIA     versus
DEFENDANT: CHARLES LLOYD BROWN     [X] PRESENT     [ ] NOT PRESENT
AKA:

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT     [X] AMENDED ABSTRACT     CASE NUMBER 1636

| DATE OF HEARING (MO)(DAY)(YR) | DEPT. NO. | JUDGE | CLERK |
|---|---|---|---|
| 8 ,07 ,89 | 3 | James L. Roeder | C. McLaurin |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| Delores Gilbert | Richard Opich | David A. Brooks | Michael Sipe |

DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONY:

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION MO | DAY | YEAR | CONVICTION BY JURY | TRIAL COURT | PLEA | TERM (L,M,U) | TIME IMPOSED YEARS | MONTHS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC | 245(a)(2) | Assault w/Firearm | 87 | 07 | 19 | 89 | | x | | M | 3 | |

ENHANCEMENTS (CHARGED AND FOUND, STRICKEN, TIME IMPOSED):

| COUNT | 12022(a) | | | 12022(b) | | | 12022.3(a) | | | 12022.3(b) | | | 12022.5 | | | 12022.6(a) | | | 12022.6(b) | | | 12022.7 | | | 12022.8 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | C/F | S | I | C/F | S | I | C/F | S | I | C/F | S | I | C/F | S | I | C/F | S | I | C/F | S | I | C/F | S | I | C/F | S | I |

OTHER ORDERS:

4. A. NUMBER OF PRIOR PRISON TERMS:

| § | C/F | S | I |
|---|---|---|---|
| 667.5(a) | | | |
| 667.5(b) | | | |
| 667.6(b) | | | |

B. NUMBER OF PRIOR FELONY CONVICTIONS:

| § | C/F | S | I |
|---|---|---|---|
| 667.6(a) | | | |

TIME STAYED §1170.1(f) [DOUBLE BASE LIMIT]:

TOTAL TERM IMPOSED: ➤ 3

[X] THIS SENTENCE IS TO RUN CONCURRENT WITH ANY PRIOR UNCOMPLETED SENTENCE(S).
Placer County Superior Court #1259

EXECUTION OF SENTENCE IMPOSED:

[X] A. AT INITIAL SENTENCING HEARING   B.[ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL   C.[ ] AFTER REVOCATION OF PROBATION   D.[ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC §1170[d])

| DATE SENTENCE PRONOUNCED: MO DAY YEAR | CREDIT FOR TIME SPENT IN CUSTODY: | TOTAL DAYS | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS |
|---|---|---|---|---|---|
| 08 07 89 | | 465 INCLUDING: | 310 | 155 | [ ] DMH   [X] CDC |

DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED:

[X] FORTHWITH
[ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS

INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT:

[ ] CALIF. INSTITUTION FOR WOMEN — FRONTERA
[ ] CALIF. MEDICAL FACILITY — VACAVILLE
[ ] CALIF. INSTITUTION FOR MEN — CHINO
[ ] OTHER (SPECIFY):

CLERK OF SUPERIOR COURT

I hereby certify the foregoing to be a correct abstract of the judgment made in this action.

DEPUTY'S SIGNATURE     C. McLaurin     DATE SEP 15 1989

This form is prescribed pursuant to Penal Code §1213.5 to satisfy the requirements of Penal Code §1213 (Abstract of Judgment and Commitment) for determinate sentences under Penal Code §1170. A copy of probation report shall accompany the Department of Corrections' copy of this form pursuant to Penal Code §1203c. A copy of the sentencing proceedings and any supplemental probation report shall be transmitted to the Department of Corrections pursuant to Penal Code 1203.01. Attachments may be used but must be incorporated by reference.

ABSTRACT OF JUDGMENT — COMMITMENT
SINGLE OR CONCURRENT COUNT FORM

Form Adopted by the
Judicial Council of California



| COURT |
| E.A. |
| P.D. |
| ATTY. |
| |
| |

PLACER COUNTY PROBATION DEPARTMENT
11564 "C" AVENUE
AUBURN, CA 95603

916/889-7900

# FILED

AUG 7 1989

MARY ANN HULSE
COUNTY CLERK OF PLACER COUNTY

BY _____
        DEPUTY

SUPERIOR COURT OF CALIFORNIA - COUNTY OF PLACER

PEOPLE OF THE STATE OF CALIFORNIA )      Department No. __3__
                                   )
                        Plaintiff, )      Case No.   1635/1636
                vs.                )
                                   )
CHARLES LLOYD BROWN,               )      PROBATION OFFICER'S REPORT
                                   )
                        Defendant. )           X   Presentence

AGE:  36          BORN:  January 23, 1953

ADDRESS:  Placer County Jail

DATE COMMITTED:  Case 1635: September 7, 1987;
                 Case 1636: August 10, 1987

DATE OF ARREST:  Case 1635: September 7, 1987;
                 Case 1636: September 12, 1988

TIME IN CUSTODY:  615 days (actual)

FELONY COMPLAINT FILED:  Case 1635: January 26, 1989;
                         Case 1636: April 28, 1988

INFORMATION FILED:  Unknown

GUILTY BY:  Plea

GUILTY OF:  Case 1636: Count One, 245(a)(2) PC, ASSAULT WITH A
FIREARM, a felony; Case 1635: Count One, 12020(a) PC, POSSESSION OF A
DEADLY WEAPON, a felony.

REPRESENTED BY:  Public Defender/Brooks

REFERRAL TO PROBATION OFFICER:  July 19, 1989

JUDGMENT AND SENTENCE:  August 7, 1989

PROBATION OFFICER'S RECOMMENDATION:  Department of Corrections

PRESENT OFFENSE:

    Case 1636: Count One, 245(a)(2) PC, ASSAULT WITH FIREARM, a felony.

The defendant beat and tortured a victim at the victim's residence.

The following information is obtained in summary from Placer County Sheriff's Department report 87-08-010-0041:

On August 10, 1987, at 9:39 a.m., Officers Taylor and Barnburg responded to an assault. They met with Donald Lefebure who directed them to the victim, Daniel Amrine. Mr. Amrine was observed to have blood on his face, arms, and chest, and was bleeding profusely. He reported being beaten with guns, knives, pipes, and tortured with an iron. He was observed to have burns on his back and left arm.

Mr. Amrine stated he was home when CHARLES BROWN, the defendant, and another male subject came to his residence and entered. Seeing the defendant had a gun, Mr. Amrine ran to his bedroom to retrieve a .38 caliber handgun when he was caught and told to sit on the couch in living room. It was there that he was repeatedly hit with a hammer in the head, elbows, and knees. He was struck several times with guns, pipes, and other items. He was then tortured with an iron burning his back and left arm. He was threatened to be killed before he broke a window and escaped. He was in extreme pain and transported to the hospital. He reports the defendant stole over $1,000 in personal belongings from his residence.

On August 20, 1987, the defendant was questioned about the incident by sheriff's department detectives. The defendant denied torturing the victim, saying they were friends. When he learned the victim was responsible for sexually molesting a little girl,
...

-2-

the defendant decided to confront the victim.  He denied the
assault stating the other male subject must have been the one who
hit the victim.

Case 1635: Count One, 12020(a) PC, POSSESSION OF DEADLY
WEAPON, a felony.

The following information was obtained in summary from Roseville
Police Department report 250-87-08780:

On September 7, 1987, the manager of Harding Inn, Lorna Wilson,
called Roseville Police Department and reported two tenants who
had not checked out and were overdue to do so.  Roseville
officers responded and knocked on the door.  No response was
received, so Ms. Wilson opened the door.  The defendant and a
female companion were observed partially clothed and asleep on
the bed.  A gun holster was also observed on the bed.  The defen-
dant awakened and was determined to be somewhat incoherent.  He
complained of shooting himself and was observed to have an Ace
bandage on one of his legs.  Roseville officers searched the
room, finding numerous gun parts, sawed-off rifles, live ammu-
nition, loaded clips, and controlled substances.  The defendant
was arrested for possession of a sawed-off rifle.

On July 19, 1989, CHARLES LLOYD BROWN pled guilty to the offenses
noted on the face sheet of this report.  According to the court
minutes, the District Attorney promised the sentence to run con-
current with Superior Court Case number 1259.  Judgment and sen-
tence was then scheduled for August 7, 1989.

STATUS OF CODEFENDANT(S):

The codefendant involved in Case number 1636 was not identified
or arrested.

. . . . .

-3-

PLACER COUNTY
PROBATION DEPT.

## DEFENDANT'S STATEMENT:

Based upon the nature of the present referral, in addition to the defendant's recent court appearance in Case 1259 and his refusal to give a statement in that case, a statement was not obtained from the defendant regarding the present offenses.

## VICTIM'S STATEMENT/RESTITUTION:

Probation has made numerous attempts in contacting Daniel Amrine unsuccessfully.  Therefore, no victim statement could be obtained during the investigation.

## PRIOR RECORD:

A copy of defendant's criminal history as obtained under C.I.I. No. A03630735 reflects the following:

| Date | Agency | Charge | Disposition |
|---|---|---|---|
| 10/21/68 | PDROSEVILLE 15301 | 1:TAKE VEHICLE W/O OWN CONSENT/VEH THEFT. | 10/21/68 DISPO:TO JUVENILE HALL. |
| 4/4/71 | SOLOS ANGELES 1491-538 | 1:KIDNAPING | 7/8/71 DISPO: CONVICTED 487.2 PC-GRAND THEFT FROM PERSON. |
| 6/7/73 | MCLOS ANGELES METRO 31448390 | 4:LOCAL ORDINANCE VIOLATION | DISPO:CONVICTED-PLED NOLO CONTENDRE |
| 12/14/83 | MCSACRAMENTO 8410 | 2:415 PC-FIGHT/NOISE OFFENSIVE WORDS | DISPO: CONVICTED FINE CONV STATUS: MISDEMEANOR. |
| 2/4/88 | MCSACRAMENTO 88M01887 | 2:12020(A)PC-POSSESS MFG/SELL DANGEROUS WEAPON. 3: 12031 PC-CARRY LOADED FIREARM IN PUBLIC PLACE. 4: 11364 H&S-POSSESS CONTROL SUBSTANCE PARAPHERNALIA | DISPO:CONVICTED-PROB/JAIL. CONV STATUS:MISDEMEANOR DISPO:CONVICTED-PROB/JAIL. CONV STATUS: MISDEMEANOR. DISPO: CONVICTED-JAIL CONV STATUS: MISDEMEANOR. |

. . . . .

PLACER COUNTY
PROBATION DEPT.

| | | | |
|---|---|---|---|
| 4/23/88 | SC AUBURN 1259 | 1:189 PC, SECOND DEGREE MURDER | 6/15/89: CON- VICTED BY JURY SENTENED TO 15 YRS. TO LIFE. |

SOCIAL STUDY:

The following information is obtained from a Placer County Proba-
tion Department interview verification/OR report dated September
15, 1988, and a previous probation report dated July 13, 1989:

CHARLES LLOYD BROWN is 35 years of age, having been born January
23, 1953. He was living in a motel in Sacramento for approxi-
mately one week prior to his last arrest. Previously, he had
been residing at 7262 Callison in Penryn. The defendant reports
having a sister and brother-in-law in Citrus Heights. The defen-
dant is divorced and has two children, ages 12 and 11. He has
been unemployed for two years, and was last employed by Erickson
Roofing Company in Orangevale. He was earning approximately $15
per hour. Previous employment includes working as a roofer and a
laborer. The defendant was supported by his girlfriend who helps
him out. He has not paid child support to his two children in
over two years.

FINANCIAL CONSIDERATION:

Based upon this officer's recommendation, reimbursement for this
report will not be recommended.

RULE 414 - CRITERIA AFFECTING PROBATION:

(a) Eligibility. The defendant is statutorily eligible for
probation, however, Penal Code Section 1203.095(a) states the
defendant must serve a minimum period of incarceration in county
jail.

. . . . .

PLACER COUNTY
PROBATION DEPT.

1  (b) <u>Danger to Others</u>.  Elements of the present offense and the
2  defendant's prior record indicate he is a significant danger to
3  others.

4  (c)(1) <u>Description of Crime</u>.  Case 1636 involves the defendant
5  entering a victim's residence and beating him with a gun and
   hammer, and toturing him with an iron.  Case 1635 involves the
6  defendant being in possession of deadly weapons.

7

8  (c)(2) <u>Vulnerability</u>.  Daniel Amrine was particularly vulnerable
   in that the offense occurred at his residence where he was
9  assaulted by two male suspects, including the defendant.

10

11 (c)(3) <u>Weapon</u>.  Case 1636, the defendant was described as having
   a large caliber handgun.  In Case 1635, numerous gun parts, a
12 sawed-off rifle, live ammunition and loaded clips were found
13 within the defendant's motel room.

14

15 (c)(4) <u>Injury</u>.  Daniel Amrine was observed to have blood on his
   head, back, and arms and was observed to be bleeding profusely.
16 He was described as being in tremendous pain before being trans-
17 ported to the hospital.

18 (c)(5) <u>Participation</u>.  The defendant and his cocompanions appear
19 equally culpable in the present offenses.  Facts related by the
20 police department indicate planning on the part of the defen-
   dant.  The defendant had admitted to sheriff's detectives that he
21 returned to Mr. Amrine's residence to confront him about a sexual
22 molestation.  Case 1635, the numerous gun parts found throughout
23 the hotel room indicate both planning and premeditation.

24
   (c)(6) <u>Unusual Circumstances</u>.  Not applicable.
25

26 (c)(7) <u>Sophistication</u>.  The facts of the present offense do not
   indicate a great deal of sophistication on the part of the defen-
27 dant.
28 .....

PLACER COUNTY
PROBATION DEPT.

(c)(8) <u>Position of Trust</u>. The victim in Case 1636 was an acquaintence of the defendants, therefore allowing him into his home and violating a position of trust.

(d)(1) <u>Record</u>. The defendant has a prior record of theft and assaultive-related offenses dating back to 1968.

(d)(2) <u>Probation/Parole Performance</u>. The defendant's past performance on probation appears unsatisfactory on the basis of his continuing arrests for related offenses.

(d)(3) <u>Compliance to Probation</u>. Unknown.

(d)(4) <u>Personal Data</u>. The court's attention is respectfully directed to the social study section of this report.

(d)(5) <u>Financial/Military</u>. Unknown.

(d)(6) <u>Substance Abuse</u>. Unknown.

(d)(7) <u>Effect of Imprisonment or Local Incarceration</u>. Unknown.

(d)(8) <u>Effect of a Felony</u>. Unknown.

(d)(9) <u>Remorse</u>. Unknown.

(d)(10) <u>Refusal/Restitution</u>. Unknown.

<u>RULE 421 - CIRCUMSTANCES IN AGGRAVATION</u>:

(a) <u>Facts relating to the crime</u>:

(1) The crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness or callousness, whether or not charged or chargeable as an enhancement under Section 12022.7.

.....

PLACER COUNTY
PROBATION DEPT.

1   The defendant mot only beat the victim, but tortured him with a
2   hot iron.

3   (3) The victim was particularly vulnerable.

4
5   (Case 1636) Daniel Amrine was attacked by the defendant and a
    codefendant at the victim's residence.
6

7   (8) The planning, sophistication, or professionalism with which
8   the crime was carried out, or other facts, indicate premeditation.

9   The defendant admitted to sheriff's detectives that he had
10  returned to Daniel Amrine's residence to confront him about a
11  sexual moelstation.  Additionally, the number of weapon parts
    found in the defendant's hotel room in Case 1635 indicates pre-
12  meditation.

13
14  (12) The defendant took advantage of a position of trust or con-
    fidence to commit the offense.
15

16  Daniel Amrine reported to sheriff's deputies that he knew the
17  defendant and accordingly let him into his residence before he
    was assaulted.  The defendant was in a position of trust over the
18  victim to gain access into the residence.

19

20      (b) Facts relating to the defendant:

21  (1) He has engaged in a pattern of violent conduct which indi-
22  cates a serious danger to society.

23
24  (2) The defendant's prior convictions as an adult are numerous or
    of increasing seriousness.
25

26  RULE 423 - CIRCUMSTANCES IN MITIGATION:

27
        (a) Facts relating to the crime:
28  .....

1    None.

2    (b) <u>Facts relating to the defendant</u>:

3

4    (3) The defendant voluntarily acknowledged wrongdoing prior to
5    arrest or at an early stage of the criminal process.

6    The defendant pled guilty to the present offenses in Municipal
7    Court.

8    <u>RULE 425 - CRITERIA FOR CONCURRENT OR CONSECUTIVE SENTENCING</u>:

9

10   Criteria affecting the decision to impose consecutive rather than
11   concurrent sentences include:

12   (a) Facts relating to the crimes, including whether or not:

13

14   (1) The crimes and their objectives were predominantly
15   independent of each other.

16   (2) The crimes involved separate acts of violence or threats of
17   violence.

18   (3) The crimes were committed at different times or separate
19   places, rather than being committed so close in time and place as
20   to indicate a single period of aberrant behavior.

21   (4) Any of the crimes involved multiple victims.

22

23   (b) Any circumstances in aggravation or mitigation.

24   It is indicated on the Court minutes that the District Attorney
25   promised the sentence to run concurrent with Superior Court Case
26   1259.  This offense occurred at a separate time and a different
27   ...

28

-9-

PLACER COUNTY
PROBATION DEPT.

location from Case 1259.  It involves additional victims and similar behavior.  There are numerous circumstances in aggrevation relating to both cases.  Accordingly, consecutive sentences are considered appropriate and are being recommended.

COMMUNITY SERVICE/WORK FURLOUGH:

Based upon this officer's recommendation, neither community service nor work furlough are being considered.

TIME SERVED CREDITS - 2900.5/4019 PENAL CODE:

The defendant was in custody in this case as follows:

| Facility | Dates From | to | Actual Days Served | 4019 or Case Law Credit | Total |
|---|---|---|---|---|---|
| (Case 1635) | | | | | |
| Placer County Jail | 11/19/87 | 11/20/87 | 2 | | |
| Placer County Jail | 2/16/88 | 2/18/88 | 3 | | |
| Placer County Jail | 9/12/88 | 7/17/89 | 305 | | |
| (Case 1636) | | | | | |
| Placer County Jail | 9/12/88 | 7/17/89* | 305 | | |
| | | | 615 | 307 | 42 |

*On July 17, 1989, the defendant became a sentenced prisoner in Case 1259.  Pursuant to People vs. Rojas, the defendant is not entitled to presentence credits after he has been sentenced in a previous case.

EVALUATION:

CHARLES LLOYD BROWN, aged 36, appears before the Superior Court of Placer County for sentencing following his plea of guilty, Assault with a Firearm and Possession of Deadly Weapons.  The offenses involve the defendant accompanying a codefendant to Daniel Amrine's residence where they beat him with hammers and guns, and tortured him with a hot iron.  The victim was able to break out a window and escaped before calling law enforcement.
...

PLACER COUNTY
PROBATION DEPT.

1    The defendant was later interviewed and denied responsibility.
2    In Case 1635, the defendant was reported as being a tenant who
3    had failed to check out at the normal checkout time. He was
     encountered by Roseville Police Department officers and later
4    found to be in possession of numerous gun parts, a sawed-off
5    rifle, live ammunition, loaded clips, and controlled substances.
     The defendant's motive for Case 1636 is admittedly retalliation
6    for the victims involved in a sexual molestation case. The
7    defendant's motive for Case 1635 is unknown.

8
     Although statutorily eligible for probation, probation is not
9    being recommended. It is noted the defendant was sentenced to 15
10   years to life July 17, 1989, for Superior Court case 1259,
     involving Second Degree Murder. Based upon the disposition in
11   that case, along with the defendant's repeated violations of the
12   law involving assaultive and theft-related offenses, he is not
13   considered an amenable candidate for probation.

14
     Although it is noted in the court minutes that the District
15   Attorney promised the defendant's sentence for the present cases
16   to run concurrent with Superior Court case 1259, in reviewing the
     criteria under Rule 25 involving concurrent of consecutive sen-
17   tencing, this officer will be recommending consecutive sentences.
18
19   RECOMMENDATION:
20
     It is therefore respectfully recommended probation be denied and
21   CHARLES LLYOD BROWN be committed to the Department of Corrections
22   for the computed term.
23
     Base Term              Penalty Range          Penalty Recommended
24
25   Case 1259:
     Ct. 1, 189 PC          15 years to Life       15 years to Life
26
     . . . . .
27

28

                                    -11-

1 | <u>Subordinate Terms</u>

2

3 | Case 1636:

Ct. 1, 245(a)(2) PC        2, 3, 4 years        1 yr. consecutive

4 | (2 yrs. stayed)

5

6 | Case 1635:

Ct. 1, 12020(a) PC        16 mos., 2, 3, yrs.    8 mos. consecutive

7 | (16 mos. stayed)

8

9 | <u>Enhancements</u>

10 | Case 1259, 12022.5 PC                          <u>2 years</u>

11

12 | TOTAL AGGREGATE TERM                            18 yrs./8 mos.

To Life

13

14

15 | It is further recommended defendant shall pay a RESTITUTION FINE

to the State Restitution Fund in the amount of $100 through the

16 | Placer County Revenue Services Division.

17 |                              Respectfully submitted,

18 |                              TED L. SMITH

19 |                              CHIEF PROBATION OFFICER

20

21 |                              MICHAEL A. SIPE

Deputy Probation Officer

22 | MAS/rlh

23 | July 27, 1989

· · · · · ·

24

25

26

27

28

1    Approved by:

2

3    H. JOHN BIXLER
     Probation Supervisor

4
         I have read and considered the foregoing report and
5    recommendation of the Probation Officer,

6

7    "and presented for signature    JAMES L. ROEDER
     and signed 8-7-89             JUDGE OF THE ABOVE ENTITLED COURT

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLACER COUNTY
PROBATION DEPT.

-13-

# EXHIBIT "C"

# MENTAL HEALTH EVALUATION FOR
## THE BOARD OF PRISON HEARINGS
### July, 2006 Lifer Calendar

## CORRECTIONAL TRAINING FACILITY SOLEDAD
### JUNE, 2006

| | |
|---|---|
| **NAME:** | **BROWN, CHARLES** |
| **CDC#:** | **E-25371** |
| **DOB:** | **1/23/53** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **4/23/88** |
| **SENTENCE:** | **17 YEARS TO LIFE** |
| **MEPD:** | **5/6/00** |
| **EVALUATION DATE:** | **6/1/06** |

## I.    IDENTIFYING INFORMATION:

Mr. Charles Brown is a 53 year old, first term, married, Caucasian male from
Placer County.  He is a Christian.  He has served 17 years in custody.

## SOURCES OF INFORMATION:

This evaluation is based upon a single one hour interview, plus review of the
central and medical files.

The psychological evaluation, dated 7/2/99, by Dr. Reed, Psychologist at CTF-
Soledad, contains a Psychosocial Assessment.  This information was reviewed
with the inmate and is still current and valid.  As a result, this information will not
be repeated at this time.

BROWN, CHARLES
E-25371
6/1/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Brown related during the interview in a serious, sober, non-defensive and cooperative manner. His mental status was within normal limits. His thinking was rational, logical, and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. His estimated level of intellectual functioning was in the average range. His memory was intact. His judgment was intact. His insight and self-awareness were good.

Mr. Brown explained that he was involved in the drug culture and biker culture when he was younger. These activities resulted in the commitment offense. He has been clean and sober for 12 years. This is after he obtained a disciplinary, in 1996, for possession of methamphetamine. He continues to attend Alcoholics Anonymous. He has also attended Narcotics Anonymous over the years. Drugs and alcohol are available in the institutional environment. The fact that he has remained clean and sober shows that he has matured, has good self-control, and is determined to avoid use of drugs in the future. Since he has remained clean and sober for 12 years, this no longer is a current diagnostic problem.

He has completed Vocational Welding with AWS certification. He also has completed his GED. In addition, he has attended Anger Management courses. He has completed the Project Change course. He stated that he enjoyed the Anger Management class, and he is planning to re-enroll in another one that will be offered in this facility.

There is no evidence of any mental or emotional problems in this case. There is no evidence of a personality disorder.

### CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 90 |

BROWN, CHARLES
E-25371
6/1/06
PAGE 3


## XIII.  REVIEW OF LIFE CRIME

Mr. Brown accepts full responsibility for the victim's death. He noted that he was very angry at the time. The victim had tried to kill him on three occasions. This fact is supported by the findings of the court. He stated that at the time he shot the victim, the victim had a gun in his hand. He admitted that he was enraged at the time of this offense. He stated that he shot the victim impulsively without premeditation. He stated that this offense was a terrible thing and that he was very sorry about it. He showed good understanding about how dangerous drugs and the drug culture are. His feelings of remorse regarding the commitment offense appear to be sincere and genuine.

## XIV.  ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, he did receive a disciplinary on 4/3/03 for battery without serious injury. He enrolled in Anger Management classes right after this offense. At this point in time, he does not appear to have anger management issues. As a result, compared to other inmates, violence potential is below average.

B. In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, disciplinaries, and current attitudes in order to determine current risk level on parole. He obtained a score of 6.6 cumulative frequency for prison inmates. This score means that if 100 men were released on parole, he would be expected do better on parole than 93 of them. This is a very low risk level. Also, his age, 53, would reduce this risk level. The age factor is not considered by this actuarial measure. Research has shown, based upon the US Department of Justice, statistics regarding recidivism rates for inmates on parole that over the age of 55, there is only 1.4 percent recidivism rate. The recidivism rate for lifers who have done many years in prison is even lower than that—less than 1 percent. Therefore, the potential for dangerous behavior at this point in his life, in comparison to the average citizen in the community, is below average.

C. At this point in time, there are no significant risk factors in this case.

**BROWN, CHARLES**
**E-25371**
**6/1/06**
**PAGE 4**

XV.    **CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS**

There are no mental or emotional problems in this case that would interfere with routine parole planning. He has excellent vocational skills in a trade that are highly valued in the community. He has job offers on file as a welder. He also has residence available in Sacramento with family members. No further programming is needed in this case. The prognosis for successful adjustment in the community in this case is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    **6/1/06**
T:    **6/2/06**

# EXHIBIT "D"

*C-file copy*

**LIFE PRISONER EVALUATION REPORT**
**SUBSEQUENT PAROLE CONSIDERATION HEARING**
**MARCH 2006 CALENDAR**


**BROWN, CHARLEY**                                      E25371


I.    **COMMITMENT FACTORS:**

    A.    **Life Crime:**  Murder 2nd, PC 187 with Use of a Firearm, PC 12020(a), Assault with a Firearm, PC 245(A).  Placer County Case #1259/1635/1636.  Sentence: 15 years to Life plus 2 years enhancement.  MEPD: 5/6/00.  Victim: Michael Konz, age unknown.  Received by CDC on 8/8/89.

        1.    **Summary of Crime:**  All relevant documents from the previous hearings including the transcripts have been considered and that information appears valid and the writer has no further information to add.

        2.    **Prisoner's Version:**  Remains the same as stated in the previous hearing.

        3.    **Aggravating/Mitigating Circumstances:**

            a.    **Aggravating Factors:**  Remains the same as stated in the previous hearing.

            b.    **Mitigating Factors:** Remains the same as stated in the previous hearing.

    B.    **Multiple Crime(s):**  None.

        1.    **Summary of Crime:** None.

        2.    **Prisoner's Version:**  None.


II.    **PRECONVICTION FACTORS:**

    A.    **Juvenile Record:** Remains the same.

    B.    **Adult Convictions and Arrests:**  Remains the same.

Sent to Inmate on 12/16/05

    C.    **Personal Factors:**  Remains the same.

LIFE PRISONER EVALUATI͟ REPORT
PAROLE CONSIDERATION HEARING
MARCH 2006 CALENDAR

2

III.    **POSTCONVICTION FACTORS:**

A.    **Special Programming/Accommodations:** None noted.

B.    **Custody History:** Documents from the previous hearings have been considered and that information remains valid. During the period of time since the last hearing (3/1/05), Brown's behavior has been positive in that he has remained disciplinary free. He is currently unassigned on the priority hire waiting list. He is a non-adverse transfer from CTF-North where he was assigned to the maintenance engineer shop.

C.    **Therapy and Self-Help Activities:** Brown has completed Anger Management.

D.    **Disciplinary History:** Brown has received four CDC 128A's and five CDC 115's. See disciplinary sheet for details.

E.    **Other:** A Subsequent Parole Hearing was held on 3/1/05. The BPT denied parole for one additional year and requested a new psych report.

Recommendations
1.  Get self help.
2.  Stay disciplinary free.
3.  Earn positive chronos.


IV.    **FUTURE PLANS:**

A.    **Residence:** Brown plans to reside with his daughter, Mindy Vita, 8766 Clay Glen Way, Elk Grove, California (916) 427-5370.

B.    **Employment:** Brown was a Journeyman Roofer for fourteen years prior to his incarceration and has completed the Vocational Welding Program. Brown has received job offers from California Bridge and Iron as a full time welder and United Rentals.

C.    **Assessment:** Brown has letters of support to validate his employment plans and has marketable work skills. He needs to update his support letters and residence plans prior to the hearing.


V.    **USINS STATUS:** No holds.


VI.    **SUMMARY:**


BROWN, CHARLEY          E25371              CTF-SOLEDAD          MAR/2006

LIFE PRISONER EVALUAT~~~ ~PORT                                                        3
PAROLE CONSIDERATION ~~~ ~ING
MARCH 2006 CALENDAR

    **A.**    Prior to release, Brown could benefit from: remaining disciplinary free, obtaining a job and participating in a self-help program.

    **B.**    This report is based upon a personal interview, incidental contact in the housing unit and a thorough review of the Central File.

    **C.**    Brown was afforded an opportunity to examine his Central File. See CDC 128B dated 12/2/05.

    **D.**    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

 

## DISCIPLINARY SHEET

### CDC 128A's:

| | | |
|---|---|---|
| 01/18/91 | FOL | Cell conditions. |
| 05/02/95 | MCSP | Unauthorized hobby craft. |
| 03/09/98 | SOL | Not in compliance with grooming standards. |
| 02/02/00 | CTF | Unexcused absence. |

### CDC 115's:

| 08/20/92 | FOL | 3033(A) | Alteration of State Issued Shoes; Guilty: Assessed $34.00 for replacement costs of Shoes. |
|---|---|---|---|
| 08/29/95 | MCSP | 3005(c) | Mutual Combat; Guilty: Assessed 90 days loss of credit. |
| 06/07/96 | MCSP | 3016 | Possession of Methamphetamines: Guilty: Assessed 150 days loss of credits and six months non-contact visiting. Placed on substance abuse program for six months. |
| 03/16/98 | CSP-SOL | 3005(b) | Failure to Comply with Grooming Standards: Guilty: Five days confined to Quarters, 30 days loss of night yard privileges. |
| 04/03/03 | CTF-C | 3005 | Battery Without Serious Injury: Guilty: Assessed 90 days credit forfeiture. |

BROWN, CHARLES              E25371                    CTF-SOLEDAD              MAR/2006

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
MARCH 2006 CALENDAR

4

_M. Rubio_   12-9-05
M. Rubio                              Date
Correctional Counselor I

_L.R. Baker, CCII(A)_   12-9-05
M. Arfa                               Date
Correctional Counselor II

_J.L. Clancy_   12/13/05
J.L. Clancy                           Date
Facility Captain

_D.S. Levorse, C&PR_   12-15-05
D.S. Levorse                          Date
Classification and Parole Representative

BROWN, CHARLEY           E25371              CTF-SOLEDAD           MAR/2006

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 03/05 to Present | | | **PLACEMENT**: CTF.<br>**CUSTODY**:  Medium A.<br>**VOC. TRAINING**:  None.<br>**ACADEMICS**: None.<br>**WORK RECORD**:  Assigned to Maintenance Engineer Shop until 10/6/05 due to non-adverse transfer to CTF-Central.<br>**GROUP ACTIVITIES**:  Completed Anger Management.<br>**PSYCH. TREATMENT**:  None.<br>**PRISON BEHAVIOR**:  Remained positive.<br>**OTHER**:  None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

M. Rubio CCI

DATE
12-9-05

BROWN, CHARLEY          E25371               CTF-SOLEDAD          MAR/2006

BPT 1004 (REV 7/86)                    Page   1

## DISCIPLINARY SHEET

**CDC 128A's:**

| | | |
|---|---|---|
| 1/18/91 | FOL | Cell conditions. |
| 5/2/95 | MCSP | Unauthorized hobby craft. |
| 3/9/98 | SOL | Not in compliance with grooming standards. |
| 2/2/00 | CTF | Unexcused absence. |

**CDC 115's:**

| | | | |
|---|---|---|---|
| 8/20/92 | FOL | 3033(A) | Alteration of State Issued Shoes; Guilty: Assessed $34.00 for replacement costs of Shoes. |
| 8/29/95 | MCSP | 3005(c) | Mutual Combat; Guilty: Assessed 90 days loss of credit. |
| 6/7/96 | MCSP | 3016 | Possession of Methamphetamines: Guilty: Assessed 150 days loss of credits and six months non-contact visiting. Placed on substance abuse program for six months. |
| 3/16/98 | CSP-SOL | 3005(b) | Failure to Comply with Grooming Standards: Guilty: Five days confined to Quarters, 30 days loss of night yard Privileges. |
| 4/3/03 | CTF-C | 3005 | Battery without serious injury: Guilty: Assessed 90 days credit forfeiture. |

BROWN, CHARLES          E-25371          CTF          DEC 2004

BOARD OF PRISON TERMS
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

X  PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 10/02 to 10/03 | | | **PLACEMENT**: Housed in general population at CTF with the exception of placement in ADSEG due to a battery on an inmate. **CUSTODY**: MED A. **VOCATIONAL TRAINING**: Remained assigned to vocational plumbing from September 7, 2002 to April 6, 2003. Brown was unassigned due to ADSEG placement. Inmate Brown did not receive any progress reports during this period. **ACADEMICS**: None. **WORK RECORD**: None. **GROUP ACTIVITIES**: None. **PSYCH. TREATMENT**: None. **PRISON BEHAVIOR**: Brown had remained disciplinary free until 4/31/03 incident. See RVR dated 4/3/03 battery without serious injury **OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                    DATE  10/18/04

BROWN, CHARLES        E-25371              CTF                DEC 2004

BPT 1004 (REV 7/86)                    Page _1_

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

CONTINUATION SHEET:  LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 10/03 to 8/23/04 | | | **PLACEMENT**: Remained housed in general population at CTF. **CUSTODY**: MED A. **VOCATIONAL TRAINING**:  None. **ACADEMICS**: None. **WORK RECORD**:  None.  Work group A2, privilege Group B effective 5/15/03. **GROUP ACTIVITIES**:  Brown is currently attending Anger Management and will be receiving a chrono stating such. **PSYCH. TREATMENT**: None. **PRISON BEHAVIOR**: Brown has remained disciplinary free during this period. **OTHER**:  None. |

ORDER:
- [ ] BPT date advanced by ___ months.
- [ ] PBR date advanced by ___ months.
- [ ] BPT date affirmed without change.
- [ ] PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
- [ ] Previously imposed conditions affirmed.
- [ ] Add or modify _____

- [ ] Schedule for Progress Hearing on appropriate institutional calendar

BROWN, CHARLES          E-25371            CTF            DEC 2004

BOARD OF PRISON TERMS                                                STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                        Page _2_

# EXHIBIT "E"

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

NAME and NUMBER     BROWN, C.          E25371          ZW-106L

You attended meetings for the Wednesday AA Central A Group for the 1st Quarter (Jan, Feb, Mar) 2006.
Since you began, you provide service to the Group with your attendance. Through this program, you are shown the tools
available to you. By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

Elected Position: None

J. Kramer
Group Staff Sponsor

Original : Central File
        cc: Staff Sponsor
            : Inmate

DATE:     4/5/06

Wednesday AA Central A  -LAUDATORY CHRONO

I/m Brown,    CDC No. E-25371


      I/m Brown, CDC No. E-25371, has voluntarily participated in the Project C.H.A.N.G.E. program. Project C.H.A.N.G.E. is an in-depth program that provides inmates with the tools to learn to live successfully within a community setting. I/m Brown was an active participant and has completed all of his assignments in a timely fashion. He has completed a 44 week course of study which includes: self-esteem & assertiveness, goal setting, anger management, coping skills, stress reduction, drug/alcohol abuse, tolerance, parenting, domestic violence, life skills, and parole & release. I/m Brown is to be commended for using his spare time to better himself and has received a certificate of completion for this course.


Orig:  C-File
  cc:   Writer       J. Stenner, Sponsor
        File         CTF North Library
        Inmate      CTF North Facility

November 9, 2004    (LAUDATORY - PROJECT C.H.A.N.G.E)



PROJECT CHANGE

Diploma of Graduation

Be It Known That

C. Brown

Has satisfactorily completed a 44 week course in Anger Management and is hereby awarded this certificate

Given at Soledad, CA this 9th day of November, Two Thousand 2004

Sponsor — J. Stenner
Ser. No. 0404

Coordinator — J. Selvidge, CCII

# CERTIFICATE OF PARTICIPATION

Presented to

## CHARLES LLOYD BROWN

For his outstanding effort and participation in the

### "THE ANGER WORKSHOP"

12-Week Self-Help Course

As prescribed by this ministry

With all rights, privileges, and honors thereto appertaining.

Given this 31st day of May, 2007, at Soledad, California

Dave Ewart
Course Instructor

Judge C. Lindsey
Protestant Chaplain



PROJECT CHANGE

Diploma of Graduation

Be It Known That

C. Brown

has satisfactorily completed 14 week
course in Anger Management and is
hereby awarded this certificate.

Given at Soledad, CA this ___9th___ day of
___November___, Two Thousand ___2004___

Sponsor — J. Stenner
Ser. No. 0404

Coordinator — J. Selvidge, CCII

I/m Brown, CDC No. E-25371, has voluntarily participated in the Project C.H.A.N.G.E. program. Project C.H.A.N.G.E. is an in-depth program that provides inmates with the tools to learn to live successfully within a community setting. I/m Brown was an active participant and has completed all of his assignments in a timely fashion. He has completed a 44 week course of study which includes: self-esteem & assertiveness, goal setting, anger management, coping skills, stress reduction, drug/alcohol abuse, tolerance, parenting, domestic violence, life skills, and parole & release. I/m Brown is to be commended for using his spare time to better himself and has received a certificate of completion for this course.

```
Orig:  C-File
  cc:  Writer           J. Stenner, Sponsor
       File             CTF North Library
       Inmate           CTF North Facility
```

November 9, 2004    (LAUDATORY - PROJECT C.H.A.N.G.E)

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS
CDC-128B (8-87)

| Name | BROWN, C.L. | CDC # | E-25371 | Housing | ZW-106L |

Mr. **BROWN, C.L.** E-25371, has completed the 12-week Anger Management Class, conducted in the Protestant Chapel. He now knows: the ways to handle anger; understand how pride, fear, loneliness and inferiority feed anger; uncovering the myths that perpetuate anger; identifying learned patterns of relating, thinking, and behaving in your life that influence your anger. The student accomplished the 13-Step Interactive Program and he now has the knowledge and understanding to deal with stress in a non-destructive manner. He is to be congratulated for his outstanding effort.

**ORIG**  C-FILE
**Cc**    Chaplain
          Inmate

Rev. Judge C. Lindsey
Protestant Chaplain
Correctional Training Facility

**Date:** 5/31/07    **LAUDATORY CHRONO**    **CTF-C**

---

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION
CDC-128-B (Rev.4/74)

| NAME and NUMBER | BROWN, C. | E25371 | ZW-106L |

**You attended meetings for the Wednesday AA Central A Group for the 1st Quarter (Jan, Feb, Mar) 2006.**
Since you began, you provide service to the Group with your attendance. Through this program, you are shown the tools available to you. By following 'The 12 Steps of Recovery' in your life, you can show your willingness to improve yourself.

Elected Position: None

J. Kramer
Group Staff Sponsor

Original : Central File
   cc: Staff Sponsor
     : Inmate

DATE:   4/5/06

**Wednesday AA Central A  -LAUDATORY CHRONO**

Charles Brown, E-25371
Correctional Training Facility
P.O. Box 689
Soledad, CA.
93960-0689



From: (061) 944-1646
Charles Brown / E-25371
Correctional Training Facility
PO Box 689
East Dorm 153-Low
Soledad, CA 93960

SHIP TO: (000) 000-0000
for the Northern Dist. of Cal.
United State District Court
450 GOLDEN GATE AVE
PO BOX 36060
SAN FRANCISCO, CA 94102

FedEx Ground

FOR UPS SHIPPING ONLY

Ship Date: 24JUL08
ActWgt: 2.0 LB
System# 4821272/INET8061
Account# S *******

Invoice #
Reference #
PO #
Dept #

Ship ID

Page 1 of 1

GND
Prepaid

(9612015) 8249197 10002469

015          1
DIRECT SIGN   of
              1

Charles Brown, E-25371
Correctional Training Facility
P.O. Box 689 / East Dorm 153-Low
Soledad, CA. 93960-0689


Dated this *17th* day of July, 2008


UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 Golden Gate Ave.
P.O. Box 36060
San Francisco, CA. 94102-3483


Re: PETITION FOR WRIT OF HABEAS CORPUS.

Dear Clerk of the Court,

    Enclosed please find a true copy of petitioner's PETITION FOR WRIT OF HABEAS CORPUS, to be filed in your court.

    Enclosed as well please a copy of the cover/caption sheet of my copy of this PETITION FOR WRIT OF HABEAS CORPUS to be stamped "filed" and returned in the S.A.S.E. I've provided.

    Please note as well that I've sent this PETITION FOR WRIT OF HABEAS CORPUS through a third party so that the $5.00 filing fee can be paid. I've provided PROOF OF SERVICE for chain of custody purposes. I've provided PROOF OF SERVICE from me to the third party signed by me and another signed by them PROOFING service of the petition to your court.

    Thank you for your attention to these matters. Your help is greatly appreciated.

Sincerely,

*Charles Brown*

Charles Brown, E-25371
Petitioner in Pro Se

```
DUPLICATE

Court Name: U.S. District Court, NDCA
Division: 3
Receipt Number: 34611021737
Cashier ID: sprinka
Transaction Date: 07/28/2008
Payer Name: charles brown
------------------------------------
WRIT OF HABEAS CORPUS
 For: charles brown
 Amount:        $5.00
------------------------------------
CHECK
 Check/Money Order Num: 11621175164
 Amt Tendered: $5.00
------------------------------------
Total Due:       $5.00
Total Tendered: $5.00
Change Amt:      $0.00

08-3596jf-pr


Checks and drafts are accepted
subject to collections and full
credit will only be given when the
check or draft has been accepted by
the financial institution on which
it was drawn.
```